IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Thomas B. McNamara

| | |
|---|---|
| **In re** <br><br> **STEVEN W. BLOOM,** <br> SSN:  XXX-XX-2156, <br><br> **Debtor.** | **Case No. 17-11650 TBM** <br> **Chapter 13** |
| **GLENCOVE HOLDINGS, LLC,** <br><br> **Plaintiff** <br><br> v. <br><br> **STEVEN W. BLOOM,** <br><br> **Defendant.** | **Adv. Proc. No. _____** |

**COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF CERTAIN DEBTS PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A) and (a)(6)**

Creditor-Plaintiff, Glencove Holdings, LLC ("Glencove"), by and through its undersigned counsel, for its Complaint for the determination of non-dischargeability of certain debts pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6), against Debtor-Defendant Steven W. Bloom ("Bloom"), hereby states and alleges as follows:

**JURISDICTION AND  VENUE**

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. 1334, Rule 7001(6) of the Federal Rules of Bankruptcy Procedure, and D.C. COLO. LCivR 84.1.  This is a core proceeding that may be heard and determined by this Court pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (I).

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**PARTIES**

3.     Creditor-Plaintiff, Glencove, is a limited liability company organized under the laws of the State of Texas, and a scheduled creditor in the above-captioned chapter 13 case (the "Chapter 13 Case").

4827-5267-9754.3

4. Debtor-Defendant, Bloom is a resident of Douglas County, Colorado with his principal residence at 6290 Ellingwood Point Way, Castle Pines, Colorado 80108.

## FACTUAL BACKGROUND

*A. The Underlying Scheme*

5. In early 2015, Glencove had determined that it wanted to pursue the purchase of a private corporate jet. Bloom, the president and chief executive officer of Bloom Business Jets, LLC ("BBJ"), contacted Glencove's principals in April 2015 via email offering the services of BBJ to locate and purchase an Aircraft. *See* April 6, 2015 Email from Steven Bloom, which is attached as Exhibit 1. Bloom and BBJ learned of Glencove and its search for a private corporate jet through Martin Orman ("Orman") of Aircraft Finance Corporation ("AFC"). *See* Exhibit 1.

6. Bloom maintained sporadic contact with Glencove's principals over the course of the next couple of months. In early July 2015, Mr. Bloom again contacted Glencove's principals regarding interest in a particular type of aircraft, proposing that Glencove consider purchasing a Hawker XP. *See* July 13, 2015 email from Bloom, which is attached as Exhibit 2. Even before he initiated that communication, however, Bloom knew a Hawker was available for sale by Loretto Aviation, LLC ("Loretto"), a company located in San Jose, CA. Bloom suggested that Glencove's goal should be to purchase this plane in a price range of $3.6 to $3.7 million. On July 23, 2015, Bloom sent Glencove information and photographs regarding Loretto's Raytheon Hawker 800XP, registration N137LA, serial number 258697 (the "Aircraft"). *See* July 23, 2015 email and Attachments from Bloom, which is attached as Exhibit 3. From this point until September 29, 2015, the Aircraft belonged to Loretto. *See* Federal Aviation Release of Lien for Loretto Aviation, LLC, which is attached as Exhibit 4, and Bill of Sale from Loretto to Big Horn Exploration, LLC which is attached as Exhibit 5.

7. In response to whether Bloom had researched any other available aircraft, Bloom indicated that he was looking into four planes, including the Hawker 800 XP. *See* July 24, 2015 email from Bloom, which is attached as Exhibit 6. However, Bloom really pushed Glencove towards purchasing the Hawker 800 XP even before presenting them with information for the other three aircraft. *See* Exhibit F. Bloom even went so far as to say that the Hawker 800 XP was his first choice of the four planes. *See* Exhibit 6. Additionally, Bloom represented that the "owner [was] motivated to sell." *See* Exhibit 6. However, Bloom intentionally never identified the owner of the Hawker 800 XP.

8. Based on Bloom's representations that the Hawker 800 XP was an "attractive" option, Glencove decided to purchase the Hawker 800 XP. *See* Exhibit 6. But Bloom and BBJ needed Glencove committed to the process. Under the guise of wanting to help Glencove, Bloom and BBJ convinced it to enter into an Agent Agreement for its brokerage and consulting services to locate and purchase an aircraft. *See* July 30, 2015 Agent Agreement, which is attached as Exhibit 7. Under the Agent Agreement, BBJ, through Bloom, agreed to act as the sole agent for Glencove on an exclusive basis; to use its best efforts to locate an aircraft available for immediate sale on terms and conditions that were mutually agreeable to Glencove and the seller of the airplane; to assist in contract negotiations between Glencove and the seller; to assist

in required inspections of the aircraft prior to purchase; and to provide its services under the agreement in a professional manner consistent with the applicable industry standards. *See* Exhibit 7, p. 1, Art. 2. In exchange, BBJ received a flat fee commission of $121,000.00. *See* Exhibit 7, p. 2, Art. 4. Although Glencove complied with its obligation to pay, Bloom and BBJ breached every single obligation they had and used their superior knowledge and contacts within the industry to concoct a plan, with help from others, to overcharge Glencove on the purchase of the Aircraft and subsequent pre-purchase inspections.

9. Over the course of the next several weeks, Bloom and BBJ provided Glencove with a series of intentional miscommunications that contained false and misleading material information relating to the Aircraft. Bloom and BBJ intended this campaign of disinformation to mislead Glencove regarding the owner of the Aircraft for sale and into over-paying for the Aircraft associated make-ready costs. Bloom and BBJ made these false statements and omissions with the intent that Glencove rely on them, which it did to its detriment. Some of these communications and omissions are outlined below:

   a. On August 7, 2015, Bloom advised Glencove that the "buy number goal" on the Hawker 800 XP "should be 3.6M little less a little more." *See* August 7, 2015 Email from Bloom, which is attached as Exhibit 8. In this same email, Bloom represented that major inspections for the Hawker 800 XP were more than 16 months away. *See* Exhibit 8.

   b. On August 8, 2015, Bloom represented via email that he made an initial offer for the Hawker 800 XP and that "the Selling agent called me this morning letting me know the offer went to the Owner." Again, at this point in time and until September 29, 2015, the Hawker 800 XP belonged to Loretto Aviation, although this was not known to Glencove. *See* Exhibits 4 and 5.

   c. On August 10, 2015, Bloom represented to Glencove that the "owner" of the Hawker 800 XP requested additional time to consider the offer, and that the offer would expire on August 11, 2015 at 5:00 p.m. (MST). *See* August 10, 2015 Email from Bloom, which is attached as Exhibit 9.

   d. On August 12, 2015, Bloom represented to Glencove that the "owner" of the Hawker 800 XP made a "final counter offer" of $3,775,000.00. *See* August 12, 2015 Email from Bloom, which is attached as Exhibit 10. In response to this email, and based on the representation that the owners of the aircraft were digging in their heels on the price, Glencove authorized a counter offer up to $3,550,000.00. *See* Exhibit 10. On August 13, 2015, Bloom represented that he had been "negotiating hard" "for the last three hours" with the owner of the Hawker 800 XP. *See* August 12, 2015 Email from Bloom, which is attached as Exhibit 11. Bloom represented that:

   > We've gotten close on the numbers right now we are within $40,000 . . . I'm working them over to deliver the plane with $60,000 worth of maintenance items completed if we

>> agree to the pricing of $3.595M. We are stuck now at this number Seller's not budging off this $3.595M.

> *See* Exhibit 11. Bloom then, shortly thereafter, represented to Glencove that the "seller" accepted a final offer of $3,550,000.00 for the Aircraft. Again, Bloom intentionally did not disclose the identity of the "seller" at any time during the alleged "negotiations."

> e. On August 14, 2015, BBJ and Bloom entered into a Letter of Intent with Loretto Aviation, LLC ("Loretto") for BBJ and Bloom, rather than Glencove, to purchase the Aircraft for a purchase price of $3,300,000.00. *See* Exhibit 12. Bloom's and BBJ's co-conspirator, Brad Rose, was aware of this transaction as he was copied on the letter of intent by Bloom and BBJ in an email of the same date. *See* the documents labeled (Bloom 702), attached along with Exhibit 12.

10. As evidenced above, through their deceptions, Bloom and BBJ obtained Glencove's commitment to purchase the Aircraft for $3,550,000.00 even though they knew that the owner of Aircraft, Loretto, was willing to sell the plane and did sell the plane to Bloom and BBJ for $250,000 less. Bloom and BBJ, made it seem as if various offers and counter-offers were being made and that the seller was driving a hard bargain, all in an effort to convince Glencove to offer more than the seller actually wanted for the Aircraft. Bloom/BBJ never actually provided Glencove with any of the alleged correspondence with the seller. Nor did Bloom ever tell Glencove that he had already agreed to purchase the Aircraft from Loretto for much less than he had convinced Glencove to offer. Rather, Bloom only provided summaries of the alleged negotiations, leading Glencove to believe that Bloom and BBJ were acting in its best interests, when clearly they were not.

11. Even though Bloom and BBJ had already duped Glencove in to offering more to purchase the Aircraft than Loretto actually wanted, Bloom and BBJ had the audacity to ask Glencove to preemptively wire a $100,000.00 deposit to Insured Aircraft Title Service ("IATS") as a down payment on its expected purchase of the plane. Glencove completed the wire transfer to IATS on August 14, 2015. *See* August 14, 2015 email from Glencove's representative, Jennifer Pierce, which is attached as Exhibit 13. Immediately thereafter, and with the consent of Bloom and BBJ, IATS, through Angie Risley, the assistant to the President of IATS, Kirk Woford, sent confirmation to Loretto that $100,000.00 had been placed in the escrow account by Bloom and BBJ for the purchase of the Aircraft. *See* Exhibit 14. In other words, Bloom and BBJ, with the help of IATS, used Glencove's money to satisfy their own down payment obligation to Loretto. IATS acted as the escrow agent for Glencove's funds, receiving them directly from Glencove, under an obligation of trust. IATS then allowed Bloom and BBJ to use these funds for their own purposes of purchasing the Aircraft from Loretto. IATS violated its own escrow obligations and the trust of Glencove by allowing Bloom and BBJ to use the funds for purposes other than the purpose for which they were provided by Glencove.

12. Not only did IATS impermissibly allow Bloom and BBJ to use funds held in escrow, it did so knowing that the contemplated transaction was underhanded. On the same day, Bloom and Risley communicated about keeping the Loretto agent in the dark about the fact that Glencove was to be the ultimate purchaser of the Aircraft. *See* August 14, 2015 emails from

Bloom to Risley, attached as Exhibit 15, where Bloom and Risely communicated about not identifying the purchaser to Loretto's agent.

13. Shortly thereafter, Bloom and BBJ began corresponding with Glencove about the steps required to complete the purchase of the Aircraft and to make it ready for delivery to Glencove. *See* Exhibit 16. As the next step in this process, Bloom forwarded a proposed Aircraft Purchase and Sale Agreement to Glencove. *See* Exhibit 17. This agreement listed Big Horn Exploration LLC ("Big Horn") as the seller and owner (which was not accurate at the time) of the Aircraft. It also reflected a sale price of $3,550,000 for the Aircraft, rather than the $3,300,000 for which Loretto actually agreed to sell the Aircraft to Bloom and BBJ. Glencove was never made aware that Loretto was the actual seller and owner. Brad Rose/Big Horn became knowing participants with Bloom and BBJ as the agreement was already signed by Brad L. Rose as manager for Big Horn.

14. The plan was certainly audacious in its scope. Big Horn/Rose did not even own the Aircraft at the time that they agreed to "sell" it to Glencove. It was not until almost a week later, on August 31, 2015, that Big Horn, through its manager Rose, even signed an agreement to purchase the Aircraft from Loretto, again for the discounted sum of $3,300,000.00 that was never disclosed to Glencove. *See* Aircraft Purchase and Sale Agreement between Loretto Aviation and Big Horn, which is attached as Exhibit 18.

15. That seeming incongruity in the plans caused them very little concern at the time. Bloom, BBJ, Rose, Big Horn and IATS moved forward with their plan and had Glencove agree to commit to pay significant and non-refundable sums to Haggan Aviation ("Haggan") for a pre-purchase inspections on the Aircraft. Bloom and BBJ convinced Glencove to use Haggan Aviation ("Haggan") to complete the pre-purchase inspections. Over the course of the next several weeks, Haggan identified a number of difference repairs that it felt needed to be addressed on the Aircraft. These proposed repairs were all identified in work order number RS14116 dated September 17, 2015. *See* Exhibit 19.

16. This work order identified approximately $68,000 worth of air worthy items in need of attention during the pre-buying inspection. *See* Exhibit 18. According to Bloom and BBJ, these were all items/repairs that should have been paid for by the seller. Less than a week before the actual closing on September 29, 2015, however and unknown to Glencove, Bloom was still negotiating terms of the sale with Loretto's agent, Fred Cei, and trying to address how to account for these pre-purchase inspection items. For instance, on September 23, 2015, Bloom corresponded with Cei about whether or not there should be a discount on the sales price because of the "looming 48 month landing gear and structures" inspection and overhaul that would be required shortly after the closing. *See* Exhibit 20. This information contradicted the representations that had been made by Bloom and BBJ to Glencove that no major inspections or overhauls would be due before 2017. Instead, the mandatory 48 month landing gear inspection and overhaul cost Glencove over $210,000 in 2016. Haggan also identified an issue with the batteries, a pre-buy condition that the seller should have covered, but Glencove was subsequently charged for a new battery for the plane in the amount of $8,883. *See* Exhibit 21. Haggan also identified an issue with one of the thrust reversers (again, a pre-buy condition that the seller should have covered), but for which Glencove was subsequently charged for part returns related to the issue in the amount of $515. *See* Exhibit 22.

-5-

17. Apparently, however, Fred Cei, on behalf of Loretto, refused to negotiate further with respect to the price or with respect to air worthy items on the Aircraft. *See* Exhibit 23. That was certainly its right, but the proper course of action would have been to disclose that intransigence with your client and seek input on whether to proceed. Of course, none of that happened. To have done so would have killed the deal entirely and jeopardized the $250,000 windfall from the undisclosed flip sale. Bloom, BBJ, Rose and Big Horn needed the sale to go through because they had already committed to purchase the Aircraft. As a result, the deal went forward with Bloom and BBJ having Glencove pick up the tab for most if not all the airworthy items that Haggan identified. Of course, none of this information was disclosed to Glencove at any time. Of equal concern is the fact that at least some of the items Haggan identified in the work order were not actually attended to at the time. For instance Haggan identified fuel leaks on the plane on September 24. *See* Exhibit 24. There is no record that Haggan ever repaired any fuel leak on the Aircraft, although Glencove was charged for it. Had any of the foregoing information been disclosed, Glencove and its principles would never have agreed to enter into any of the series of transactions.

18. On September 29, 2015, IATS finalized the closing documents between Loretto Aviation and Big Horn. *See* Exhibit 25. These closing documents were all signed by Brad Rose on behalf of Big Horn. *See* Exhibit 25. Loretto then transferred title to the Aircraft to Big Horn. *See* Exhibit 5. Big Horn then flipped the Aircraft to Glencove on the same day. *See* Aircraft Bill of Sale between Big Horn and Glencove, which is attached as Exhibit 26. IATS handled both closings and the scheme to defraud Glencove of several hundred thousand dollars was thus complete.

19. Through concerted actions, Bloom and BBJ, with assistance from others, willfully and maliciously obtained an improper benefit from Glencove under false pretenses by taking advantage of its trust, making material false representations, and failing to disclose their serious misdeeds and by placing their personal interests over their client's interest, all amounting to fraud.

### B. *The Mismanagement of the Aircraft*

23. Unfortunately for Glencove, it did not discover this scheme until much later and only after it had already committed itself to the subsequent aircraft management agreement with BBJ on November 12, 2015. See Exhibit 27. Glencove funded the management agreement on or about November 25, 2015 by wire transfer.

24. The management agreement required BBJ to, among many other things, properly crew and manage the maintenance on the Aircraft, specifically including the engine manufacturer's continuing maintenance program. BBJ also agreed to negotiate the "best pricing available" for fuel at Hobby Airport in Houston, Texas, where the Aircraft is based. However, BBJ/Bloom breached the management agreement in all three of these critical areas, despite repeated efforts by Glencove to ensure compliance. At all times, Glencove complied with its payment obligations under the Aircraft Management Agreement.

4827-5267-9754.3

25. The management agreement also required BBJ/Bloom to provide Glencove, by the tenth day of each month, an invoice for all costs and expenses incurred since the previous invoice. Despite repeated efforts by Glencove to obtain such invoices in a timely manner, BBJ/Bloom failed to provide them, and in fact delayed presentation of many such invoices for months, even though they were available to BBJ. This made it impossible for Glencove to properly account for the operational costs of the Aircraft. BBJ/Bloom often billed multiple times for the same services or goods, and frequently charged Glencove for goods or services that were not actually provided, or that had already been paid directly to third party vendors by Glencove. Serious errors—many of which appeared to be intentional—were consistently and frequently found in BBJ's charges.

26. In early May 2016, Glencove notified BBJ and Bloom it was terminating the management agreement. Soon thereafter, BBJ/Bloom began inundating Glencove with invoices for payments that seemed to come out of nowhere. Some of the invoices dated back to October of 2015. Many were for charges Glencove had already paid. Some were double billed; some were for charges that Glencove had already paid to third parties.

27. When Glencove objected, and requested backup documentation for the charges, BBJ responded by illegally using the Texas Property Code, Sec. 70.301 et seq., to file a lien with the Federal Aviation Administration. This lien, in the amount of $48,131.65, was filed on June 21, 2016, before Glencove was even required by the Agreement to pay all of the "invoices" upon which it was allegedly based. For several weeks thereafter, Glencove showed Bloom example after example of improper and incorrect billing it had received from Bloom, in a good faith effort to determine the correct amount owed, if any. As a clear example of the fraudulent and/or incompetent bookkeeping done by Bloom, Glencove later learned that BBJ filed "amended" liens to try to correct its obviously flawed accounting errors. Bloom never even informed Glencove of the amended lien filings, which Bloom only discovered when contacted by the mortgage holder on the Aircraft. Regardless, the liens were illegally filed under Texas law because neither Bloom nor BBJ met the criteria.[1] Bloom's and BBJ's illegal actions required considerable effort on the part of Glencove to have the liens removed, including initiating a declaratory judgment action in Texas to remove the liens and quiet title, handling an interlocutory appeal and writ of mandamus for the Texas lawsuit, and paying sums to BBJ that were not due in order to have the liens released and avoid foreclosure by Glencove's mortgage holder.

C. *Bloom's Chapter 13 Case*

28. On March 3, 2017, Glencove filed a third-party complaint against Bloom and others in the District Court for Pitkin County, Colorado, Case No. 2016CV30114 (the "State-Court Complaint"), premised on the same acts and omissions as this action.

29. Bloom immediately responded by commencing the Chapter 13 Case on the same day in this Court.

---

[1] Under the Texas Property Code, a person may place a lien on an aircraft only if that person stores, fuels, repairs, or maintains the aircraft. Bloom and BBJ did none of those things.

-7-

4827-5267-9754.3

30. Glencove filed a proof of claim in the chapter 13 case on June 13, 2017 [Claim No. 7-1] (the "Claim"). The Claim asserts claims against Bloom for the same damages sought in the State-Court Complaint. This action seeks a judgment of non-dischargeability of those damages and debts, some of which continue to accrue.

31. Bloom filed his Amended Chapter 13 Plan on May 31, 2017 [Docket No. 21] (as may be further amended, the "Plan").

32. Glencove filed a limited objection to confirmation of the Plan on June 14, 2017 [Docket No. 27].

## CLAIMS FOR RELIEF

### FIRST CLAIM OF RELIEF
**(Non-Dischargeability of Debt Under 11 U.S.C. § 523(a)(2)(A))**

33. Glencove hereby incorporates all previous allegations above as if fully set forth herein.

34. 11 U.S.C. § 523(a)(2) provides that "[a] discharge . . . does not discharge an individual debtor from any debt – . . . for money, property, [or] services . . . to the extent obtained by – (A) false pretenses, a false representation, or actual fraud[.]"

35. Bloom is an individual debtor.

36. The money and property provided by Glencove were obtained by Bloom with false pretenses, false representations, and/or actual fraud and Bloom's debts to Glencove arising from the provision of such money and property are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

37. Specifically, Bloom made false representations and/or material omissions to Glencove regarding his service as an agent for Glencove to broker the purchase of the Aircraft. Bloom made these false representations and/or material omissions with the intent to deceive Glencove. Glencove relied on the representations and/or material omissions, and Glencove's reliance was justifiable. Bloom's representations and/or omissions caused Glencove to execute the Agent Agreement, and pay a commission of $121,000.00 (the "Commission").

38. Bloom also made false representations and/or material omissions to Glencove during the negotiations for, and at the closing of, the purchase of the Aircraft. Bloom made these false representations and/or material omissions with the intent to deceive Glencove. Glencove relied on the representations and/or omissions, and Glencove's reliance was justifiable. Bloom's representations and/or omissions caused Glencove to overpay to buy the Aircraft in the amount of $250,000, pay other pre-purchase inspection charges in the amount of $68,000, pay a loan origination fee to AFC in the amount of $25,915, and to incur extra interest on the AFC loan in the amount of $18,000 (collectively, the "Overpayments").

39. Bloom also made false representations and/or material omissions to Glencove related to its management of the Aircraft pursuant to the Aircraft Management Agreement. Bloom made these false representations and/or material omissions with the intent to deceive Glencove. Glencove relied on these false representations and/or material omissions, and Glencove's reliance was justifiable. Bloom's representations and/or omissions caused Glencove to pay monies to Bloom which were not owed ($15,000), and to pay money to Bloom to remove an unlawful lien associated with this unfounded debt ($13,143.57) (collectively, the "Management Payments").

40. A judgment of non-dischargeability should be entered by the Court in favor of Glencove and against Bloom pursuant to 11 U.S.C. § 523(a)(2)(A) with respect to Bloom's debts of the Commission, the Overpayments, the Management Payments, and any associated, recoverable interest, attorneys' fees, costs, and expenses, constituting money and property provided by Glencove as a result of Bloom's false pretenses, false representations and/or omissions, and fraudulent actions and/or omissions.

**SECOND CLAIM OF RELIEF**
**(Non-Dischargeability of Debt Under 11 U.S.C. § 523(a)(6))**

41. Glencove hereby incorporates all previous allegations above as if fully set forth herein.

42. 11 U.S.C. § 523(a)(6) provides that "[a] discharge . . . does not discharge an individual debtor from any debt – . . . for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"

43. Bloom is an individual debtor.

44. Bloom willfully and maliciously injured Glencove and its property by making false representations and/or material omissions to Glencove in his service as an agent for Glencove to broker the purchase of the Aircraft, extracting from Glencove the Commission.

45. Bloom willfully and maliciously injured Glencove and its property by making false representations and/or material omissions to Glencove during the negotiations for, and at the closing of, the purchase of the Aircraft, causing Glencove to pay the Overpayments.

46. Bloom willfully and maliciously injured Glencove and its property with respect to management of the Aircraft pursuant to the Aircraft Management Agreement, causing Glencove to pay the Management Payments.

47. A judgment of non-dischargeability should be entered by the Court in favor of Glencove and against Bloom pursuant to 11 U.S.C. § 523(a)(6) with respect to Bloom's debts of the Commission, the Overpayments, the Management Payments, and any associated, recoverable interest, attorneys' fees, costs, and expenses, from the willful and malicious injury by Bloom to Glencove and its property.

4827-5267-9754.3

WHEREFORE, Creditor-Plaintiff, Glencove Holdings, LLC, respectfully requests that the Court enter judgment in its favor and against Debtor-Defendant, Steven W. Bloom, on the claims asserted herein and award the following relief:

(a) entry of a judgment declaring Bloom's debts for the Commission, the Overpayments, the Management Payments, and any associated, recoverable interest, attorneys' fees, costs, and expenses, non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and/or (a)(6);

(b) entry of a judgment awarding monetary damages against Bloom and in favor of Glencove for the Commission, the Overpayments, the Management Payments, and any associated, recoverable interest, attorneys' fees, costs, and expenses; and

(c) any such other and further relief to Glencove that the Court deems just and appropriate, including Glencove's reasonable attorneys' fees and costs incurred in this action, to the extent recoverable.

Respectfully submitted this 19th day of June, 2017.

KUTAK ROCK LLP

*/s/ Adam L. Hirsch*
Adam L. Hirsch (Colo. 44306)
Mark C. Willis (Colo. 31025)
Kutak Rock LLP
1801 California St., Suite 3000
Denver, CO 80202
Telephone: (303) 297-2400
Facsimile: (303) 292-7799
Email: adam.hirsch@kutakrock.com

ATTORNEYS FOR CREDITOR
GLENCOVE HOLDINGS, LLC