## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| STEVEN W. BLOOM, | ) | Case No.  17-11650-TBM |
| Debtor. | ) | Chapter 11 |
| ―――――――――――――― | ) | |
| | ) | |
| GLENCOVE HOLDINGS, LLC, | ) | Adv. Proc. No. 17-1255 TBM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN W. BLOOM, | ) | |
| Defendant. | ) | |
| | ) | |

## MOTION FOR SUMMARY JUDGMENT

Steven W. Bloom ("Mr. Bloom"), through counsel, respectfully moves this Court for Summary Judgment in his favor denying Glencove Holdings, LLC's Complaint, pursuant to Fed.R.Civ.P. 56, incorporated by Fed.R.Bankr.P. 7056, and states as follows:

### I.  INTRODUCTION

On March 3, 2017, Mr. Bloom filed a voluntary petition for bankruptcy under chapter 13 of the Bankruptcy Code.   Pre-petition, Glencove Holdings, LLC ("Glencove" or "Plaintiff") commenced an action against Mr. Bloom with a Third-Party Complaint filed in the District Court for Pitkin County, Colorado ("State Court") Case No. 2016CV30114.  Glencove also filed a proof of claim in the underlying bankruptcy case asserting it was a creditor.  Mr. Bloom objected to Glencove's claim in his bankruptcy case.

-1-

On June 19, 2017, Glencove initiated this proceeding by filing a Complaint for Determination of Non-Dischargeability of Certain Debts ("Complaint").  Glencove asserted two claims of non-dischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).  Glencove's dischargeability claims arise out of the same facts and circumstances as pled in its Third-Party Complaint in the State Court.[1]

Mr. Bloom seeks Summary Judgment against Glencove asking the Court to dismiss Glencove's claims for non-dischargeability and all other claims alleged against Mr. Bloom as a matter of law.  Based on the absence of evidence showing a genuine dispute of material fact, Mr. Bloom asks this Court to grant summary judgment in his favor.

## II.  STANDARD OF REVIEW

### A.    Summary Judgment Standards

Fed.R.Civ.P. 56(c), applicable under Fed.R.Bankr.P. 7056, provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The moving party has the initial burden to establish no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party may carry this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning as essential element of the

---

[1] Mr. Bloom and the other defendants in the State Court case have also sought summary judgment on all of the claims brought against all defendants. The State Court has not yet ruled on that pending motion for summary judgment. Glencove sought a stay in the State Court of that motion.

nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(c)). *See also, Whitesel v. Sengenberger*, 222 F.3d 861, 866-67 (10th Cir. 2000); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). Once the moving party informs the court of the basis for its motion and identifies those portions of the record, discovery responses, and affidavits, which it believes demonstrate the absence of a genuine issue of material fact, the burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 250. *See also, Thom v. Bristol-Meyers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

To meet its burden, the non-moving party must "go beyond the pleadings and present some type of evidentiary material in support of its motion." *Anderson*, 477 U.S. at 250. The ""mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Id.* at 247-48 (emphasis in original). Moreover, "[f]ailure of proof of an essential element renders all other elements, and the facts that support them, immaterial." *Koch v. Koch Indus. Inc.,* 203 F.3d 1202, 1236 (10th Cir.), cert. denied, 531 U.S. 926 (2000).

**B.    Burden of Proof for Dischargeability Claims**

The standard of proof for an action under Section 523(a) is the ordinary preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).  The Plaintiff bears the burden of proving all of the elements of the Section 523(a) claims. *Id.  See also, Fowler Bros. v. Young*, 91 F.3d 1367 (10th Cir. 1996), *In re Smith*, 472 B.R. 833 (Bankr.D.Colo. 2012)(Tallman, J.).  "Exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *In re Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008) (quotation omitted).

### III.  ELEMENTS OF CLAIM TO BE PROVEN

**A.      First Claim for Relief, 11 U.S.C. §523(a)(2)(A)**

To prove a claim is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), the Plaintiff must show:

> (1) the debtor made a false representation;
>
> (2) the debtor made the representation with the intent to deceive the creditor;
>
> (3) the creditor relied on the representation;
>
> (4) the creditor's reliance was justifiable; and
>
> (5) the debtor's representation caused the creditor to sustain a loss.

*Field v. Mans*, 516 U.S. 59, 69 & n. 9 (1995); *In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009); *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

**B.      Second Claim for Relief, 11 U.S.C. §523(a)(6)**

For a debt to be non-dischargeable under 11 U.S.C. § 523(a)(6), the Plaintiff must prove, "a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury."  *In*

*re Smith*, 321 B.R. 542, 546 (Bankr.D.Colo. 2005) (emphasis in original)(citing *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998)).

"Willful" and "malicious" under 11 U.S.C. § 523(a)(6) are two, distinct elements. *In re Gagle*, 230 B.R. 174, 179 (Bankr.D.Utah 1999); *In re Longley*, 235 B.R. 651, 655 (10th Cir.BAP1999)(stating "the phrase 'willful and malicious injury' has been interpreted as requiring proof of two distinct elements—that the injury was both 'willful' and 'malicious.'").  Thus, nondischargeability under 11 U.S.C. § 523(a)(6) requires the plaintiff to "establish that the Debtor's conduct was both willful and malicious." *In re Gagle*, at 179,

Because 11 U.S.C. § 523(a)(6) requires both willful and malicious injury, "[i]t is clear ... that a 'knowing breach of contract,' without more, does not create a debt which is non-dischargeable due to willful and malicious injury under § 523(a)(6)." *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 878 (Bankr.D.Colo.2004)(citing *Davis v. Aetna Acceptance*, 293 U.S. 328, 333 (1934) ("The discharge will prevail as against a showing of conversion without aggravated features."). *See also, Dorr & Associates v. Pasek (In re Pasek)*, 129 B.R. 247, 252 (Bankr.D.Wyo.1991), aff'd, 983 F.2d 1524 (10th Cir.1993)("an intentional breach of contract, without more, is not sufficient to establish a willful and malicious injury for the purposes of § 523(a)(6).")

## IV.  STATEMENT OF MATERIAL FACTS

A.     **Facts From the Debtor's Bankruptcy Case**

1.     The Debtor filed for relief under Chapter 13 of Title 11 of the United States Code on March 3, 2017.  *See Case No. 17-11650-TBM, Docket No. 1.* (Mr. Bloom's bankruptcy case is hereinafter referred to as "Bloom BK Case.")

2.      On November 20, 2017, at his request, the Bankruptcy Court converted Mr. Bloom's

case to a case under Chapter 11.  *See Bloom BK Case, Docket No. 73.*

3.      On December 3, 2018, the Bankruptcy Court entered an order requiring all creditors

to file proofs of claim by January 7, 2019.  *Id., Docket No. 174.*

4.      Plaintiff filed a proof of claim in Mr. Bloom's bankruptcy case on June 13, 2017. *See*

*Bloom BK Case, Proof of Claim No. 7.*

5.      Mr. Bloom then filed an Objection to Plaintiff's proof of claim. *See Bloom BK Case,*

*Docket No. 32.*

6.      On February 11, 2019, Mr. Bloom filed his Amended Chapter 11 Plan of

Reorganization as well as his Amended Disclosure Statement. *Bloom BK Case,*

*Docket No. 200 & 201.*

7.      On April 5, 2019, the Bankruptcy Court approved Mr. Bloom's Amended Disclosure

Statement.  *Bloom BK Case, Docket No. 224.*

8.      On May 15, 2019, Mr. Bloom filed a Second Amended Plan of Reorganization.

*Bloom BK Case, Docket No. 244.*

9.      On May 23, 2019, the Bankruptcy Court entered an Order Confirming Debtor's

Second Amended Plan of Reorganization. *Bloom BK Case, Docket No. 258.*

10.     As provided in his Second Amended Plan, payments to Mr. Bloom's creditors will

come from his operation and income of his new company, Bloom Business Jets, Inc.

*Bloom BK Case, Docket No. 244, p. 10.*

11.     Mr. Bloom's bankruptcy case remains open and pending at this time pending

resolution of this proceeding. *See Bloom BK Case, Docket No. 290.*

**B.      Facts Relevant to This Proceeding**

12.     Mr. Bloom formed Bloom & Associates, LLC on or about January 17, 2001.  A copy of the Articles of Organization filed with the Colorado Secretary of State is attached hereto as **Exhibit 1** and incorporated herein by reference.

13.     On or about May 15, 2014, the name of Bloom & Associates, LLC was changed to Bloom Business Jets, LLC ("BBJ").  A copy of the Articles of Amendment filed with the Colorado Secretary of State is attached hereto as **Exhibit 2** and incorporated herein by reference.

14.     Mr. Bloom did business exclusively through BBJ from and after its formation until he filed for bankruptcy relief.  A copy of a Declaration of Mr. Bloom is attached hereto as **Exhibit 3** and incorporated herein (hereinafter "Bloom Decl."). *Bloom Decl. ¶ 6.*

15.     BBJ's business consisted of, among other things, brokering the sale of aircraft, aviation consulting services, certified appraisal services, and flight equipment sales. *Id.* ¶ 7.

16.     On or about August 6, 2015, Jennifer and Huw Pierce (the "Pierces") entered into an Agent Agreement with Bloom Business Jets, Inc.[2]  A copy of the Agent Agreement is attached hereto as **Exhibit 4** and incorporated herein by reference.

17.     Mr. Bloom signed the Agent Agreement as president of BBJ, not in any capacity for a company that was not yet in existence. *Id.* at 4.

---

[2] Bloom Business Jets, Inc. ("INC") was not in existence at this time.  INC was formed after Mr. Bloom commenced his bankruptcy case and is a different business, albeit wholly owned by Mr. Bloom.  Similarly, Glencove did not exist at the time; it was formed the next day. Thus, Mr. Bloom asserts the proper party to the Agent Agreement is LLC.

18.   Under the Agent Agreement, Mr. and Ms. Pierce owed indemnity obligations to BBJ. *Id.* at 2.

19.   The Agent Agreement provided that BBJ would provide brokerage and consulting services in connection with assisting the Pierces in locating and purchasing a Hawker 800 or similar mid jet from a third party.  *Id.* at 1.

20.   The Agent Agreement provides that "AGENT agrees not to communicate any information to BUYER in violation of proprietary rights of any third party." *Id.* at 3.

21.   Under the Agent Agreement, BBJ affirmatively represented that it would use its best efforts to locate an aircraft, assist in contract negotiations, and provide services in a professional manner consistent with industry standards. *Id. at 1.*

22.   Pursuant to the Agent Agreement, BBJ's relationship with Mr. and Ms. Pierce was that of an independent agent, and nothing in the Agreement was intended to or should be construed to create a partnership, agency, joint venture or employment relationship. *Id.* at 3.

23.   On or about September 29, 2015, Glencove entered into an Aircraft Purchase and Sale Agreement (the "Purchase Agreement") with Big Horn Exploration, LLC ("Big Horn") for the purchase of a certain Raytheon Model 800XP aircraft, manufacturer's serial number 258697 and currently bearing FAA Registration N133KS (the "Aircraft").  A copy of the Purchase Agreement is attached hereto as **Exhibit 5** and incorporated herein by reference.

24.   Section 4.1 of the Purchase Agreement states:

-8-

DISCLAIMER OF WARRANTIES.  THE AIRCRAFT IS A USED AIRCRAFT AND EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT SHALL BE DELIVERED TO, AND ACCEPTED BY, BUYER IN AN "AS IS" CONDITION. EXCEPT AS OTHERWISE PROVIDED FOR IN SECTION 2.1 HEREIN, SELLER DISCLAIMS AND BUYER HEREBY WAIVES ALL WARRANTIES, GUARANTEES OR REPRESENTATIONS OF ANY KIND OR NATURE, EITHER EXPRESSED OR IMPLIED, AS TO ANY MATTER WHATSOEVER ARISING BY LAW OR OTHERWISE, WITH RESPECT TO THE AIRCRAFT INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION WITH RESPECT TO AIRWORTHINESS OR CONDITION OF THE AIRCRAFT, ANY OBLIGATION OR LIABILITY IN TORT, NEGLIGENCE OR WITH RESPECT TO FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, LOSS OF USE OR PROFITS, OR INCIDENTAL OR CONSEQUENTIAL DAMAGES AND ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE.

*Id.* at 5 (emphasis in original).

25.    The Purchase Agreement has broad limitations, including specific provisions excluding many types of damages that may be recovered in the event of any alleged breach of such agreement. *Id. at 5.*

26.    Under the Purchase Agreement, Glencove agreed to pay any fees and expenses of any broker retained by Glencove in connection with transactions regarding the purchase of the Aircraft. *Id. at 8.*

27.    Glencove and BBJ entered into an Aircraft Management Services Agreement (the "Management Agreement") effective as of November 12, 2015.  A copy of the Management Agreement is attached hereto as **Exhibit 6** and incorporated herein by reference.

28.    Under the Management Agreement, BBJ also represented that it would manage the Aircraft pursuant to the terms and conditions of the Management Agreement.  *See Exh. 6, at 4.*

29.   The Management Agreement has a broad limitation of liabilities, which excludes many types of damages that may be recovered in the event of any alleged breach of such agreement. *See Exh. 5 at 10-11.*

30.   Under the Management Agreement, each party explicitly agreed that in no event shall either party be liable for any claimed indirect, special, incidental, consequential, or punitive damages, or for any damages consisting of damages for loss of use, revenue, profit, business opportunities and the like, or depreciation of value of the Aircraft. *Id.*

31.   The Management Agreement contains a jurisdiction and venue provision which provides that the courts of Pitkin County, Colorado have personal and subject matter jurisdiction over any dispute arising from such agreement. *Id.* at 12.

32.   Mid-May 2016, BBJ received notice from Glencove that Glencove desired to terminate the Management Agreement.  *Exh. 3, Bloom Decl. ¶ 14.*

33.   Glencove's Operating Account was negative at the time it tendered notice of termination, as it was at many times during the course of the management relationship, including at the very inception of the Management Agreement. *Exh. 3, Bloom Decl. ¶ 15.*

34.   Following termination, BBJ made numerous unanswered attempts for account reconciliation and reimbursement.  *Exh. 3, Bloom Decl. ¶ 16.*

35.   On June 21, 2016, in an effort to protect itself from non-payment of hangar rent, fuel and maintenance expenses by Glencove, pursuant to the Texas Property Code, BBJ filed a Mechanic's or Materialmen's Lien Statement with the FAA against the

Aircraft, which was domiciled in Texas. A copy of the Lien Statement is attached hereto as **Exhibit 7** and incorporated herein by reference.

36. Given the breakdown of communications and failure of attempts at settlement, on August 8, 2016, BBJ filed a lawsuit against Glencove in the District Court for Pitkin County, Colorado, Case No. 2016CV30114 ("State Court Action"). *Exh. 3, Bloom Decl. ¶ 18.*

37. After BBJ recorded its lien, on August 15, 2016, Glencove filed an action against BBJ in District Court in Harris County, Texas, Cause No. 2016-50795 (the "Texas Complaint"). *Exh. 3, Bloom Decl. ¶ 19.*

38. Ultimately, the Texas Court of Appeals ruled that all of the claims should have been transferred to Pitkin County, Colorado as set forth in the Management Agreement. *Exh. 3, Bloom Decl. ¶ 20.*

39. On March 3, 2017, Glencove filed a third-party complaint against Mr. Bloom and others in the pending State Court Action. *Exh. 3, Bloom Decl. ¶ 21.*

**C.     BBJ and Mr. Bloom's Expert Witness**

40. BBJ's expert witness, Mr. Jason Zilberbrand opined on the fair market value of the Aircraft at the time it was under contract to be purchased by the Pierces (and Glencove). A copy of the Expert Report of Jason Zilberbrand dated March 15, 2019, is attached hereto as **Exhibit 8** and incorporated herein by reference.

41. Mr. Zilberbrand opined conducted an independent valuation of the Aircraft. *Id.* at 15.

42. Mr. Zilberbrand determined that fair market value of the Aircraft was a range between $3,100,000.00 USD and $3,800,000.00 USD in 2015. *Id.* at 15.

43.    Mr. Zilberbrand also opined that the appraisal furnished to the financial institution supported the high retail market value of the aircraft backed by both a deposit and signed letter of intent to purchase. *Id.*

44.    He further opined that the financial institution should have ordered an independent appraisal of the aircraft to support its loan documentation, but nonetheless the appraisal fair market value and the purchase price are both within the range of what the aircraft was worth at the time it was purchased. *Id.*

45.    According to Mr. Zilberbrand, no set of ethical standards exist in General or Business Aviation creating guidelines for aircraft brokers. A copy of Mr. Zilberbrand's Rebuttal Report dated April 15, 2019 is attached hereto as **Exhibit 9.** *See Exh. 7, at 4.*

46.    Neither the National Business Aircraft Association's ("NBAA") guidelines nor the National Air Transport Association's ("NATA") ethical guidelines specifically address aircraft brokerage, nor were they intended to be regulatory standards, as aviation brokerage is unregulated. *Id.*

47.    Mr. Zilberbrand describes the NBAA as "nothing more than an industry trade association that lobbies on behalf of the interests of private and corporate jet owners" and that there are no by-laws governing the behavior of its members. *Id.*

48.    Mr. Zilberbrand further states that NATA is an advocacy group promoting safety related resources and does not have any authority to set industry guidelines for aircraft transactions. *Id.*

49.     The International Aircraft Dealer Association ("IADA"), formerly the National Aircraft Resale Association ("NARA"), is not a regulatory association nor does it have the authority to set industry guidelines. *Id.* at 5.

50.     Mr. Zilberbrand's Rebuttal Report also references an article published on the Forbes website in June of 2016, in which Johnny Foster, an expert retained by Glencove in this matter, was a key contributor as NARA's then Chairman. *See App. 3 to Exh. 9.*

51.     Specifically, the article states, "Aircraft brokers generally do not need to adhere to any standards of ethical conduct. Unlike licensed real estate brokers, aircraft brokers can operate outside the rules or without any rules." *Id.*

52.     BBJ's Appraisal of the Aircraft dated September 22, 2015, called for a current fair market value of $3,697,399.00 USD. A copy of BBJ's Appraisal is attached hereto as **Exhibit 10** and incorporated herein. *See Exh. 10, at 10.*

53.     Mr. Zilberbrand agreed with BBJ's conclusion and indicates the following in his report, "Based on my opinion and my own valuation of the aircraft back at the time of sale, I determined that fair market value was a range between $3,100,000.00 USD and $3,800,000.00 USD in 2015." *See Exh. 8, at 15.*

54.     Mr. Zilberbrand opines:

[i]t is important to note and highlight that confidentiality with regards to the agreement would be upheld except when required by a financial institution, lender, lawyer or accountant and that Bloom did in fact disclose the end buyer at the appropriate time during the normal course of business to insure the lender TruStone could indeed conduct its Know Your Customer (KYC) and compliance of the borrower.

*See Exh. 9, at 10.*

**D.     Material Facts From Glencove and its Representatives**

55.     On September 6, 2019, Mr. Huw Pierce provided sworn testimony to BBJ and Mr.

Bloom.  A copy of excerpts from Mr. Pierce's deposition transcript is attached hereto

as **Exhibit 11** and incorporated herein.

56.     Mr. Pierce testified as follows:

Q. Did Glencove purchase the aircraft in anything other than an as-is, where-is
condition, Mr. Pierce?
A. It did not buy it in an as-is, where-is condition. The contract doesn't say that.
Q. Does Glencove contend that the aircraft was purchased in anything except an as-is
condition?
A. We're back to the same argument. I've told you, the documents show that we
bought it in not an as-is condition. That's clear. That's a part of the record.

*See Exh 11, at 65:8-11; 128:9-14.*

57.     Mr. Pierce testified, "I had discovered that my agent had been hired by the very bank

that gave me the loan to appraise the aircraft. I was shocked because I did not know

that would be legal . . . " *See Exh. 11, at 86:10-13.*

58.     Mr. Pierce also testified, "We didn't have a reason not to pay [Bloom]. We were

going to pay him. We did pay him….It just looks, from what I can tell in the e-mails,

we got tied up." *See Exh. 11, at 184: 19-23.*

59.     Ms. Jennifer Pierce also provided sworn testimony on September 5, 2019. A copy

of excerpted portions of Ms. Pierce's deposition transcript is attached hereto as

**Exhibit 12** and incorporated herein.

60.     Ms. Pierce testified as follows:

Q. Do you know what the fair market value was of the aircraft in 2015, at the time
the aircraft was purchased by Glencove?
A. Well, it had to be 3.2, because that's what it sold for.

*See Exh. 12, at 80:6-10.*

-14-

61.   In an email dated September 8, 2015, Jennifer Pierce wrote to Martin Ormon, "As you know, I want this plane, so please do what it takes to make it happen". A copy of Ms. Pierce's Email of September 8, 2015 is attached hereto as **Exhibit 13** and incorporated herein.

62.   Ms. Pierce also told Mr. Bloom to "get it done".  A copy of Ms. Pierce's Email dated August 12, 2015, to Mr. Bloom is attached hereto as **Exhibit 14** and incorporated herein.

63.   Ms. Pierce confirmed that she authored these emails during her deposition. *See Exh. 12, at 143:10-14.*

64.   Ms. Pierce denied asking Mr. Bloom to appraise the Aircraft and further denied knowing how it came to pass that Bloom did the appraisal. *See Exh. 12, at 79:10-17.*

65.   Text messages between Mr. Ormon and Ms. Pierce show that Mr. and Ms. Pierce knew, unequivocally, that Mr. Bloom would perform the appraisal. Text Messages between Ms. Pierce and Mr. Ormon are collectively attached hereto as **Exhibit 15** and incorporated herein by reference.

66.   Mr. and Ms. Pierce even inquired about where to send Mr. Bloom's fee. *Id.*

67.   In September 2019, Mr. and Ms. Pierce confirmed that Glencove continues to operate the Aircraft with Steve McDowell as a contract pilot. *Exh. 11, at 73:14-19; Exh. 12, at 180:18- 181:5.*

68.   Mr. Pierce further stated that he monitors the status of the Aircraft and arranges for required maintenance, as well as Steve McDowell and Harco Aviation, a maintenance repair facility. *Exh. 11, at 74:14-18.*

# V.  ARGUMENT

Plaintiff's two claims for relief against Mr. Bloom fail for several reasons. First, Plaintiff cannot prove that it is a proper creditor of Mr. Bloom.

Second, Plaintiff's claim for fraud under §523(a)(2)(A) must fail because Plaintiff cannot meet its burden of proof.  The overwhelming quality and quantity of the undisputed evidence shows that Mr. Bloom committed no such fraudulent acts.

Third, Plaintiff's claim under §523(a)(6) also fails because Plaintiff cannot meet the higher burden of proof that any alleged injury was both willful and malicious.

## A.    Plaintiff's Claims Fail Against Bloom, an Individual Debtor.

Despite Plaintiff's contention that it entered into a valid and enforceable agreement with BBJ, the Agent Agreement actually reflects that the parties to the Agent Agreement are Jennifer and Huw Pierce, and Bloom Business Jets, LLC. *Exh. 3.*  Glencove Holdings, LLC did not exist at the time of execution of the Agent Agreement.  Accordingly, Glencove Holdings, LLC is not a party to the Agent Agreement and is, therefore, not the proper party to bring forth this claim for breach of the Agent Agreement.   Moreover, inconsistencies abound in the Agent Agreement as it names Bloom Business Jets, Inc. as the Agent in the agreement, yet it is signed by Steven Bloom as president of Bloom Business Jets, LLC.

In *Sago v. Ashford*, the Colorado Supreme Court held that where an individual, president of a corporation, signed an agreement by individual name without any designation of office which he held he was personally liable on signed agreement. 358 P. 2d 599 (Colo. 1961).  Analogously, Mr. Bloom signed the Agent Agreement and designated himself as president of Bloom Business Jets, LLC. *Exh. 4, at 4.*  Therefore, BBJ is liable on the contract signed by Mr. Bloom in his capacity as

president of BBJ.  Because Mr. and Ms. Pierce signed the Agent Agreement, they would have been the proper parties to bring claims against Mr. Bloom, and in fact would owe Mr. Bloom indemnity as set forth in that Agreement.

Nevertheless, Plaintiff is unable to demonstrate that BBJ breached the Agent Agreement in any aspect.  The obligations of BBJ under the Agent Agreement are as follows:

A.      Use its best efforts to locate Aircraft which is available for immediate sale under terms and conditions which are mutually agreeable to BUYER and SELLER.

B.      Assist in subsequent contract negotiations between BUYER and SELLER for the sale and purchase of such Aircraft.

C.      Assist in any visual or technical inspections of the Aircraft prior to the purchase thereof;

*See Exh. 4, at 1.* The Agent Agreement further provides that BBJ will "provide all services hereunder in a professional manner consistent with applicable industry standards." *Id.*

While BBJ asserts that it did, at all times under the agreement, act in a professional matter, it is relevant to point out that, from a legal or regulatory perspective, industry standards simply do not exist, and there are no statutes that apply to jet aircraft agency and/or brokerage. *Exh. 9, at 4.*

According Mr. Zilberbrand, no set of standards exist in General or Business Aviation creating guidelines for an aircraft broker to act ethically. *Id.* at 4.  Neither the NBAA guidelines nor the NATA ethical guidelines specifically address aircraft brokerage, nor were they intended to be regulatory standards, as aviation brokerage is unregulated. *Id.*  Mr. Zilberbrand describes the NBAA as "nothing more than an industry trade association that lobbies on behalf of the interests of private and corporate jet owners" and that there are no by-laws governing the behavior of its members. *Id.*

-17-

Mr. Zilberbrand further states that NATA is an advocacy group promoting safety related resources and does not have any authority to set industry guidelines for aircraft transactions. *Id.*

BBJ agreed to use its "best efforts" to locate an aircraft and provide services under the Agent Agreement in a professional manner consistent with "industry standards." Even though the Agent Agreement specifically sets forth the duties of each party, it does not define "best efforts" or "industry standards." Nevertheless, Plaintiff fails to demonstrate that Mr. Bloom or BBJ failed to perform nor has Plaintiff proved that it has suffered any damages as a result of BBJ's alleged failure to perform.[3] Nonetheless, Mr. Bloom, in his individual capacity, is not a party to the Agent Agreement and has no duties thereunder. Thus, Plaintiff fails to prove that Mr. Bloom or BBJ has breached the Agent Agreement.

Furthermore, Mr. Zilberbrand opines that the IADA is not a regulatory association nor does it have the authority to set industry guidelines. *Exh. 9 at 5.* His report also references an article published on the Forbes website in June of 2016, in which Mr. Johnny Foster, an expert retained by Glencove in this matter, was a key contributor as NARA's then Chairman. *See Exh. 9, at 4-5.* Specifically, the article states, "[a]ircraft brokers generally do not need to adhere to any standards of ethical conduct. Unlike licensed real estate brokers, aircraft brokers can operate outside the rules or without any rules." *Id.* Accordingly, Plaintiff fails to prove that Mr. Bloom did not provide services in a manner consistent with applicable industry standards. Moreover, Plaintiff makes no

---

[3] Other than seeking reimbursement of virtually every dollar spent on purchasing, operating, maintaining, insuring, and continuing to operate the Aircraft by Mr. and Ms. Pierce over a five-year period, Plaintiff offers, not only in this case but the state court case as well, very little legitimate or understandable explanations as to the basis or bases for the damages sought, including any specific manner in which they have allegedly been financially harmed as a result of any of the contracts setting forth the relationships presented in the ultimate purchase of the Aircraft, including paying less than fair market value for that Aircraft.

cognizable complaints regarding the mechanical status of the very low time Aircraft it purchased and continues to operate through today.

According to the terms of the Agent Agreement, there are no restrictions against BBJ, Mr. Bloom, or any entity under Bloom's ownership or control from either: (1) being the seller in the purchase and sale transaction of the Aircraft to Mr. and Ms. Pierce or Plaintiff or, (2) from deriving income in addition to the fee income from Plaintiff as a result of the transaction. Finally, Article 9 of the Agent Agreement (actually, a "non-agency" agreement, per the following) states that BBJ's relationship with Mr. and Ms. Pierce (or Glencove) "is that of an independent agent, and nothing in the Agreement is intended to or should be construed to: create a partnership, agency, joint venture or employment relationship." *Exh. 4, at 3.*

Plaintiff fails to prove that BBJ did not perform the contract, as demonstrated during the depositions of both Mr. and Ms. Pierce.  Mr. Pierce even categorically stated, "We didn't have a reason not to pay [Bloom]. *See Exh. 11, at 184:19*.  Ms. Pierce has repeatedly stated that the fair market value of the Aircraft in 2015 was $3.2 million. *See Exh. 12, at 80:6-10*.  However, Ms. Pierce frankly concedes that she is not an appraiser. *Exh. 12, at 81:2-5*. Ms. Pierce's professional background as a realtor and current employment in education fail to establish that she has any proficiency and/or expertise in aircraft valuations, appraisals, or transactions. *Exh. 12, at 15: 10-15*. As such, Ms. Pierce's conclusory statements regarding fair market value are merely opinions unsupported by the evidence.

To the contrary, BBJ's expert witness had another opinion regarding the fair market value of the Aircraft at the time it was under contract to be purchased by Mr. and Ms. Pierce, which was not contested by Plaintiff's expert, to wit:

-19-

> Based on my opinion and my own valuation of the aircraft back at the time of sale, I determined that fair market value was a range between $3,100,000.00 USD and $3,800,000.00 USD in 2015, and the appraisal furnished to the financial institution supported the high retail market value of the aircraft backed by both a deposit and signed letter of intent to purchase. In my opinion, the financial institution should have ordered an independent appraisal of the aircraft to support its loan documentation, but nonetheless the appraisal fair market value and the purchase price are both within the range of what the aircraft was worth at the time it was purchased.

*See Exh. 8, at 15.*

In an email dated September 8, 2015, Ms. Pierce wrote to Martin Ormon, "As you know, I want this plane, so please do what it takes to make it happen", as well as telling Steve Bloom to "get it done". *See Exh. 13, at 1.* Ms. Pierce also confirmed that she authored this email during her September 5, 2019 deposition. *See Exh. 12, at 143:10-14.* Based on the foregoing, it is evident that Mr. Bloom performed all of the obligations that Plaintiff may assert under the Agent Agreement. Plaintiff's claim for breach of Agent Agreement fails accordingly.

**B.      Plaintiff Cannot Meet its Burden of Proof on Its § 523(a)(2)(A) Claim**

Discharge under the general fraud provision requires that Plaintiff sufficiently prove that its debt was "obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

Actual fraud has two parts: actual and fraud. The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that 'involves moral turpitude or intentional wrong.' Thus, common law fraud done with wrongful intent is "actual fraud." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) (citation omitted).

To prove a claim for fraud, Plaintiff must prove the following elements: (1) that the defendant made a false representation of a material fact; (2) that the one making the representation

knew it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff. *Bristol Bay Prods., LLC v. Lampack*, 312 P. 3d 1155, 1160 (Colo. 2013).

To prove a claim for fraudulent concealment, Plaintiff must prove the following elements: (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of the fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *Ackmann v. Merchs. Mortg. & Tr. Corp.*, 645 P. 2d 7, 13 (Colo. 1982).

In order to prevail on a claim of fraudulent concealment, a plaintiff must show that a defendant actually knew of a material fact that was not disclosed.  It is not enough that the defendant should have or might have known this fact. *Ackmann*, 645 P. 2d at 16.  Additionally, the plaintiff must show that the defendant's intent was to cause the plaintiff to act differently than he might otherwise have done if the information had been disclosed. *Id.*  To establish a claim for fraudulent concealment or nondisclosure, the plaintiff must show that the defendant had a duty to disclose information. *Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo. 2018).

1.     *Fraud Claims are Barred as a Matter of Law*

The "economic loss rule" bars recovery on post-contractual claims for fraudulent concealment and fraudulent misrepresentation which arise out of contract rather than tort duties. *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282 (Colo. App. 2009); *see also Top*

*Rail Ranch Estates, LLC v. Walker*, 327 P. 3d 321 (economic loss rule barred fraud claims). Plaintiff claims that Mr. Bloom made false representations about and/or failed to disclose material facts regarding the ownership, market value, negotiations, sales price, as well as inspection and repair costs of the Aircraft.  All of these matters pertain to the Agent Agreement.

The Agent Agreement explicitly sets forth the obligations of BBJ to locate an Aircraft for sale under terms and conditions agreed upon by Plaintiff, to assist in contract negotiations for purchase of Aircraft and to assist in inspections prior to purchase of the Aircraft. *See Exh. 4, at 1.* As one would reasonably expect, management of the Aircraft is subject to the Management Agreement.  *See Exh. 6.*  Thus, the economic loss rule also applies to this specific claim regarding how the Aircraft would be and was being managed.  Accordingly, Plaintiff's fraud claims asserted against Mr. Bloom must be barred because they arise out of contractual duties set forth in both the Agent Agreement as well as Management Agreement.

2.    *Glencove Cannot Prove Any Material False Representations*

Plaintiff claims that Mr. Bloom made false representations about and/or failed to disclose material facts to Plaintiff regarding the ownership of the Aircraft, the market value of the Aircraft, the actual sales price of the Aircraft, the "negotiations" for the aircraft, inspection and repair costs related to the Aircraft, and how the Aircraft would be and was being managed. *Docket No. 1, Complaint, p. 3.*  Plaintiff alleges that "[Mr.] Bloom made false representations and/or material omissions to Glencove regarding his service as an agent for Glencove to broker the purchase of the Aircraft." *Docket No. 1, at  37.*  Plaintiff claims a debt of $121,000.00 as a result of executing the Agent Agreement based on Mr. Bloom's alleged representations and/or omissions (the "Commission"). *Id.*  Plaintiff further alleges that Mr. Bloom "made false representations and/or

-22-

material omissions to Glencove during the negotiations for, and at the closing of, the purchase of the Aircraft." *Id.* at 38. Plaintiff alleges that Mr. Bloom's representations and/or omissions caused Plaintiff to pay a total amount of $361,915.00 in "Overpayments". *Id.*

A claim for fraud cannot be based on the alleged non-performance of a promise or contractual obligation or upon the failure to fulfill an agreement to do something at a future time. *H & H Distrib., Inc. v. BBC, Int'l*, 812 P. 2d 659, 662 (Colo. App. 1990). Thus, any statements made by BBJ to Plaintiff as to its ability to procure an airplane for Mr. and Ms. Pierce cannot form the basis for any fraud claim as a matter of law.

### 3.   *Plaintiff Lacks Justifiable Reliance*

Under § 523(a)(2)(A), Plaintiff must show justifiable reliance, which is satisfied if the falsity of the representation relied upon is not patent from a cursory examination or investigation. *Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 686 (B.A.P. 10th Cir. 2006). If the plaintiff has access to information that would have led to the discovery of the true facts and such information was equally available to both parties, then plaintiff's reliance is not justified or reasonable as a matter of law. *See Colo. Coffee Bean, LLC v. Peaberry Coffee, Inc.*, 251 P. 3d 9 (Colo. App. 2010); *Balkind v. Telluride Mtn. Title Co.*, 8 P. 3d 581 (Colo. App. 2000); *see also M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380 (Colo. 1994).

Contrary to Plaintiff's assertions, Mr. Bloom accurately represented the current market value of the Aircraft to Plaintiff.  BBJ's Appraisal of the fair market value for the Aircraft was $3,697,399.00. *See Exh. 10 at 10.*  Mr. Zilberbrand agreed with BBJ's valuation.  Mr. Zilberbrand determined that a fair market value for the Aircraft was a range between $3,100,000.00 and $3,800,000.00 at the time of sale. *See Exh. 8, at 15.*

Prior to entering into the Management Agreement, Plaintiff could have readily determined the fair market value of the Aircraft by reviewing BBJ's Appraisal of the Aircraft. Mr. Zilberbrand confirms that BBJ's appraisal is similar to other NAAA appraisal reports that he has reviewed. *See Exh. 8, at 7.*

Based on the foregoing, Plaintiff is unable to prove that BBJ (let alone Mr. Bloom) made false representations and/or failed to disclose material facts about the market value of the Aircraft. Indeed, Mr. and Ms. Pierce continue to own and operate the Aircraft through today. *See Exh. 11 at* 23:14-24; 6; & 73:14-16.  If Plaintiff was actually economically damaged as a result of its purchase of the Aircraft it defies all logic that it would still own, let alone use, the Aircraft.   Therefore, Plaintiff's claim for a non-dischargeable fraud against Mr. Bloom must be dismissed.

4.       *Plaintiff's Fraud Claims Barred by Agency Law*

Mr. Bloom is not liable on the 11 U.S.C § 523(a)(2)(A) claim based on an agency relationship with BBJ nor any other individuals or entities. The question of whether agency principles are applicable to a claim under 11 U.S.C. § 523(a)(2) is an issue of law. *Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 681 (10th Cir. BAP 2006).  Plaintiff's against Mr. Bloom should be denied because he did not personally make the false representations upon which Plaintiff allegedly relied.  Rather, Mr. Bloom acted through BBJ, just as Mr. and Ms. Pierce acted through Plaintiff.

5.       *Neither BBJ nor Mr. Bloom fraudulently Concealed any Material Facts*

Plaintiff fails to adequately establish that BBJ (or Mr. Bloom) had a duty to disclose any information.  The terms and conditions of the Agent Agreement are explicitly made clear in Article 10 of the Agent Agreement. *See Exh. 4, at 3.*  Specifically, the Agent Agreement states that

-24-

"AGENT agrees not to communicate any information to BUYER in violation of proprietary rights of any third party." *Id.*   According to Mr. Zilberbrand, "[i]t is important to note and highlight that confidentiality with regards to the agreement would be upheld except when required by a financial institution, lender, lawyer or accountant and that [Mr.] Bloom did in fact disclose the end buyer at the appropriate time during the normal course of business to insure the lender TruStone could indeed conduct its Know Your Customer (KYC) and compliance of the borrower." *Id.*   at 10.   Plaintiff readily accepted the confidentiality provisions of the Agent Agreement.   As a result, Plaintiff was not entitled to information about third parties until closing.   Accordingly, Plaintiff's claim for fraudulent concealment and inducement should be dismissed.

Nonetheless, the economic loss rule also bars Plaintiff's claims for fraudulent concealment and inducement because such claims do not arise out of tort under circumstances where the duties of the parties are established by contract, as set forth in the section above on Plaintiff's fraud claims. The economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d at 1264. Fraud and misrepresentation claims are dependent on contract duties and are, thus, barred by the economic loss rule. *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P. 3d 1226, 1229 (Colo.App. 2012).   Moreover, Plaintiff has yet to identify any damages that were not directly related to its purchase of the Aircraft.   Since Plaintiff has asserted breach of contract claims against BBJ, it cannot bring independent claims for fraud when the facts and circumstances arise out of a contract.

**C.**   **Plaintiff Cannot Meet its Burden of Proof under 11 U.S.C. § 523(a)(6)**

Section 523(a)(6) of the Bankruptcy Code provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not subject to discharge. The Tenth Circuit has interpreted the phrase "willful and malicious injury" as requiring proof of two distinct elements-that the injury was both "willful" and "malicious." *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 654 (10th Cir. BAP 1999). Plaintiff has the burden of proof to establish that the debt is nondischargeable by a preponderance of the evidence. *In re Longley*, 235 B.R. at 655 (citation omitted). Failure of a creditor to establish either willfulness or malice renders the debt dischargeable. *Id.* (citing *Farmers Ins. Group v. Compos (In re Compos)*, 768 F. 2d 1155 (10th Cir. 1985)).

### 1.    Plaintiff Cannot Show its Injury was "Willful"

The word "willful" in Section 523(a)(6) modifies the word "injury," indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. at 61 (emphasis in original). To constitute a willful act under § 523(a)(6), the debtor must desire to cause the consequences of his act or believe that the consequences are substantially certain to result from it. *In re Moore*, 57 F. 3d 1125, 1129 (10th Cir. 2004).

Plaintiff has proffered no credible evidence to date that Mr. Bloom intended his actions to intentionally cause damages to Plaintiff. Indeed, a careful review of the damages claimed by Plaintiff in its Proof of Claim evidence that all such alleged losses are directly related to their purchase of the Aircraft. A purchase price which, according to the experts was at or below market value. Indeed, it was Mr. and Ms. Pierce who stressed the urgency for obtaining the Aircraft *at all cost.*

-26-

BBJ, through Mr. Bloom, performed exactly as it was contracted to do.  BBJ located the Aircraft which met Mr. and Ms. Pierce's requirements.  The purchase price for the Aircraft was well within market parameters.  BBJ was entitled to its commission upon the consummation of the sale.

Post-sale, Plaintiff failed to pay for all of the management costs of the Aircraft.  Plaintiff's actions led to the mechanic's lien on the Aircraft.  Clearly, Plaintiff failed to appreciate the complexity of the maintenance issues an airplane like the Aircraft requires.  Yet, Plaintiff continues to own and operate that Aircraft today.  Contrary to being struck in the nose by a fist, Plaintiff cannot prove by any competent evidence that BBJ and Mr. Bloom did anything other than what they were contracted to do.  Consequently, Plaintiff cannot meet the willfulness requirement of Section 523(a)(6).

### 2. Plaintiff Cannot Show that its Injury was "Malicious"

A malicious act is a wrongful act, done intentionally, without just cause or excuse. *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 880 (Bankr. D. Colo. 2004) (quotation omitted).

At all relevant times herein, Mr. Bloom acted in accordance with the terms and conditions set forth in both the Agent Agreement and Management Agreement.  Plaintiff cannot show any malicious act by Mr. Bloom causing injuries Plaintiff.  Rather, Plaintiff's alleged damages are from a breach of the Agency Agreement and Management Agreement.  Such breaches cannot support a claim of non-dischargeablity due to willful and malicious injury under § 523(a)(6)." *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. at 878.

### 3. Plaintiff Has Not Suffered any "Injury"

Section 523(a)(6) excepts from discharge only obligations arising from acts intended to cause injury. *In re Tinkler,* 311 B.R. at 880 (citing *Compos*, 768 F.2d at 1153). Debts arising from recklessly or negligently inflicted injuries do not fall within the compass of Section 523(a)(6). *Geiger*, 523 U.S. at 64. The debtor must also have intended to cause the particularized injury sustained by the plaintiff. *In re Tinkler*, 311 B.R. at 878-79.

Breach of a contract that appears to be an "innocent and technical" act rather than a "willful and malicious injury" fails to establish a debtor's subjective intent regarding the wrongful act of breaching the contract. *In re Delbert Joseph Militare*, 2011 WL 4625024, *3 (Bankr. D. Colo. Sept. 30, 2011).

Again, Plaintiff cannot prove it suffers any injuries other than based on the Agent Agreement and Management Agreement.  Plaintiff did not suffer a broken nose as a result of BBJ's (or Mr. Bloom's) actions.  Rather, its "injuries" are clearly monetary. Quite simply, Plaintiff (and Mr. and Ms. Pierce) is frustrated with the simple fact that BBJ and Mr. Bloom benefitted out of its purchase of the Aircraft.  Such discomfort is not a willful and malicious injury. *In re Moore*, 57 F.3d at 1129.

**D.     Plaintiff's Other Tort-Based Claims Against Mr. Bloom Fail**

Plaintiff's remaining bases for a claim in Mr. Bloom's bankruptcy case also fail for several reasons including lack of proof or being barred as a matter of law.

Where a "duty of care is created by, and completely contained in, the contractual provisions," a tort claim cannot stand. *See Grynbreg v. Agri Tech., Inc.*, 10 P. 3d 1267, 1270 (Colo. 2000). Again, there is no tort action for negligence where the only damages are for economic loss under the economic loss rule. *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256 (Colo. 2000).

-28-

Here, various contracts existed and governed the relationships between Plaintiff and BBJ, including the Agent Agreement and Management Agreement. The Aircraft Purchase Agreement did not govern the relationship between Plaintiff and Mr. Bloom in any aspect. Thus, by virtue of clear principles of law, Plaintiff's negligence and gross negligence claims cannot for the basis for a claim in Mr. Bloom's bankruptcy case. *See Wolfe*, 343 P. 3d at 22.

To prove a claim for negligent misrepresentation, Plaintiff is required to prove: (1) Mr. Bloom supplied false information in a business transaction; (2) Mr. Bloom failed to exercise reasonable care of competence in obtaining or communicating that information; and (3) Plaintiff justifiably relied upon the false information. *Campbell v. Summit Plaza Assocs.*, 192 P. 3d 465, 477 (Colo. App. 2008). Such a claim must focus on what a party "affirmatively represented, not what it failed to disclose." *Hildebrand v. New Vista Homes II, LLC*, 252 P. 3d 1159, 1167 (Colo. App. 2010).

Under the Agent Agreement, BBJ affirmatively represented that it would use its best efforts to locate an aircraft, assist in contract negotiations, and provide services in a professional manner consistent with industry standards. *See Exh. 4, at 1.* BBJ also represented that it would manage the Aircraft pursuant to the terms and conditions of the Management Agreement. *See Exh. 6, at 4.* BBJ performed the duties and obligations as set forth in each agreement, respectively. Furthermore, where a "duty of care is created by, and completely contained in, the contractual provisions," a tort claim cannot stand. *See Grynbreg v. Agri Tech., Inc.*, 10 P. 3d 1267, 1270 (Colo. 2000). Thus, Plaintiff's claims for negligent misrepresentation against BBJ and Mr. Bloom fail as a matter of law because no claim exists where a contract governs the parties' relationship.

-29-

To establish a civil conspiracy claim, Plaintiff must show the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result. *Nelson v. Elway*, 908 P. 2d 102, 106 (Colo. 1995) (citation omitted). *See also Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486 (Colo. 1989). A claim for civil conspiracy is a derivative cause of action; therefore, if the acts constituting the underlying wrong do not provide the basis for an independent cause of action, there is no cause of action for the conspiracy itself. *Double Oak Constr., L.L.C.*, 97 P.3d at 146. A plaintiff must present evidence of an agreement to form a conspiracy because a court will not imply a conspiracy. *More v. Johnson*, 568 P. 2d 437, 440 (Colo. 1977).

For its conspiracy claim, Plaintiff alleges that Mr. Bloom, BBJ, Big Horn and Mr. Brad Rose (Mr. Bloom's attorney), allegedly committed an unlawful act in purchasing the Aircraft and then selling it to Plaintiff. *See Docket No. 1, Complaint at 16.* Yet, Plaintiff has not, and cannot, show that back-to-back transactions in the purchase and sale of airplanes are illegal or unlawful. Rather, such transactions are a common and accepted occurrence in the industry. *See Exh. 8, pp. 17-18.*

Plaintiff asserts it was injured during its purchase transaction because BBJ and Mr. Bloom did not disclose the Aircraft was previously owned by Loretto Aviation, LLC ("Loretto"). *See Docket No. 1, Complaint, p. 2 & 9.* Similarly, Plaintiff was unaware that Big Horn was the seller of the Aircraft until Plaintiff was presented with the Purchase Agreement. *Id.* at 5. Plaintiff wholly fails to understand Colorado law.

Agents regularly act on behalf of undisclosed or unidentified principals and to do so is not fraudulent. *Rocky Mt. Exploration, Inc. v. Davis Graham & Stubbs LLP*, 428 P. 3d 567, 571 (Colo. App. 2016) (citing Restatement (Third) of Agency § 6.03 (2006)). The Agent Agreement required

BBJ, as the Agent, not communicate any information to Plaintiff in violation of proprietary rights of any third party. *See Exh. 4, at 3.*

Big Horn was a private company, not a public company.  As such, its membership was not a piece of information in the public domain.  Rather, Big Horn's membership was confidential.  As such, BBJ's refusal to disclose Big Horn's identify was not fraudulent.

Likewise, BBJ (and Mr. Bloom) were contractually bound not to disclose Loretto as the owner of the Aircraft pursuant to the Agent Agreement.  If Plaintiff actually cared about who owned the Aircraft, it could have easily searched the FAA aircraft registry, which is public information.[4] Mr. Pierce knew how to conduct such search. *See Exh. 11 at 82:5-17.*  If a plaintiff has access to information that was equally available to both parties and would have led to discovery of the true facts, he has no right to rely upon the misrepresentation. *Balkind v. Telluride Mountain Title Co.*, 8 P.3d 581, 587 (Colo.App.2000).  Thus, Plaintiff cannot complain about lack of information which a simple search would have revealed.

These facts, quite simply, cannot form the basis for any conspiracy.  As such, Plaintiff cannot be a creditor of Mr. Bloom under such a claim.

**F.  Plaintiff's Claim Under the Colorado Consumer Protection Act Fails.**

Plaintiff also asserts it is a creditor of Mr. Bloom because Mr. Bloom engaged in unfair or deceptive trade practices in regard to the transactions with the Aircraft. Plaintiff alleges Mr. Bloom knowingly making a false representations as to the source, sponsorship, approval, or certification of property; knowingly making false representations as to affiliation, connection, or association with another; knowingly making false representations as to the characteristics of services or property; and

---

[4] https://registry.faa.gov/aircraftinquiry/

representing that goods, services, or property are of a particular standard, quality, or grade, when it knew or should have known that it was of another; making false or misleading statements of fact concerning the price of goods, services or property; and failing to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction, all in violation of the Colorado Consumer Protection Act. *See Bloom BK Case, Proof of Claim, p. 15.*

To assert such a claim, Plaintiff must show unfair and deceptive trade practices occurred in the course of the business, vocation, or occupation of Mr. Bloom, and they significantly impact the public as actual or potential consumers of Mr. Bloom's goods, services, or property. Colo. Rev. Stat. § 6-1-101, *et seq.* "A fundamental element of a claim under the Colorado Consumer Protection Act (CCPA) is that the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property." *Jaeger v. HSBC Bank USA, N.A.*, Civil Action No. 12-cv-01736-REB-KLM, at *8 (D. Colo. Mar. 14, 2013) citing *Rhino Linings United States v. Rocky Mt. Rhino Lining*, 62 P.3d 142, 146-47 (Colo. 2003).

Finally, as with allegation of fraud, Plaintiff must plead with particularity, in accordance with Fed.R.Civ.P. 9(b), which it has failed to do. "In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." *Id.* In *Duran v. Clover Club Foods Co.*, the court concluded that "[a]n examination of the Act reveals that claims under the Act are not precisely actions for fraud although the Act does require proof of many of the same elements as fraud. I am persuaded that allegations of deceptive trade practices under the Act are subject to Rule

-32-

9(b)'s requirement of particularity." *Duran v. Clover Club Foods Co.*, 616 F. Supp. 790, 793 (D. Colo. 1985).

Ms. Pierce expressed on several occasions that she strongly desired to purchase the Aircraft. During the purchase process, she wrote an email to Mr. Ormon asking him to do whatever it takes to purchase the Aircraft. *See Exh. 13.* Ms. Pierce also instructed Mr. Bloom to "get it done". *See Exh. 14.*

Mr. and Ms. Pierce knew that Mr. Bloom was the appraiser of the Aircraft. Both Mr. Bloom's Appraisal and Mr. Zilberbrand's appraisal of the Aircraft were within the accepted market value range for similar airplanes.

The text messages between Mr. Ormon and Ms. Pierce show that Mr. and Ms. Pierce did unequivocally possessed knowledge that Mr. Bloom would be doing the appraisal, and even inquiring about where to send Mr. Bloom's fee. *See Exh. 15.* Based on the terms of the agreements as well as the participation of all parties, Plaintiff cannot establish that Mr. Bloom engaged in any deceptive trade practices nor establish that any damages were sustained. Accordingly, Plaintiff cannot have a claim in this bankruptcy case under Colorado's Consumer Protection Act.

## VI. CONCLUSION

As set forth above, there are no disputes of material fact which would preclude summary judgment. Even viewing the evidence in a light favorable to Plaintiff, the evidence is insufficient to establish that Plaintiff is a valid creditor of Mr. Bloom. Should this Court determine that Plaintiff is a creditor and therefore has standing, Plaintiff's claims for non-dischargeability fail for lack of proof. Plaintiff's damages (if any) were a direct result of the contractual relationship with BBJ, not with Mr. Bloom. Promises of future performance are sufficient to prove a fraud upon Plaintiff.

Similarly, a knowing breach of contract is insufficient to prove a willful and malicious injury.  For all of the above reasons, Mr. Bloom requests this Court to enter judgment in his favor, denying all of Plaintiff's claims.  Mr. Bloom also seeks an award of his attorneys fees and costs as provided by law and/or agreement, and this Court grant such additional relief as it deem appropriate.

DATED: April 30, 2020.                          Respectfully submitted,
                                                BUECHLER LAW OFFICE, L.L.C.

                                                */s/ K. Jamie Buechler*
                                                _____
                                                K. Jamie Buechler, #30906
                                                999 18th Street, Suite 1230-S
                                                Denver, Colorado 80202
                                                Tel: 720-381-0045
                                                Fax: 720-381-0382
                                                Jamie@KJBlawoffice.com

**CERTIFICATE OF SERVICE**

I certify that on April 30, 2020, I served the **MOTION FOR SUMMARY JUDGMENT** on the following parties in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules:

**Via Email**:

Steven W. Bloom
6290 Ellingwood Point Way
Castle Pines, CO 80108

**Via CM/ECF**:

Adam L. Hirsch, Esq.
Kutak Rock, LLP
Attorney for Glencove Holdings, LLC

_/s/ Sharon E. Fox_____
For Buechler Law Office, L.L.C.

-35-