**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | ) |
| | ) |
| STEVEN W. BLOOM, | )    Case No. 17-11650-TBM |
|          Debtor. | ) |
| | )    Chapter 11 |
| _____ | ) |
| | ) |
| GLENCOVE HOLDINGS, LLC, | )    Adv. Proc. No. 17-1255 TBM |
|          Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| STEVEN W. BLOOM, | ) |
|          Defendant. | ) |
| | ) |

## DEFENDANT'S POST-TRIAL BRIEF

Defendant Steven W. Bloom ("Mr. Bloom"), by and through his undersigned counsel, respectfully submits his Post-Trial Brief, and states as follows:

### INTRODUCTION

From Monday, June 22, 2020 through Wednesday, June 24, 2020, the parties attended trial in the above referenced adversary proceeding brought by Plaintiff Glencove Holdings, LLC ("Plaintiff" or "Glencove"). After the three day trial, Glencove failed to prove the essential elements of its claims. In order to conclude that the laundry list of claims brought by Glencove are subject to non-dischargeability with respect to Mr. Bloom, individually, the Court must engage in the multiple legal fictions set forth below:

1) Glencove had the right to contractually bind itself into an agreement when it did not yet exist as a corporate entity under Colorado law, and the Agent Agreement was never assigned to Glencove;

2) Glencove somehow has the legal right to demand that Steve Bloom assume all obligations of Bloom Business Jets, a separate corporate entity, under the Agent Agreement, when the

1

Agent Agreement specifically disclaims "agency", and refers to the duties as that of an "independent agent", creating serious questions as to whether there was ever a meeting of the minds in that regard;

3)    The corporate entity Bloom Business Jets should be completely disregarded, and Steve Bloom individually should be found to have absorbed those legal responsibilities for all purposes;

4)    Similarly, Steve Bloom, individually, should be held legally responsible for income generated by Big Horn Exploration, a separate entity under Colorado law;

5)    The separate corporate entity Big Horn Exploration's existence should be disregarded, and any income it generated on the "front and end" the transaction should be legally imputed to Steve Bloom, individually;

6)    Assuming the Agent Agreement is the single operative document giving rise to any duty, Glencove should be excused from being required to comply with the tort liability causes of action willingly disclaimed therein;

7)    Steve Bloom, individually should be held to be the contractual obligor under the Aircraft Purchase Agreement, not Big Horn Exploration;

8)    Glencove should be excused from bargaining away its tort liability remedies under the Aircraft Purchase Agreement;

9)    Steve Bloom, individually should be held to be the contractual obligor under the Aircraft Management Agreement, not Bloom Business Jets;

10)   Glencove should be excused from its initial breach of the Aircraft Management Agreement, and should be permitted to recover alleged damages when it remained in breach throughout the term of the Agreement, including when the agreement was terminated; and

11)   Glencove should be excused from bargaining away its tort liability remedies under the Aircraft Management Agreement.

This Post-Trial Brief also includes key statutory and case law authority upon which Mr. Bloom has relied upon in demonstrating Glencove's failure to prove its claims.

## I.   <u>PIERCING THE CORPORATE VEIL</u>

Glencove failed to meet its burden of proof at trial to establish that the corporate veil of Bloom Business Jets, LLC ("BBJ") should be pierced. Absent meeting the high burden required to pierce, Mr. Bloom cannot be held individually liable for the actions of either BBJ or Big Horn Exploration, LLC ("Big Horn"). Glencove failed to present any evidence whatsoever to support the veil piercing required to disregard the separate corporate identities of BBJ and Big Horn.

Colorado permits traditional piercing of the corporate veil, however, only under extraordinary circumstances. *Connolly v. Englewood Post No. 322 VFW of the United States, Inc. (In re Phillips)*, 139 P. 3d 639, 641 (Colo. 2006). Individual liability is appropriate when the corporation is merely the alter ego of the shareholder, and the corporate structure is used to perpetuate a wrong. *Id.* at 644. In such extraordinary circumstances, the courts may ignore the independent existence of the business entity and pierce the corporate veil to achieve an equitable result. *Id.* (citations omitted).

First, the court must inquire into whether the corporate entity is the alter ego of the shareholder. An alter ego relationship exists when the corporation is a "mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist. *Id.* Second, the court must determine whether justice requires recognizing the substance of the relationship between the shareholder and corporation over the form because the corporate fiction was "used to perpetuate a fraud or defeat a rightful claim." *Id.* Only when the corporate form was used to shield a dominant shareholder's improprieties may the veil be pierced. *Id.*

3

"Members and managers of limited liability companies are not liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the limited liability company." Colo. Rev. Stat. § 7-80-705. "In any case in which a party seeks to hold the members of a limited liability company personally responsible for the alleged improper actions of the limited liability company, the court shall apply the case law which interprets the conditions and circumstances under which the corporate veil of a corporation may be pierced under Colorado law." Colo. Rev. Stat. § 7-80-107.

As set forth at length herein, BBJ's relationship with Mr. and Mrs. Pierce was that of an "independent agent", and nothing in the Agreement created an "agency" relationship, all as explicitly disclaimed therein. *See* Ex. EC at 3. Under the common law of agency, an agent is liable on a contract entered on behalf of a principal only if the principal is not fully disclosed. In other words, an agent who negotiates a contract with a third party can be sued for breach of the contract unless the agent discloses both the fact that he or she is acting on behalf of a principal and the identity of the principal. If both the existence and identity of the agent's principal are fully disclosed to the other party, the agent *does not* become a party to any contract which he negotiates. *Water, Waste & Land, Inc. d/b/a Westec v. Lanham*, 955 P. 2d 997, 1001 (Colo. 1998). Glencove is illicitly trying to make Mr. Bloom the contracting entity in the Agent Agreement, while at the same time trying to make itself the contracting entity despite the fact that it did not exist on the date the Agreement was entered into by the parties thereto.

Here, BBJ fully disclosed Glencove's identity to the seller, Big Horn. In fact, the Aircraft Purchase and Sale Agreement (the "Purchase Agreement") entered into by and between Glencove and Big Horn conclusively illustrates BBJ's full disclosure of the existence and identity of

Glencove to Big Horn. *See* Ex. 24. Mr. Bloom is not a party to the Purchase Agreement. BBJ is also not a party to the Purchase Agreement.

In dealing with Glencove, Mr. Bloom acted as BBJ's representative at all times. In such capacity, BBJ behaved in accordance with the common law of agency and Colorado law. As a result, BBJ is not liable on the Purchase Agreement either, nor is Mr. Bloom. In any event, Mr. Bloom is not liable under the Purchase Agreement. For Glencove to hold Mr. Bloom liable, Glencove must first pierce BBJ's corporate veil, something it wholly failed to do at trial. Furthermore, Glencove failed to present any evidence that the corporate veil of Big Horn should be pierced and thus extend liability to Mr. Bloom. Absent not only extraordinary proof of facts to support such a drastic outcome, Colorado law forbids Glencove from piercing the corporate veils of BBJ and Big Horn.

Glencove failed to provide any evidence that it is a creditor of Mr. Bloom. Mr. Bloom never performed any services for Glencove. Mr. Bloom and Glencove are not parties to any written agreement. Mr. Bloom never dealt with Glencove in any capacity other than as the representative of BBJ and Big Horn. Glencove cannot point to any pre-petition judgment or liability on any claim against Mr. Bloom.

Mr. Bloom's actions pertaining to all three (3) operative agreements which are the subject of this adversary proceeding—the Agent Agreement, Purchase Agreement and Management Agreement—all satisfy the requirement that members and managers shall each discharge his or her duties to the LLC and exercise any rights consistently with the contractual obligation of good faith and fair dealing. *See* Colo. Rev. Stat. § 7-80-404(3).

The contractual obligation of good faith and fair dealing is a basic tenet of contract law in Colorado. *See* Colo. Rev. Stat. § 7-80-108(2)(d). *see also e.g., Cary v. United of Omaha Life*

5

*Insurance Company*, 68 P. 3d 462, 466 (Colo. 2003); Colorado law provides that every contract contains an implied duty of good faith and fair dealing in each party's performance and enforcement. *See Cary*, 68 P. 3d at 466 (citing *Wheeler v. Reese*, 835 P. 2d 572, 578 (Colo. App. 1992)).

In *Cary v. United of Omaha Life Insurance Company*, the Colorado Supreme Court held that insurance contracts are not ordinary commercial contracts due to the special nature of the insurance contract and the relationship which exists between the insurer and the insured. 68 P. 3d 462, 466. As such, an insurer's breach of duty of good faith and fair dealing gives rise to a separate cause of action sounding in tort. *See id.* The Court further explained that only the *insurer* owes the duty of good faith to its insured; agents of the insurance company—even agents involved in claims process—do not owe a duty, since they do not have the requisite special relationship with the insured. *See id; see, e.g., Martinez v. Lewis*, 969 P. 2d 213, 214 (Colo. 1998) (declining to impose a duty of good faith on physicians performing independent medical examinations as part of the claims adjustment process); *Gorab v. Equity General Agents*, 661 P. 2d 1196, 1198 (Colo. App. 1983) (rejecting an attempt to hold an insurance agent liable for breach of the duty of good faith by an insurance company).

The exception to the privity requirement recognized in *Travelers Ins. Co. v. Savio*, 706 P. 2d 1258 (Colo. 1985), requires a duty of good faith and fair dealing based on the "special nature" of the relationship that exists between the insured and his insurer. Even in the absence of any contractual relationship whatsoever between Glencove and Mr. Bloom, no "special relationship" exists between them regarding the Aircraft purchase transaction and subsequent Aircraft management. Furthermore, Mr. Bloom has the right under Colorado law to determine the

6

standards by which the performance of the obligation is to be measured, if such standards are not unreasonable. *See* Colo. Rev. Stat. § 7-80-108(2)(d).

The Court in *Cary* also held that the *motivation* of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract. By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity, rather than to secure commercial advantage. *See Cary*, 68 P. 3d at 466 (emphasis added). In contrast, Glencove's motivation for entering into the Agent Agreement with BBJ was to locate and purchase an aircraft acceptable in its sole discretion. *See* Ex. EC at 1. At no point was Glencove particularly financially vulnerable during the relevant time period pertaining to any of the three (3) operative agreements. The parties agreed the terms and conditions regarding the sale of the Aircraft would be mutually agreeable between Glencove and the seller of the airplane. (*See* Stipulations of Fact ¶ 36). Accordingly, the Aircraft purchase was an equitable transaction under which Glencove voluntarily and in its sole discretion decided to purchase the Aircraft.

By no means was Glencove devoid of bargaining power during the purchase of the Aircraft. It is undisputed that during the course of the transaction, the strong-willed and demanding Ms. Pierce sent multiple emails, including one to Mr. Bloom demanding he "get it done" as well as an email to Martin Ormon instructing him to "do what it takes to make it happen," despite the fact that she perjured herself with respect to these points during the course of her deposition (*See* Stipulations of Fact ¶ ¶ 20, 21; Ex. CF; Ex. 15). Ms. Pierce, a savvy entrepreneur possessing business acumen, was well-equipped to be involved in such a transaction. In quite an equitable fashion, on August 25, 2015, Glencove decided to purchase the Aircraft in its sole discretion and the sale was consummated, at Glencove's behest, on September 29, 2015, well within the confines of what Glencove demanded with respect to the transaction. (*See* Stipulations of Fact ¶ 15).

In typical commercial contracts, a breach of the duty of good faith and fair dealing merely results in damages for breach of contract, *not independent tort liability*. *Cary*, 68 P. 3d at 466 (Colo. 2003)(emphasis added). Mr. Bloom's duties and subsequent actions are distinguishable from *Cary* because no special relationship exception exists imposing a duty of good faith and fair dealing on Mr. Bloom even when there is no contractual privity between Mr. Bloom and Glencove. *See Cary*, 68 P. 3d 462. Accordingly, Mr. Bloom owed no duty to Glencove under any of the three (3) operative agreements, so Glencove is not entitled to the alleged damages based on the operative agreements. Moreover, Glencove's claims against Mr. Bloom for tort liability also fail.

## II.   <u>AGENT AGREEMENT</u>

Glencove asserts that it has standing to bring claims against Mr. Bloom because Mr. Bloom acted as its "buyer's agent." Glencove claims that as the "client", Mr. Bloom intentionally misrepresented certain facts to it. However, Glencove never retained Mr. Bloom to act as a buyer's agent, or in any capacity in connection with its purchase of the Aircraft.

As set forth in the Stipulations of Fact, the Agent Agreement was entered into on August 6, 2015, yet Glencove was not formed until the next day, on August 7, 2015. (*See* Stipulations of Fact ¶¶ 33, 34). Ms. Jennifer and Mr. Huw Pierce are the actual Buyers in the Agent Agreement. *See* Ex. EC. The Agent Agreement provides that, other than the Pierces, a buyer can also be an "assigned corporation". Glencove Holdings, LLC is not referenced anywhere in the Agent Agreement. The Pierces admitted at trial that they never assigned the Agent Agreement to Glencove Holdings, LLC. The fact that the Pierces formed Glencove the following day provides no support whatsoever for the proposition the Agent Agreement was indeed assigned to Glencove no matter how many excuses Glencove offers the Court.

8

Glencove's formation documents also show Glencove was never a party to the Agent Agreement. *See* Ex. 6. Based on the parties' Stipulations of Fact, trial testimony and exhibits, Glencove simply did not exist when the Pierces signed the Agent Agreement on August 6, 2015. Based on the undisputed facts, Glencove does not have standing to bring forth any claims stemming from the Agent Agreement. The only entities with whom Glencove did any business at all was Big Horn Exploration under the Purchase Agreement and BBJ under the Management Agreement.

Nothing could be more apparent with Glencove's false claims then its own allegations of standing in this proceeding. Glencove attempts to hide behind its corporate veil to sue Mr. Bloom, but asks this Court to wholly ignore BBJ's and Big Horn's corporate veils as a matter of convenience. Glencove serves no legitimate business purpose. It only serves to provide the Aircraft to the Pierces for their personal use. The fatal fallacy of Glencove's argument is therefore completely obvious on its face.

## III.   INDUSTRY STANDARDS

Pursuant to the Agent Agreement, BBJ was required to provide all services in a professional manner consistent with applicable industry standards. *See* Ex. EC at 1. However, the National Business Aviation Association's ("NBAA") Ethical Business Aviation Transactions Statement did not exist in 2015, nor was it even published until December 2017, long after Glencove purchased the Aircraft. Moreover, NBAA's statement merely highlights best ethical practices for transactions in the business aviation industry as suggested by NBAA and encourages industry participants to conduct themselves in a manner that seeks to avoid even the appearance of improper behavior when engaging in business transactions. *See* Ex. CN. NBAA's Statement is quite ambitious as these best practices are equally applicable to everyone in the industry

representing a company or an individual in any transaction. *Id.* Based on the aspirational nature of the Statement, it is abundantly clear that NBAA's statement lacks the requisite specificity associated with standards governing the professional manner in which services should be provided as set forth in the Agent Agreement.

In practice, both experts agreed regarding IADA's limited and exclusionary membership. Remarkably, Mr. Bloom's expert Jason Zilberbrand even likened IADA to an exclusionary *fraternity* based on several exclusionary practices essentially barring membership for the majority of aircraft dealers, with virtually no minorities of any kind or nature presented within the ranks of IADA membership, as testified to by Glencove's expert Johnny Foster. According to the IADA History (Ex. 84), IADA is a "worldwide association of more than 100 Aircraft Dealers, Brokers and business aviation product and service companies." The IADA history further states, "[J]ust 3% of all aircraft dealers have earned IADA Membership." *Id.*

In fact, IADA's Code of Ethics states that all IADA members shall keep with the highest standards of business and professionalism in the field of aircraft resale. Ex. 84 at 2. As both experts testified at trial, IADA's Code of Ethics only applies to IADA members. Based on the testimony of both experts, it is abundantly clear that any standards set forth by IADA simply do not apply to the overwhelming majority of aircraft dealers, brokers and companies in the business aircraft industry, and thus cannot under any circumstance purport to establish binding standards on aircraft brokers or dealers.

Both experts agreed at trial there is nothing inherently wrong in conducting a back to back transaction. As demonstrated by Mr. Zilberbrand, BBJ and Mr. Bloom acted in accordance with the best practices at the time of Glencove's purchase of the Aircraft. Further, Mr. Zilberbrand opined that BBJ, and thus Mr. Bloom, was limited by the express terms of the Agent Agreement

10

as to what, if any, information BBJ could share with the Pierces concerning the seller of the Aircraft. Mr. Zilberbrand opined that BBJ, and Mr. Bloom, acted in compliance with the Agent Agreement.

## IV.   VALID LIEN UNDER TEX. PROP. CODE § 70.301

During closing argument, Glencove misled this Court as to the Texas Property Code. Glencove asserted a restrictive interpretation of Texas' Property Code that only a person who stores, fuels, repairs, or maintains an aircraft has a lien on an aircraft. Such is not the case.

Texas Property Code §70.301 provides as follows:

LIEN:

(a) A person who stores, fuels, repairs, or performs maintenance work on an aircraft has a lien on the aircraft for:

(1) the amount due under a contract for the storage, fuel, repairs, or maintenance work; or
(2) if no amount is specified by contract, the reasonable and usual compensation for the storage, fuel, repairs, or maintenance work.

(b) This subchapter applies to a contract for storage only if it is:

(1) written; or
(2) oral and provides for a storage period of at least 30 days.

Texas Property Code Section 70.303 states:

RECORDING OF LIEN: AIRCRAFT REGISTERED IN UNITED STATES.

A holder of a lien under this subchapter may record the lien on the aircraft by filing with the Federal Aviation Administration Aircraft Registry not later than the 180th day after the date of the completion of the contractual storage period or the performance of the last repair or maintenance a verified document in the form and manner required by applicable federal laws and regulations that states:
(1) the name, address, and telephone number of the holder of the lien under this subchapter;
(2) the amount due for storage, fuel, repairs, or maintenance;
(3) a complete description of the aircraft; and

(4) the name and address of the owner of the aircraft and the number assigned the aircraft by the Federal Aviation Administration, if known.

Indeed, it is well settled that the mechanic's and materialman's lien statutes of Texas should be liberally construed for the purpose of protecting laborers and materialmen. *In re Curry*, 407 S.W. 3d 376, 381 (Tex.App.—Dallas 2013) (citing *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W. 2d 262, 269 (Tex. 1974). Under the Texas Property Code, even a person providing management services relating to the aircraft, including maintenance, storage and leasing of the aircraft, upkeep of maintenance records and flight logs, acquisition of fuel, and coordination of pilot services. *In re Curry*, 407 S.W.3d 376 (Tex.App.—Dallas 2013).

Given the prevailing case law in Texas, there is no limit as to who may actually record and file a lien against an aircraft. In fact, the only limitation on that right the situation where the aircraft owner did not request the services to be provided. *Id.* Accordingly, there is absolutely no indication that the legislature intended to exclude service providers like BBJ, as discussed above.

A federal district court in the Eastern District of Virginia ruled that Section 70.301 does not create statutory liens in favor of credit card companies. *Westwind Acquisition Co., LLC v. Universal Weather & Aviation*, 668 F. Supp. 2d 749, 753 (E.D.Va. 2009). "Yet, defendant clearly did not provide any fuel or services for plaintiffs' airplanes, and, indeed, *it is not even in the business of doing so*." *Id.* (emphasis added). The right of the statutory lien created by Section 70.301 belongs to the person or entity with whom the owner or operator of the aircraft contracts for the provision of storage, fuel repair, or maintenance services. *Westwind*, 668 F. Supp. 2d 749, 753 (E.D.Va. 2009).

Here, BBJ filed and recorded a lien against the Aircraft because the Pierces and Glencove failed to pay its bills. Under the Management Agreement, BBJ was tasked with providing an

amazing array of fuel, repair, storage, and maintenance to the Aircraft during the course of managing it. The Aircraft required constant maintenance and upkeep, including hanger rent and fuel. Glencove was required to pay for these expenses, yet failed to do so, it illicitly placing that financial burden squarely upon BBJ.

Accordingly, Glencove failed to live up to its financial obligations. The Pierces admitted at trial they breached the Management Agreement by failing to fund that agreement for a full 13 days. This failure forced BBJ to expend its own funds on an aircraft that it did not own.

Now, Glencove seeks damages against Mr. Bloom to remove the lien BBJ placed on the Aircraft. There is no dispute that the Aircraft continued to incur expenses during BBJ's management. There is no dispute Glencove and the Pierces failed to pay all of those expenses. When Glencove asked for a reconciliation of the bills represented by the Lien, BBJ through Mr. Bloom and its employees strove to make the Pierces aware. However, the Pierces refused to believe the charges. Despite "living in Quickbooks" with their other businesses, the Pierces demanded different formats for their billing and different documentation on the expenses. BBJ did so even though its prior billing was more than adequate. After further review, BBJ voluntarily reduced the amount of the Lien, giving credit to Glencove for certain charges Glencove paid directly rather than through the Management Agreement. Glencove failed to tell or show BBJ that it had in fact direct-paid these expenses prior to the Lien.

BBJ had a good faith basis to file its lien. It defies all logic to even suggest that Mr. Bloom should be individually liable for the amounts Glencove paid to remove the Lien when they admitted their breach of the Management Agreement. Glencove points to no basis in fact or in law in support of such a theory.

V.    **DISCHARGE CLAIMS**

The standard of proof for an action under Section 523(a) is the ordinary preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991). The plaintiff bears the burden of proving all of the elements of the Section 523(a) claims. *Id. See also, Fowler Bros. v. Young*, 91 F.3d 1367 (10th Cir. 1996), *In re Smith*, 472 B.R. 833 (Bankr.D.Colo. 2012)(Tallman, J.). "Exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *In re Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008) (quotation omitted).

A.    **FALSE REPRESENTATION, FALSE PRETENSES, OR ACTUAL FRAUD UNDER § 523(a)(2)(A)**

Glencove fails to prove its § 523(a)(2)(A) non-dischargeability claim against Mr. Bloom. Section 523(a)(2)(A) excepts from discharge any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. "Actual" means any fraud that involves moral turpitude or intentional wrong. No single definition exists for fraud. Anything that counts as "fraud" and is done with wrongful intent is "actual fraud". *Husky Intern. Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016). Glencove fails to prove Mr. Bloom's actions constitute actual fraud.

The elements required to prove a claim for false representation are: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the false representation resulted in damages to the creditor. *Fowler Bros. v. Young*, 91 F. 3d 1367, 1373 (10th Cir. 1996). Creditor must establish that it sustained a loss as proximate result of

14

materially false representations by debtor, i.e., causal relationship must exist between misrepresentation and loss suffered. Glencove sustained no damages as a proximate result of Mr. Bloom's alleged misrepresentation.

The facts admitted into evidence at trial establish that Big Horn was the Seller of the Aircraft to Glencove, not Loretto Aviation, LLC ("Loretto"). Loretto sold the Aircraft to Big Horn because, as both Mr. Ormon and Mr. Bloom testified, the Pierces lacked the financial ability to obtain a loan for the required purchase price. Indeed, their debt to income ratio prior to the sale was an outlandish 74%. They had only $37,000 of cash available for the purchase. It took a personal favor and some financial wizardry by Mr. Ormon to complete the loan for the Pierces, which Ms. Pierce essentially demanded be arranged.

Big Horn negotiated its purchase price for the Aircraft separate and apart from Glencove or the Pierces. Mr. Bloom testified, and Mr. Zilberbrand supported such facts, that doing a "back to back" transaction was necessary to avoid the risk that the Pierces, and thus Glencove, could not fulfill its commitments under the Purchase Agreement. Mr. Bloom testified, without objection, that Big Horn and BBJ had the capacity to complete the purchase from Loretto if the Pierces and Glencove failed. Given such facts, neither BBJ nor Mr. Bloom made any misrepresentations of material fact to the Pierces or Glencove about the true purchase price. Both experts agreed that the market value of the Aircraft was what a willing buyer would pay a willing seller. Here, if the Pierces, and thus Glencove, were not willing to pay the purchase price, they could have walked away. All of the risk would then be absorbed by Big Horn.

Yet, the Pierces desperately wanted this Aircraft to support their ongoing pursuit of the lavish lifestyles of the rich and famous. They had to beg Mr. Ormon to get a loan. Ms. Pierce wrote to Martin Ormon, "As you know, I want this plane, so please do what it takes to make it happen.

Stip. Fact, #20. Ms. Pierce then instructed Mr. Bloom to "get it done" when it came to buying the Aircraft. *Id.* #21. Glencove continues to own the Aircraft, using it to provide the Pierces the ability to fly around the country for their personal enjoyment. *Id.* #23.

The undisputed facts at trial show that BBJ, acting through Mr. Bloom, could not disclose the pertinent facts relating to the actual seller of the Aircraft to the Pierces. Further, if Glencove had actual concerns about the ultimate seller under the Purchase Agreement, Mr. Pierce was fully aware and knowledgeable on how to look up aircraft records with the FAA. Indeed, Mr. Pierce did "everything he could" to gain all of the necessary knowledge to buy and keep an airplane for his and Ms. Pierce's personal use.

Moreover, the Pierces had other professionals assist them with the transaction. Only after such review did the Pierces enter into the transaction to buy the Aircraft. As such, the Pierce's, and thus Glencove's reliance, on any statements made by BBJ through Mr. Bloom, are not justified under the circumstances.

The economic loss rule bars Plaintiff's claims for fraudulent concealment and inducement because such claims do not arise out of tort under circumstances where the duties of the parties are established by contract, as set forth in the section above on Plaintiff's fraud claims. The economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). Fraud and misrepresentation claims are dependent on contract duties and are, thus, barred by the economic loss rule. *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P. 3d 1226, 1229 (Colo.App. 2012).

The key to determining whether the economic loss rule bars a tort claim is determining the source of the duty that forms the basis of the action. *Top Rail Ranch Estates, LLC v. Walker*, 2014 COA 9, ¶ 31, 327 P.3d 321, 328 (citation omitted). In making this determination, three factors are considered: 1) whether the relief sought in the tort claim is the same as the contractual relief; 2) whether there is a recognized common law duty in tort; and 3) whether the tort duty differs in any way from the contractual duty. *Id.* (citing *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P. 3d 66, 74 (Colo. 2004)).

Glencove's damages alleged under § 523(a)(2)(A) arise under the three operative agreements in this case. In its Complaint, Glencove seeks recovery of BBJ's Commission under the Agent Agreement, Overpayments under the Aircraft Purchase Agreement and Management Payments. *Docket No. 1, Complaint, pp. 8-9.* Glencove also alleges damages for interest, attorneys' fees, costs and expenses. Such damages constitute *contractual relief* pursuant to the Management Agreement. Thus, the relief sought by Glencove in the tort claim is the same as the contractual relief.

While there is a recognized common law duty in tort to refrain from deliberate concealment or misrepresentation of material facts, it has been determined that not all fraud claims arise independently of contractual duties. The common law duties to refrain from fraud and to disclose material facts are subsumed within the implied covenant of good faith and fair dealing. *Top Rail Ranch Estates, LLC*, 327 P.3d at 328 (citation omitted). The implied covenant of good faith and fair dealing is an implied contractual duty that bars tort claims under the economic loss rule. *Id.* (citing *Jorgensen v. Colo. Rural Props., LLC,* 226 P. 3d 1255,1259 n.3 (Colo. App. 2010)). Tort duties to refrain from fraudulent concealment or misrepresentation do not differ from the implied covenant of good faith and fair dealing. *Id.* (citing *Hamon Contractors, Inc. v. Carter & Burgess,*

*Inc.,* 229 P. 3d 282, 293 (Colo. App. 2009)). The common law tort duty does not differ from BBJ's contractual duties based on the implied covenant of good faith and fair dealing. In essence, Glencove's tort claims are just pale duplicates of its contract based claims. Moreover, Glencove has yet to identify any damages that were not directly related to its purchase of the Aircraft, with Mr. Pierce testifying at trial that virtually every penny of damages claimed by Glencove is directly related to the Aircraft. Since Glencove has asserted breach of contract claims against BBJ, it cannot bring independent claims for fraud when the facts and circumstances arise out of a contract.

### B.   WILLFUL AND MALICIOUS INJURY UNDER § 523(a)(6)

Glencove's non-dischargeability claim under § 523(a)(6) also fails for its lack of proof. Glencove was required to establish that the acts in question were both willful and malicious. *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998)). The Tenth Circuit has interpreted the phrase "willful and malicious injury" as requiring proof of two distinct elements-that the injury was both "willful" and "malicious." *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 654 (10th Cir. BAP 1999). Plaintiff has the burden of proof to establish that the debt is nondischargeable by a preponderance of the evidence. *In re Longley*, 235 B.R. at 655 (citation omitted). Failure of a creditor to establish either willfulness or malice renders the debt dischargeable. *Id.* (citing *Farmers Ins. Group v. Compos (In re Compos)*, 768 F. 2d 1155 (10th Cir. 1985). The standard of proof for a Section 523(a)(6) claim is clear and convincing evidence. *In re Irvin*, 31 B.R. 251, 257 (Bankr. D. Colo. 1983). Glencove has failed to meet its burden of proof at trial. Glencove failed to establish any element of this claim. Indeed, there was no evidence that Mr. Bloom deliberately caused an intentional injury to Glencove. It is axiomatic that debts resulting from recklessness or negligence *do not fall* within § 523(a)(6).

"In the case of *Kawaauhau v. Geiger,* the Supreme Court of the United States addressed the term "willful" as it is used in § 523(a)(6). 523 U.S. 57, 118 S.Ct 974, 975, 977, 140 L.Ed.2d 90, 92 (1998). The specific factual question presented to the Court was whether a medical malpractice suit brought on the grounds of negligence met the "willful" standard of § 523(a)(6), a question which had divided the circuit courts. In looking to the language of the statute, the Supreme Court answered the question in the negative, stating, "[t]he word 'willful' in[§ 523]a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." 118 S.Ct at 977. In making this statement, the Court was careful to note that the "(a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." *Id.* U.S. at 61-62, S.Ct. at 977."

*In re Martin*, 321 B.R. 437, 441 (Bankr. N.D. Ohio 2004)

Further, mere breach of contract, without more, *is not a willful and malicious injury. Dorr & Associates v. Pasek (In re Pasek)*, 129 B.R. 247, 252 (Bankr.D.Wyo.1991), aff'd, 983 F.2d 1524 (10th Cir.1993).

### 1.    Willful Conduct

A debtor must desire to cause the consequences of his act or believe that the consequences are substantially certain to result from it. The word 'willful' means 'deliberate or intentional'; a deliberate and intentional act which necessarily leads to injury. *Id.* An examination of the terms "deliberate or intentional" reflects its definition to mean "done with the will or intentionally, and not inadvertently or negligently . . . . Intent to do the wrongful act is sufficient and that constitutes the willful part of the act . . . ." *In re Irvin*, 31 B.R. 251, 258 (Bankr. D. Colo. 1983).

### 2.    Malicious Injury

The Court must conduct a subjective test to determine what the debtor knew or intended with respect to the consequences of his actions ("wrongful intent"). Wrongful intent may be established by direct evidence of specific intent to harm a creditor or the creditor's property. Wrongful intent may also be established by indirect evidence of both the debtor's knowledge of the

creditor's rights and the debtor's knowledge that the conduct will cause particularized injury. "Malice" means an act which is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *Id.*

In *Bombardier Capital, Inc. v. Tinkler*, 311 B.R. 869, 884 (Bankr. D. Colo. 2004), a debtor was held liable for the tort of conversion under Colorado law based on the creditor's rights under Colo. Rev. Stat. § 4-9-609. A debtor can be held liable for a wrongful act, however, when there is no evidence that debtor intended to harm the creditor, then the nondischargeability claim fails. The *Tinkler* malice test consists of the following requirements: 1) the act is wrongful, in violation of a legal duty and unjustly infringes on another's right; 2) the act is intentional; and 3) the act is without just cause or excuse. *Tinkler*, 311 B.R. at 884 (Bankr. D. Colo. 2004).

Mr. Bloom in no way infringed on Glencove's rights. Likewise, Mr. Bloom did not injury Glencove or its property. Glencove had no right whatsoever to *pay less* than what it did for the Aircraft, nor was Big Horn under any obligation of any kind or nature to demand less money in selling the aircraft to Glencove. BBJ, through Mr. Bloom, identified an aircraft that met the Pierces specifications, including number of seats and required flight distance. Further, BBJ arranged for Glencove to have the opportunity to purchase the Aircraft within Glencove's desired and stated price range. Glencove voluntarily entered into an agreement with Big Horn to purchase the Aircraft for that price.

Glencove could have elected to not enter into the Purchase Agreement. Glencove could have let the Agent Agreement expire. It could have terminated its arrangement with BBJ. The Pierces had a prior broker willing to assist them. Mr. Pierce let that contract expire. Clearly, the Pierces and Glencove had an abundance of choices and knowledge before entering into the transaction. Glencove cannot point to any case law whatsoever that gives them the ability to pay

less for the Aircraft. Indeed, it took a serious amount of financial wrangling by Mr. Ormon just for the Pierces to obtain the required loan. And of course, the Pierces sued Mr. Ormon for that conduct as well.

Unless a debtor's breach of contract is accompanied by *malicious and willful tortious conduct*, it is dischargeable. *Commercial Bank v. Breedlove (In re Breedlove)*, Nos. 04-11096-R, 04-1116-R, 2007 Bankr. LEXIS 2358, at *5-6 (Bankr. N.D. Okla. July 9, 2007). The law will only imply malice if a person of reasonable intelligence knows that the act in question is contrary to commonly accepted standards of conduct. *In re Irvin*, 31 B.R. 251, 258. The law will also imply malice when there is proof that the debtor either intended the resulting injury or intentionally took action that was substantially certain to cause the injury. *Id.*

Here, as Mr. Zilberbrand opined, BBJ and Mr. Bloom acted within the commonly accepted standards of conduct for aircraft broker professionals at the time. As set forth above, the code of ethics Glencove's expert used did not exist at the time of the transaction. But for the actions of BBJ through Mr. Bloom and Mr. Ormon, there was simply no way the Pierces or Glencove could ever close on the purchase of such an aircraft as the one subject of the Purchase Agreement.

## VI. **DAMAGES**

The falsity of Glencove's arguments under Section 523(a)(6) is belied by their own actions. Glencove still owns and the Pierces still use the Aircraft today. They still make payments on the loan Mr. Ormon obtained for them. They have wholly failed to show that they have mitigated any of their damages. Rather, they continue to engage in scorched earth litigation in an effort to prove a conspiracy where none is found, complaining to no less than the Federal Bureau of Investigation, the Internal Revenue Service, the Colorado State Bar, and others, all as testified to during trial by Huw Pierce.

21

As the Colorado Supreme Court held in *Fair v. Red Lion Inn*, 943 P.2d 431 (Colo. 1997), a party seeking damages has "'has the duty to take such steps as are reasonable under the circumstances in order to mitigate or minimize the damages sustained.'" *Id.* at 437 quoting *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 680 (Colo.1994) (citing *Tull v. Gundersons, Inc.*, 709 P.2d 940, 946 (Colo.1985)); *Technical Computer Servs., Inc. v. Buckley*, 844 P.2d 1249, 1255 (Colo.App.1992). "This means that the plaintiff may not recover damages for injuries which he or she reasonably might have avoided." *Ballow*, 878 P.2d at 680.

The defense of failure to mitigate damages is satisfied when the injured party fails to take reasonable steps to minimize the resulting damages. *Fair v. Red Lion Inn*, 943 P.2d at 437 *citing Burt v. Beautiful Savior Lutheran Church*, 809 P.2d 1064, 1068 (Colo.App.1990); *see also Berger v. Security Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1385 (Colo.App.1990).

Here, Glencove failed to introduce any evidence whatsoever on their non-existent mitigation efforts. Yet, Glencove did not sell the Aircraft. Glencove could have cut its losses and found a cheaper aircraft. Instead, Glencove continues to reap the benefit of BBJ's actions through Mr. Bloom. Glencove is therefor equitably estopped from seeking *any damages*. *Comm. For Better Health Care for All Colo. Citizens v. Meyer*, 830 P. 2d 884, 891 (Colo. 1992); *Kruse v. Town of Castle Rock*, 192 P. 3d 591, 603 (Colo. App. 2008).

Glencove did not refinance the loan. Glencove did not seek any refinancing of the loan Mr. Ormon called in a favor to obtain. Glencove did nothing. Yet, they seek damages for a loan origination fee and additional interest on a plane they still appreciate all the benefits of. *Comm. for Better Health Care for All Colo. Citizens v. Meyer*, 830 P.2d at 891.

Glencove seeks attorneys' fees of almost $500,000 as an item of damage against Mr. Bloom. There is no law, nor any agreement between Glencove and Mr. Bloom, that permits

attorneys' fees. "In the absence of an express statute, court rule, or private contract to the contrary, attorney fees generally are not recoverable by the prevailing party in a contract or tort action." *Allstate Ins. Co. v. Huizar*, 52 P. 3d 816, 818 (Colo. 2002). In and of itself, the mere request for such an extraordinary amount of attorneys' fees is exceedingly arrogant on its face in this adversary proceeding. Such enormous attorneys' fees show the extent of Glencove's and the Pierce's unmitigated and ongoing vengeance. By continuing to seek such damages, Glencove proves the fatal fallacy of its claims.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons and authorities, Mr. Bloom respectfully requests this Court to enter an Order denying Glencove's Complaint and overruling and striking Glencove's Proof of Claim filed in this case. Mr. Bloom further requests this Court to enter an Order declaring any debts owed by Mr. Bloom to Glencove are dischargeable and thereafter dismissing Glencove's Complaint.

 Dated this 10th day of July 2020.

                    **BUECHLER LAW OFFICE, L.L.C.**

                    By:  /s/***K. Jamie Buechler***
                         K. Jamie Buechler, #30906
                         999 18th Street, Suite 1230-S
                         Denver, CO 80202
                         Tele: 720-381-0045
                         Fax: 720-381-0382
                         Email: Jamie@Kjblawoffice.com

COATS & EVANS, P.C.

By:  /s/*Gary L. Evans*
      Gary Linn Evans
      State Bar No. 00795338
      Email: evans@texasaviationlaw.com
      George Andrew Coats
      State Bar No. 00783846
      Email: coats@texasaviationlaw.com
      Post Office Box 130246
      The Woodlands, Texas 77393-0246
      Telephone: (281) 367-7732
      Facsimile: (281) 367-8003

**ATTORNEYS FOR DEFENDANT
STEVEN W. BLOOM**

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 10, 2020, the foregoing **Defendant's Post-Trial Brief** was filed with the Court, and served upon the counsel named below, via CM/ECF, in accordance with L.B.R. 9070-1:

R. Edward Perkins
SHEEHY, WARE & PAPPAS, P.C.
909 Fannin Street, Suite 2500
Houston, Texas 77010
Email: eperkins@sheehyware.com

Adam L. Hirsch
Mark C. Willis
KUTAK ROCK, LLP
1801 California Street, Suite 3000
Denver, CO 80202-2626
Email: adam.hisch@kutakrock.com
         mark.willis@kutakrock.com

                                                          **/s/ Sharon E. Fox**
                                              For Buechler Law Office, L.L.C.