IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | § | Case No. 17-11650-TBM |
| | § | |
| STEVEN W. BLOOM | § | |
| | § | Chapter 11 |
| *Debtor.* | § | |
| _____ | § | |
| | § | |
| GLENCOVE HOLDINGS, LLC | § | Adv. Proc. No. 17-01255 TBM |
| | § | |
| *Plaintiff* | § | |
| | § | |
| | § | |
| STEVEN W. BLOOM | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF GLENCOVE HOLDINGS, LLC'S POST-TRIAL BRIEF

Plaintiff, Glencove Holdings, LLC ("Glencove"), respectfully submits this Post-Trial Brief in further support of its claims, as follows:

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Following summary judgment briefing and a three-day bench trial, the facts of this case are well known to the Court and are discussed only briefly here.[1]  This case arises from the purchase, sale, and management of a private corporate jet owned by Glencove—a limited liability corporation formed by Texas residents Huw and Jennifer Pierce.  Glencove began the process of purchasing the aircraft in early 2015.  Debtor defendant Steven Bloom ("Bloom")—the president and chief executive officer of Bloom Business Jets, LLC ("BBJ")—became Glencove's exclusive agent for the transaction.  Bloom provided Glencove with blatantly false information about negotiations for the aircraft in an effort to

---

[1] For a more complete recitation of the facts, see Glencove's Response to Motion for Summary Judgment (Doc. No. 44) at pg. 10-19, and the Stipulations of Fact, (Doc. No. 53).

manipulate Glencove to agree to a purchase price that was $250,000.00 greater than what the seller—Loretto Aviation, LLC ("Loretto")—actually offered.  Bloom then contrived an undisclosed "back-to-back" sale of the aircraft with his other company, Big Horn Exploration, LLC ("Big Horn"), acting as a straw purchaser, and his lawyer, Brad Rose ("Rose"), acting as Big Horn's supposed representative.  Doing so allowed Bloom and Rose to conceal the back-to-back and the seller's true identity from Glencove along with the inflated purchase price.  In the process, Bloom, Rose and Martin Orman pocketed the $250,000 "spread."

The deception did not end there.  After the sale of the aircraft in September 2015, Glencove (which was still unaware of Bloom's fraud) entered into an Aircraft Management Services Agreement (the "Management Agreement"), requiring Bloom to crew and manage the operations of the aircraft.  Over the next several months, Bloom engaged in blatantly false billing practices that resulted in erroneous, duplicative, and/or inflated charges to Glencove.  Frustrated with Bloom's seeming inability to generate timely and accurate billing, Glencove terminated the Management Agreement in early May 2016.  In retaliation, Bloom orchestrated the filing of an illegal lien against the aircraft in June 2016, falsely representing in an acknowledged statement that he had standing to file the lien.  These actions forced Glencove to incur considerable effort and expense—including retaining attorneys and paying sums to Bloom that were not due—simply to remove the liens and prevent Glencove's mortgage holder from foreclosing on the aircraft.

As this Court knows, Bloom had BBJ file a lawsuit against Glencove in Colorado State Court in Pitkin County, Case No. 2016CV30114, in August 2016, asserting alleged rights under the illegal lien and claiming Glencove breached the Management Agreement.  Glencove appeared and answered the complaint.  On March 3, 2017, Glencove—which by this point had discovered the full scope of Bloom's deception—filed a Counterclaim against BBJ, and a Third-Party Complaint against Bloom, Rose, Big

Horn and others for their fraudulent actions related to the purchase and management of the aircraft (the "Third-Party Complaint").[2]  Immediately thereafter, on the very same day that Glencove filed its Third-Party Complaint, Bloom filed a petition in the United States Bankruptcy Court for the District of Colorado, commencing a case under chapter 13 of the U.S. Bankruptcy Code (the "Bankruptcy Code"). The chapter 13 case was later converted into a case under chapter 11 of the Bankruptcy Code.

On June 13, 2017, Glencove filed a proof of claim in the bankruptcy case (the "Claim"), asserting a claim for damages against Bloom based on the fraudulent, deceptive, willful, and malicious conduct described above.[3]  On June 19, 2017, Glencove commenced this adversary proceeding against Bloom, seeking a determination that Bloom's debts to Glencove as described in the Claim and in Glencove's Third-Party Complaint are not dischargeable under 11 U.S.C. § 523(a)(2) and (6).[4]  Both the Claim and adversary proceeding are based on the same allegations asserted against Bloom in Glencove's Third-Party Complaint.[5]  The adversary suit proceeded to a three-day bench trial commencing on June 22, 2020.  The evidence closed on June 24, 2020, and this Court took the matter under advisement.  The Court permitted the parties to submit any post-trial briefing that they believed would aid the Court on the contested issues.  The Court set a deadline of July 10, 2020, for any post-trial briefing.

## II.
### NOTE ON CITATIONS TO TRIAL EVIDENCE

In this post-trial brief, Glencove cites to the exhibits admitted at trial in the manner that they were identified at trial.  Regarding citations to trial testimony, time constraints have prevented the parties from obtaining a written transcript of the trial proceedings prior to the July 10 post-trial briefing deadline.  Glencove has, however, obtained electronic recordings of the

---

[2] *See* Glencove's Third-Party Complaint, attached as Ex. A to Glencove's Proof of Claim (Claim 7) on file in the main Case No. 17-11650-TBM.
[3] *See* Glencove's Proof of Claim (Claim 7) on file in the main Case No. 17-11650-TBM
[4] *See* Glencove's Complaint for Determination of Non-Dischargeability of Certain Debts Pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) (the "Adversary Complaint") (Doc. 1), on file herein.
[5] *Compare* the Third-Party Complaint *with* the Claim and Adversary Complaint.

trial proceedings from the court reporter.  The recordings were provided in separate electronic files, each containing approximately five minutes of recorded proceedings.  The files are named according to the date and time of the recording (for instance, a file containing recorded proceedings beginning at 8:31 AM on June 22 will bear the file name "courtroom e_20200622-0831").  In this post-trial brief, Glencove cites to the trial testimony by providing the name of the electronic file(s) where the referenced testimony may be found.

Glencove also notes that certain of the electronic files for day two of the trial appear to have been corrupted.  As a result, the testimonies of John B. Foster, IV, Brad Rose, and Martin Orman are inaudible.  Accordingly, to the extent Glencove references the testimonies of these individuals in this post-trial brief, it has cited to all electronic files pertaining to their testimony. Glencove is in the process of obtaining uncorrupted copies of the electronic recordings for these witnesses.  Once the uncorrupted files are received, Glencove will supplement this brief with pinpoint citations to the relevant testimony for these individuals.

### III.
### ARGUMENTS & AUTHORITIES

Glencove's claims and the facts supporting them have been fully presented to the Court during the course of this litigation and Bloom's underlying bankruptcy case through Glencove's complaint, proof of claim, summary judgment papers, three-day bench trial, and other papers and oral presentations to the Court.  The evidence at trial clearly proves Glencove's claims against Bloom and, as the Court observed in its order denying Bloom's motion for summary judgment, amounts to "overwhelming evidence" of Bloom's false representations and material omissions. Following trial, the Court provided the parties with an option to brief additional issues that may be helpful to the Court.  Rather than simply regurgitate the overwhelming evidence at trial proving Glencove's claims against Bloom, Glencove submits this brief to refute Bloom's

arguments as to why he somehow should not be held accountable for his fraud and other acts and omissions injuring Glencove.

**A.      Bloom is independently liable to Glencove for his acts and omissions.**

Throughout the trial of this case, Bloom has steadfastly maintained that Glencove is not a proper creditor under the Bankruptcy Code.  In support of this contention, Bloom seems to maintain that the state-law causes of action upon which Glencove bases its creditor status— including (but not limited to) its claims for fraud, fraudulent concealment and inducement, civil conspiracy, and violations of the Colorado Consumer Protection Act—cannot succeed because there is no cognizable relationship between Glencove and Bloom that gives rise to any legal duties.  Specifically, Bloom argues that he, personally, never acted as Glencove's agent related to the sale and/or management of the subject aircraft, and therefore, Glencove has no standing to pursue any legal recourse for Bloom's wrongful conduct.  Bloom's basis for this contention is twofold:  (1) at all relevant times, he did not act in a personal capacity but, rather, in a representative capacity for his company, BBJ (or for Big Horn as counsel stated during closing argument), and (2) Glencove did not exist as a corporate entity at the time the Agent Agreement with BBJ was signed and, therefore, was never a party to the agreement.

As to the first point, Colorado law is clear that "[c]orporate agents are liable for torts of the corporation if they approved of, sanctioned, directed, actively participated in, or cooperated in such conduct."  *Colorado Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 28 (Colo. App. 2010).  Here, Bloom was the actor, the one that made the misrepresentations and actively concealed the material facts forming the basis of Glencove's claims.[6]  Indeed, Bloom has stipulated to the fact that he *personally* made the misrepresentations and testified that *he alone*

---

[6] Bloom's other employees, Dayna Olivas and Mary Lynn Fisk, and Brad Rose, all disclaimed any interaction with Glencove prior to the sale closing in later September 2015.

communicated with Glencove during the course of the negotiations upon which Glencove bases its complaints.[7]  As Bloom testified:

> Q.   In the interactions that took place with Glencove and the Pierces [related to the purchase of the aircraft], there was no other person doing it except you, right?
>
> **A.   Correct.**[8]

Further, Bloom admitted that he knew and understood the nature of his falsehoods, as well as Glencove's reliance thereupon.[9]  In view of this, Bloom's self-serving contention that he acted "solely" as a corporate representative—even if accepted as true—is irrelevant. Bloom *himself* actively approved of, sanctioned, directed, participated in, and/or cooperated in the wrongful conduct and, therefore, may be held *personally* liable.

As to the second contention—*i.e.*, that Glencove was "not a party" to the Agent Agreement because Glencove did not exist as a corporate entity when the agreement was signed and is not specifically named as a party to the contract—Bloom ignores the *undisputed fact* that Mr. and Mrs. Pierce formed Glencove **at the specific behest of Bloom** to facilitate the purchase of the aircraft.[10]  For this reason, the Agent Agreement—which Bloom and/or his attorney Brad Rose drafted—specifically references and anticipates Glencove as a party to the agreement by identifying the principals in the agency relationship as Jennifer and Huw Pierce or the "assigned corporation with offices at 6015 Glencove, Houston, TX 77007"—*i.e.*, Glencove's corporate address.[11]  Thus, even though Glencove had not yet been formed at the time of signing, its

---

[7] *See* Stipulations of Fact 27-51 (Doc. 53); *see also* Bloom's Testimony, courtroom e_20200624-1146.
[8] *See* Bloom's Testimony, courtroom e_20200624-1146.
[9] *See* Bloom's Testimony, courtroom e_20200624-1156, courtroom e_20200624-1201, courtroom e_20200624-1206.
[10] *See* Huw Pierce's Testimony, courtroom e_20200622-1016.
[11] *See* Agent Agreement, Glencove Trial Ex. 7, at pg. 1; *see also* Huw Pierce's Testimony, courtroom e_20200622-1016.

6

formation was complete the very next day,[12] Bloom knew that it was being formed for this purpose, and the Agent Agreement nonetheless expressly contemplates Glencove's participation in the sale.[13]   The evidence is clear that Bloom knew this was going to be the process for handling the transaction.

Further, Article 8 of the Agent Agreement provides that "upon notice to [Bloom] Buyer may assign this Agreement to any affiliate entity controlling, controlled by, or under common control with BUYER."[14]   As stated above, Bloom had notice *from the very beginning* that Glencove would be the ultimate purchaser of the aircraft, and all negotiations conducted pursuant to the agreement were done on Glencove's behalf.   Indeed, *it was Bloom's idea to begin with*, and the subsequent Aircraft Purchase and Sale Agreement ("PSA"), which Bloom and Rose prepared, lists Glencove as the buyer.[15]   Accordingly, because the contracts expressly contemplate Glencove's participation in the aircraft sale and in the benefits of the Agent Agreement, Bloom's argument has no merit.

But, even if Glencove was not a party to the Agent Agreement (which it was), it does not matter because, under Colorado law, "[a]n agency relationship need not be contractual, and may exist even though the parties do not call it an agency and do not subjectively intend that legal consequences flow from their relation." *Am. Family Mut. Ins. Co. v. Tamko Bldg. Products, Inc.*, 178 F. Supp. 3d 1121, 1126 n.3 (D. Colo. 2016). "What is critical is that the parties materially agree to enter into a particular relation to which the law attaches the legal consequences of agency, even though those consequences might not have been within the contemplation of the parties at the time of their agreement." *Stortroen v. Beneficial Fin. Co. of Colorado*, 736 P.2d

---

[12] *See* Glencove Trial Ex. 6
[13] *See* Agent Agreement, Glencove Trial Ex. 7, at pg. 1; *see also* Huw Pierce's Testimony, courtroom e_20200622-1016.
[14] *See* Agent Agreement, Glencove Trial Ex. 7 at Art. 2.
[15] *See* Glencove Trial Exhibits 23 and 24.

391, 395 (Colo. 1987). In other words, "[a]n agency relationship results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Bayview*, 727 F. Supp. 2d at 1073.

Here, there is clearly "manifestation of consent" that Bloom would act for Glencove, as evidenced by Bloom's repeated engagement in direct negotiations with third parties on Glencove's behalf and representations to Glencove about those negotiations. Bloom himself acknowledged in testimony that the entire purpose of the Agent Agreement was to empower himself and BBJ to represent Glencove's interest in negotiations for the sale of the aircraft:

> Q.   Mr. Bloom, you understood, didn't you, that Glencove was relying on you to give them the guidance they needed in order to make their purchasing decision with respect to the aircraft. That was the whole purpose in engaging with them, right?
>
> **A.   Yes**
>
> Q.   And you understood that it would be important in that context for you to be honest in you communications with them?
>
> **A.   Yes.**
>
> Q.   And the whole purpose of getting Glencove and the Pierces to sign off on the Agent Agreement was so that you could go out and talk to the Fred Cei's of the world and try and find a plane that they would have an interest in buying and then negotiate a sales price for that plane, right?
>
> **A.   Correct.**[16]

Further following the conclusion of negotiations, Bloom and/or his attorney prepared the draft purchase agreement and organized the closing, identifying Glencove as the end purchaser.[17] Indeed, even Bloom's own expert, Jason Zilberbrand, conceded that the relationship of Bloom to Glencove was that of an agent:

---

[16] *See* Bloom's Testimony, courtroom e_20200624-1201, courtroom e_20200624-1206.
[17] *See* Draft Purchase Agreement, Glencove Trial Ex. 23.

Q.     Mr. Zilberbrand, did you form any opinions regarding [. . .] the role that [.
.] Mr. Bloom played in the transaction?

**A.     [F]rom reading the documentation and the agreements that were signed, it
appears that he was hired to represent the purchasers [as] an exclusive
agent.**[18]

Thus, regardless of the existence of any contract, Bloom acted as Glencove's agent and,

therefore, was bound by an agent's duties.

## B.     The economic loss rule does not apply.

Bloom also argued during closing arguments at trial (and in his motion for summary

judgment) that Glencove's § 523(a) claims are barred by the economic loss rule, which states

that "a party suffering only economic loss from the breach of an express or implied contractual

duty may not assert a tort claim for such a breach absent an independent duty of care under tort

law."[19]  *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).  Specifically,

Bloom argues that any claimed wrongful conduct alleged against him arises out of duties under

the Agent Agreement and, therefore, is duplicative of Glencove's breach-of-contract claims

against BBJ, which are presently pending in state court.[20]  This argument is somewhat ironic

considering that, throughout this case, Bloom has adamantly maintained that he is not even a

party to the Agent Agreement but, rather, that the agreement is exclusively between Mr. and

Mrs. Pierce and BBJ.  Even ignoring this equivocation, however, Bloom's argument is

substantively unfounded.

First and foremost, Bloom cites absolutely no authority suggesting that the economic loss

rule applies to a non-dischargeability claim under § 523.  Indeed, the very nature of a non-

dischargeability claim militates against the rule's application.  Specifically, the entire purpose of

---

[18] *See* Jason Zilberbrand's Testimony, courtroom e_20200624-1337.
[19] *See* Bloom's Motion for summary judgment (Doc. 43 at pg. 21-22).
[20] *Id.*

the economic loss rule is "to maintain a distinction between contract and tort law." *Alma*, 10 P.3d at 1262. But, a non-dischargeability claim is not a tort. Rather, it is a statutory claim to which the contract/tort distinction does not apply. *See In re Grandparents.com, Inc.*, 17-14711-LMI, 2020 WL 1875165, at *4 (Bankr. S.D. Fla. Apr. 10, 2020) (economic loss rule did not apply to bankruptcy claim to avoid a transfer based on constructive fraud because "statutory claims are not tort claims."). Accordingly, application of the economic loss rule in the non-dischargeability context makes no sense.

Nevertheless, Bloom appears to contend that, because the economic loss rule could *potentially* apply to the underlying fraud-based torts (*i.e.*, common-law fraud, fraudulent inducement, etc.), on which Glencove's bankruptcy claim is *partially* based, then the rule would equally apply to the non-dischargeability action. But, this misconstrues the statute. Nothing in § 523(a)(2)(A) or § 523(a)(6) requires a creditor to succeed on an underlying *tort* claim to be eligible for non-dischargeability. Rather, § 523(a)(2)(A) applies to "***any*** debt" (*i.e.*, any liability on any ***claim***, as broadly defined in the Bankruptcy Code)[21] for money or property that was "obtained by . . . false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A) (emphasis added). Likewise, § 523(a)(6) applies to any willful and malicious "injury," which is broadly understood to mean "a violation of another's legal right, for which the law provides a remedy." *In re Burris*, 598 B.R. 315, 333 (Bankr. W.D. Okla. 2019).

Hence, even if the economic loss rule applied to Glencove's fraud-based claims currently pending in state court (which, as discussed below, it clearly does *not*), and Glencove was forced to pursue such claims solely on a breach-of-contract theory, this would not alter the fraudulent nature of the underlying *conduct* forming the basis of the claim. The claim would still be non-dischargeable even though denominated as a "breach-of-contract" because the underlying

---

[21] The Bankruptcy Code defines "debt" simply as "liability on a claim." 11 U.S.C. § 101(12).

breach—and the money or property obtained thereby—would, nonetheless, have arisen by "false pretenses, a false representation, or actual fraud" and/or by "willful and malicious injury" as contemplated in § 523. Put another way, if a party breaches a contract by *lying*, *cheating*, and *stealing* against the other contracting party (as Bloom did), the fact that the wrongdoer's liability might ultimately come by way of a breach-of-contract claim does not change the fact that the resulting debt is the product of fraud and/or willful and malicious injury. *See In re David*, 05-3078-BKC-LMI-A, 2008 WL 2222069, at *10 (Bankr. S.D. Fla. May 21, 2008) (refusing to apply economic loss rule to a non-dischargeability claim based, in part, on a breach-of-contract because "a breach of contract can nonetheless . . . include fraudulent acts.").

But, even if the economic loss rule could theoretically apply in the non-dischargeability context, it clearly does not apply in this case. As the Colorado Supreme Court made clear, the critical inquiry in determining whether the economic-loss rule applies is not the nature of the loss (*i.e.*, whether it involves economic damages) but, rather, the source of the duty allegedly breached. *Id.* at 1262 n.8. To avoid the application of the economic loss rule, a party must (1) identify an independent tort duty, and (2) assert a tort claim based on that independent duty. *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168–69 (D. Colo. 2018). "Tort obligations generally arise from duties imposed by law" to protect the general public. *Alma*, 10 P.3d at 1262. By contrast, "contract obligations arise from promises made between parties" and are designed "to enforce the expectancy interests created by the parties' promises[.]" *Id.*

Bloom erroneously assumes that the economic loss rule bars all tort claims related to a contractual transaction. However, the economic loss rule precludes recovery in tort *only* when "the duty breached is a contractual duty." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226 (10th Cir. 2000) (applying Colorado law). The rule is inapplicable where

"the duty breached . . . arises independent of the contract," such as the common-law duty to abstain from fraud, either by affirmative misrepresentation or concealment.  *Id.*;  *see also Alma*, 10 P.3d at 1263; *Black v. First Fed. Sav. & Loan Ass'n of Fargo, N. Dakota, F.A.*, 830 P.2d 1103, 1113 (Colo. App. 1992).  Indeed, "common law tort claims that are expressly intended to remedy economic loss such as fraud . . . can exist independent of ***or in conjunction with*** a contractual claim."  *Robinson v. Colorado State Lottery Div.*, 179 P.3d 998, 1004 (Colo. 2008) (emphasis added).  Thus, in situations where "it appears two parties have in good faith entered into a contract but, in actuality, one party has deliberately made material false representations of past or present fact [or] has intentionally failed to disclose a material past or present fact," the economic loss rule does not apply.  *Wharf*, 210 F.3d at 1227.

Here, the gravamen of Glencove's underlying fraud-based claims is *not* that Bloom breached the Agent Agreement (although BBJ certainly did).  Rather, it is that Bloom outright *lied* by sharing information he knew to be false, and by concealing the true facts, with the intent that Glencove rely on it.  Bloom even admitted to doing so, both in the Stipulations of Fact and in testimony during cross-examination.  Bloom affirmatively misrepresented the terms of Loretto's offer for the sale of the aircraft in an effort to mislead Glencove into agreeing to a purchase price that was ***a quarter-million dollars*** higher than what Loretto was willing to take.[22] Bloom then took pains to conceal the details of the transaction and his interest in the underlying sale by structuring it as an undisclosed back-to-back with his own company, Big Horn, acting as the straw buyer, so that he might surreptitiously reap the benefit of the upcharge.[23]

Such conduct is actionable under Colorado law irrespective of *any* agreement between Glencove and Bloom.  The mere fact that Glencove's fraud claims overlap with its breach-of-

---

[22] *See* Glencove Trial Exs. 13-15.
[23] *See* Glencove Trial Ex. 24 and Stipulations of Fact 37-51 (Doc. 53).

contract claim in terms of supporting allegations and evidence does not change the fact that the source of the duty breached is independent of any contract. *See Brody v. Bock*, 897 P.2d 769, 776 (Colo. 1995) (discussing the economic-loss rule in the fraud context, noting that "the fact that such alleged representations constitute the substance of [plaintiff's] breach of contract claim does not require dismissal of his tort claim."). Therefore, Bloom's economic loss argument fails.

**C.    The confidentiality provisions of the Agent Agreement do not apply.**

In defense of the bogus back-to-back structure of the underlying aircraft sale, by which Bloom concealed the identity of the seller and the "true" purchase price of the aircraft from Glencove, Bloom points to Article 10 of the Agent Agreement, under the heading "Confidentiality." This article states, among other things, that "AGENT [i.e., Bloom] agrees not to communicate any information to BUYER [i.e., Glencove] in violation of proprietary rights of any third party." Based on this provision, Bloom maintains that he was contractually bound to protect Loretto's identity during the sale, and therefore, the back-to-back transaction was entirely appropriate. Such hollow rationalization does not bear legal scrutiny.

Article 10 of the Agent Agreement only prevented Bloom from disclosing "proprietary" information of "third parties." Though the agreement does not define the scope of "proprietary information" as contemplated in Article 10, Colorado's Uniform Trade Secrets Act provides some guidance as to the type of information generally protected from disclosure. Specifically, the act defines as a "trade secret" "any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. § 7–74–102(4). Factors to consider in determining whether a trade secret exists include: (1) the extent to which the information is

known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the business to guard the information; (4) the savings effected and the value to the business in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).

Bloom has provided *zero* legal authority to the court supporting his proposition that the mere identity of a willing seller, or more importantly, the true sales price for the aircraft, in a simple transaction for the sale of goods is *per se* confidential or proprietary. Moreover, Bloom has not presented any evidence indicating that such information was uniquely proprietary under the circumstances of this case, or that any of the factors outlined above militate in favor concealing this information. For instance, there is no record evidence that Loretto or any of its agents, officers, or employees requested that its identity be kept secret. A simple review of the records produced by Loretto and its agent, Fred Cei, bear this out.[24] Likewise, there is nothing unusual or exceptional about the facts surrounding the underlying aircraft sale that would warrant protection of this information. Simply put, there is *no explanation or justification* for Bloom's concealment of Loretto's identity as confidential, trade secret, or otherwise proprietary information in this case.

But even if Bloom could support his position that Loretto's identity was "proprietary information" (which he cannot), this does not account for or explain Bloom's concealment of numerous *other* facts associated with the back-to-back sale. For instance, in addition to Loretto's identity, Bloom also concealed from Glencove (1) the *true* $3.3 million purchase price that Loretto agreed to, (2) the interrelationship between Bloom, BBJ, Rose, and Big Horn, (3) the

---

[24] *See* Glencove Trial Exs. 89 and 91, respectively.

14

$250,000 upcharge[25] on the purchase price, and (4) Bloom's, Rose's and Orman's personal interest in the transaction.  As with Loretto's identity, Bloom does not even attempt to explain how this information constitutes the "proprietary rights" of any party.   To the contrary, Glencove's expert—Mr. John B. Foster, IV—testified that this is precisely the information that *must* be disclosed in this type of transaction according to the standards of the industry.[26]  Indeed, Bloom never even told Glencove that the subject sale would be structured as a "back-to-back" sale—a point that ***Bloom's own expert***, Jason Zilberbrand, stated should typically be disclosed to a client in any type of commercial transaction.[27]  Simply put, the confidentiality provisions of Article 10 have *nothing* to do with Glencove's claims and provide no defense to Bloom.

**D.     Bloom's efforts to encumber the aircraft with a lien were illegal and fraudulent.**

As stated above, one of the debts for which Glencove seeks a non-dischargeability judgment in this case concerns the fees, costs, and expenses connected with defending against and removing a knowingly illegal lien Bloom filed against the aircraft.  Bloom wrongfully filed this lien in response Glencove's termination of the Management Agreement, occasioned by Bloom's mismanagement of the aircraft and mishandling of the monthly invoices.  At trial, Bloom argued that this lien was proper under the existing laws of Texas, and therefore, any liability associated with the lien is dischargeable.  Texas law, however, makes clear the lien was, in fact, illegal, and Bloom's statements supporting the lien were wholly fraudulent.

The Texas Property Code provides that "[a] person who stores, fuels, repairs, or performs maintenance work on an aircraft" has a lien on the aircraft for:  (1) the amount due under a contract for the storage, fuel, repairs, or maintenance work or (2) if no amount is specified by

---

[25] Which Rose admitted in cross-examination was the only reason for the back-to-back. *See* Brad Rose's Testimony, courtroom e_20200623-1735 through courtroom e_20200623-1804.
[26] *See* John B. Foster, IV's Testimony, courtroom e_20200623-1028 through courtroom e_20200623-1254.
[27] *See* Jason Zilberbrand's Testimony, courtroom e_20200624-1407, courtroom e_20200624-1412.

contract, the reasonable and usual compensation for the storage, fuel repairs or maintenance work." TEX. PROP. CODE § 70.301(a).  A holder of a lien may record the lien by filing with the Federal Aviation Administration's Aircraft Registry no later than 180 days after the performance of the last repair or maintenance a verified document that includes the following:  (1) the name, address, and telephone number of the holder of the lien; (2) the amount due; (3) a complete description of the aircraft; and (4) the name and address of the owner and the number assigned to the aircraft by the FAA.  *Id.* § 70.303.  The Property Code also requires that the holder of a lien that retains possession of an aircraft[28] shall notify the owner within 60 days of the last repair, and the notice must state the name, address, and telephone number of the holder of the lien, the amount due, a complete description of the aircraft, and the legal right of the lienholder to sell the aircraft at public auction.  *Id.* § 70.304(a).  Failure to meet *all* these requirements renders a lien "unenforceable and invalid."  *See Hutch Aviation, Inc. v. Teal*, 12-19-00001-CV, 2019 WL 5258068, at *6 (Tex. App.—Tyler Oct. 17, 2019, pet. denied).[29]

Bloom first filed the subject lien against the aircraft on June 21, 2016.[30]  For some unexplained reason, the lien asserted two different amounts that Glencove purportedly owed for management expenses—namely, $46,231.00 and $48,131.65.  The lien did *not* include the address or telephone number for either Bloom or Glencove, nor did it include a description of the services or products covered, other than a general statement that Glencove owed Bloom money pursuant to the Management Agreement: certainly not something for which a lien could be placed under Texas law.  The lien did, however, include an acknowledged statement by Bloom

---

[28] Bloom never had possession of the aircraft, so this provision of the statute does not really apply.
[29] Bloom should be familiar with the standards for aircraft liens under § 70.301, since his counsel—Gary Evans—was the attorney of record for the failed "lienholder" in the *Hutch* case.  *See* 2019 WL 5258068.  As he unsuccessfully attempted to do in *Hutch* (losing at both the trial and appellate level), Mr. Evans tries again to advocate for the validity of a lien that plainly failed to meet the requirements of § 70.303.  This Court should follow the example of *Hutch* and reject his arguments.
[30] *See* Glencove Trial Ex. 73, pg. 3.

that BBJ "has and claims a lien upon said aircraft . . . according to the laws of the State of Texas, Title 5, Subtitle B, Chapter 70, Subchapter D, Aircraft Repair and Maintenance Lien."[31]

On July 8, 2016, Bloom filed an amendment to the lien.[32]  The only change was a reduction in the lien amount by about half—i.e., to $23,157.47.  Bloom did not include the required information that was missing in the original—specifically, the addresses or telephone numbers for the parties or a specific description of the goods or services provided for which a lien could be placed.  As adduced at trial, Bloom subsequently informed Glencove's mortgage company about the lien.[33]  The mortgage company then declared the note in default and demanded that Glencove remove the lien or face foreclosure.[34]  Had the mortgage company done so, Glencove would have lost the plane and the considerable equity that it had invested in the plane.  Thus, Glencove was forced to pay Bloom to have the lien removed.[35]

On August 5, 2016, after Glencove initiated a lawsuit in Texas to have the lien removed, Bloom amended and supplemented the lien a second time, again reducing the amount allegedly owed in half again—i.e., to $13,143.57.[36]  Thus, over the course of less than two months, Bloom reduced the lien amount from (roughly) $48,000 to $23,000 to $13,000.  All of this was done without Glencove having paid Bloom or BBJ any money,[37] thus confirming that the amounts claimed by Bloom in the original filing were, indeed, fraudulent since neither Bloom nor BBJ ever paid any other entity or person the difference between the original claimed lien amount or the final amended amount.  Regardless, this last amendment had the same problems as its predecessors in that it failed to include the information required by the statute.  Nevertheless, the

---

[31] *Id.*

[32] *Id.*, pg. 2.

[33] *See* Huw Pierce's Testimony, courtroom e_20200622-1410, courtroom e_20200622-1415.

[34] *Id.*

[35] *Id.*

[36] *See* Glencove Trial Ex. 73.

[37] *See* Huw Pierce's Testimony, courtroom e_20200622-1415, courtroom e_20200622-1420.

amendment included another acknowledged statement by Bloom that BBJ "has and claims a lien upon said aircraft . . . according to the laws of the State of Texas, Title 5, Subtitle B, Chapter 70, Subchapter D, Aircraft Repair and Maintenance Lien."[38]

The lien and amendments were illegal and invalid on substantive and procedural grounds. First, the statute requires that a lien include certain information, including: (1) the name, address and telephone number of the lienholder; (2) the amount due for "storage, fuel, repairs or maintenance;" and (3) the address of the plane's owner. TEX. PROP. CODE § 70.303. This information was not included in the original lien or any of the amendments. Accordingly, the liens did not comply with even the most basic requirements of the statute.[39]

Second, and perhaps most importantly, the lien statute limits the class of persons authorized to file a lien against the aircraft to persons who actually "store, fuel, repair or perform maintenance work" on the aircraft. TEX. PROP. CODE § 70.301(a); *Westwind Acquisition Co. v. Universal Weather and Aviation*, 668 F. Supp. 2d 749 (E.D. Va. 2009) (applying Texas law). Bloom did none of these. Indeed, the liens do not even mention "storage," "fuel," "repair," and/or "maintenance" of the aircraft. Bloom and Rose both admitted that neither Bloom nor BBJ provided any of these services.[40] Rather, as Rose confirmed, Millionaire hangered the plane and provided fuel, and Haggan Aviation performed maintenance and repairs, if any were needed.[41] And, as shown at trial, Glencove paid these charges directly.[42] Bloom never paid them. In fact,

---

[38] *See* Glencove Trial Ex. 73, pg. 1.
[39] The original lien mentioned the owner as "Share Air Corporation." Glencove is not familiar with this company. In any event, Share Air Corporation was not a party to the Management Agreement, and did not own the plane. There is no dispute that Glencove did.
[40] *See* Bloom's Testimony, courtroom e_20200624-1216; *see also* Brad Rose's Testimony, courtroom e_20200623-1735 through courtroom e_20200623-1804.
[41] *See* Brad Rose's Testimony, courtroom e_20200623-1735 through courtroom e_20200623-1804.
[42]*See* Huw Pierce's Testimony, courtroom e_20200622-1206, courtroom e_20200622-1211, courtroom e_20200622-1216.

Bloom was not even supposed to pay these charges.[43]  To the extent Bloom was involved at all in anything other than arranging for flights, he simply attempted to charge Glencove for items provided by other vendors without having paid for them first.[44]  Regardless, Bloom had no standing to assert the lien at all, which was void *ab initio*, and his statements included with the lien and amendments that Bloom and/or BBJ presently possessed the lien or had any right to the lien were fraudulent and false.

In their closing arguments, Bloom's counsel cited a Dallas Texas Court of Appeals decision, *In re Curry*, as evidence that an aircraft "manager" may file a lien against an aircraft for services provided.  407 S.W.3d 376 (Tex. App. 2013).  As discussed in rebuttal argument, however, Bloom's counsel neglected to mention that, unlike Bloom, the "manager" in *Curry* actually provided the storage and repairs for the aircraft in question (rather than just arranging for third-parties to provide these services).  *Id.* at 377.  Thus, unlike Bloom, the manager in *Curry* did, in fact, qualify to file the lien under the statute's terms.  TEX. PROP. CODE § 70.301(a).  Further, even if this were not the case, the appellate court expressly noted that the relators in the underlying case "do not argue [the manager] is not the holder of a valid lien on the aircraft."  *Id.* at 379.  Thus, the issue of standing was not even before the court.  In short, *Curry* is factually and legally inapposite, and Bloom's reliance upon it is wholly misplaced.

In sum, Texas law did not allow Bloom or BBJ to place a lien on the plane, but he did so anyway.  Bloom has not attempted to justify or excuse this illegal conduct.  Not only did Bloom place the illegal lien on the plane, he called the mortgage company in an attempt to intimidate

---

[43] *See* Glencove Trial Ex. 62.

[44] As established at trial, Bloom was to have arranged for the CAMP program on the aircraft.  CAMP had sent an invoice to Bloom in January 2016 for annual program fee.  *See* Glencove Trial Ex. 59.  By the time Glencove canceled the Management Agreement in May 2016, Bloom had still not paid the invoice, but attempted to charge Glencove for it in his April Invoice from June 25, 2016. *See* Bloom Trial Ex. C, p. 53. Bloom even used it as a basis for his fraudulent lien even though he had not paid for the program.  Glencove paid this invoice directly in June 2016. *See* Glencove Trial Ex 72.

Glencove into paying Bloom's demand.  Essentially, Bloom held the plane hostage, causing Glencove to have to pay the extortion money to have the lien released, the mortgage compnay's attorney's fees, and Glencove's own attorneys' fees in getting the lien released.  For these reasons, Bloom's filing of the lien was a wholly illegal and fraudulent act, caused Glencove damages for Bloom's willful and malicious injury to Glencove and its property, and Glencove's associated damages arising from Bloom's acts are non-dischargeable under § 523(a).

### E.   Bloom conspired to defraud Glencove.

Bloom and his counsel have also contested Glencove's conspiracy claim as lacking any evidence to support an illegal agreement.  Under Colorado law, a civil conspiracy "may be implied by a course of conduct and other circumstantial evidence" provided only that there is "some indicia of agreement in an unlawful means or end."  *Schneider v. Midtown Motor Co.,* 854 P.2d 1322, 1327 (Colo. App. 1992).  The illegality and fraudulent nature of the underlying aircraft sale is well supported by the evidence in this case and need not be threshed out again here.  As to the underlying agreement, the circumstantial and direct evidence in this *strongly* militates in Glencove's favor.

Specifically, Bloom, BBJ, Big Horn, Rose, and Orman are all closely-related entities and/or friends with strong business and personal ties.  Bloom is the sole owner and manager of BBJ.  He is also the sole owner of Big Horn, which he co-manages with Rose, his personal attorney.  Bloom and Orman refer business to each other and routinely engage in these types of back-to-backs.  Bloom and Rose worked together to arrange the back-to-back sale of this aircraft with Big Horn as the "straw" purchaser.  Indeed, Rose signed the PSA for the "straw" transaction.  Further, Rose himself admitted that any actions he and/or Big Horn undertook

respecting the underlying transaction was performed at the direction of Bloom and BBJ.[45] Moreover, the September 28, 2015, IATS email regarding the "breakdown of the $250K," plainly shows that Rose, Bloom, and Orman all shared in the $250,000 realized from Bloom's misrepresentations and concealment during the sale, with $29,633.66 going to Rose, and $130,366.34 going to BBJ (for which, again, Bloom is the *sole* manager and owner).[46] Thus, there is clearly "indicia" of an agreement between Bloom, Rose, BBJ, Big Horn, and Orman to work together to inflate the purchase price of the aircraft and defraud Glencove of a quarter million dollars.[47] Further, as Rose confirmed during cross-examination, he worked with Bloom to place the illegal lien on the aircraft in June 2016.[48] Accordingly, Glencove's conspiracy claims should prevail.

### F.   Bloom's conduct significantly impacts the public.

Bloom also challenges Glencove's ability to recover on its claims under the Colorado Consumer Protection Act ("CCPA"). *See* §§ 6-1-105, 6-1-113, C.R.S. The CCPA was enacted to regulate commercial activities and practices which, "because of their nature, may prove injurious, offensive, or dangerous to the public." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003) (internal quotations omitted). To prevail on a CCPA claim, a plaintiff must prove that (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Garcia v. Medved*

---

[45] *See* Brad Rose's Testimony, courtroom e_20200623-1735 through courtroom e_20200623-1804.
[46] *See* Glencove Trial Ex. 42.
[47] And Bloom was additionally paid $120,000 as a fee for his work.
[48] *See* Brad Rose's Testimony, courtroom e_20200623-1735 through courtroom e_20200623-1804; *see also* Glencove Trial Ex. 73 and

*Chevrolet, Inc.*, 263 P.3d 92, 98 (Colo. 2011).  Glencove has already detailed the evidence supporting elements (1)-(2) and (4)-(5) at trial and in its previous summary judgment briefing and will not repeat the same here.  Rather, Glencove writes briefly to address the third element— impact to the public—and explain why the evidence warrants judgment in Glencove's favor.

Courts often consider three factors are in determining public impact for CCPA claims: (1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.  *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 149 (Colo.2003).  Importantly, these factors are not exhaustive, and no single factor or collection of factors controls in any case.  *One Creative Place, LLC v. Jet Ctr. Partners, LLC*, 259 P.3d 1287, 1290 (Colo. App. 2011).  Accordingly, Colorado courts have viewed the analysis "more akin to a balancing test than a checklist."  *Id.*

Here, Bloom's own testimony confirms that his actions significantly impact the public as "actual or potential consumers of [Bloom's] goods, services, or property."  Bloom himself testified that he has structured "many" back-to-back transactions following the same model of the sale that underlies this case—namely, using his own company as a straw purchaser without informing the client.  As Bloom testified:

> Q.    You've done many back-to-backs over the years, right?
>
> **A.    Yes.**
>
> Q.    [. . .] [J]ust like with this one [. . .] between Loretto, Big Horn, and Glencove [. . .] you've done a number of different [. . .] back-to-backs using that same type of scenario, right?
>
> **A.    Yes.**[49]

---

[49] *See* Bloom's Testimony, courtroom e_20200624-1322, courtroom e_20200624-1327.

Bloom's admitted, repeated engagement in the type of conduct at issue in this case places the public at significant risk of his continued fraud.

Moreover, in these types of transactions, Bloom's conduct creates a gross imbalance of power in his favor. Specifically, where (as here) Bloom willfully conceals pertinent information concerning the nature of the transactions, his clients—even sophisticated clients—are unable to discover (1) the existence of the back-to-back sale, (2) the identity of the "true" seller, and (3) any undisclosed "mark-up" that Bloom has built in to the purchase price. In such cases, Bloom's clients have virtually no protection from his fraud and, absent extraordinary circumstances, are unlikely to discover even the existence of an injury. Indeed, Bloom's self-serving testimony that "this is the only [back-to-back transaction] I've had a problem with"[50] begs an obvious question—of the "many" prior transactions that he's structured in this manner, how many of his clients were deceived into an inflated purchase price (as Glencove was in this case) and simply never discovered the nature of the fraud?

In sum, Bloom admits that his clients rely on his skill, experience, and professional advice to facilitate the negotiation and purchase of aircrafts. Notwithstanding this, Bloom further admits—with no apparent reservations—that he *routinely* follows the "back-to-back" transaction model involved in this case. Such a model virtually ensures Bloom's ability to enrich himself at his clients' expense while disguising his fraud from detection. Such conduct places the public at significant risk, and therefore, the Court should enter judgment in Glencove's favor on its CCPA claims.

---

[50] *Id.* In any event, Bloom's statement is false, which was pointed out in trial during the testimony of Mary Lynn Fisk. Bloom, BBJ and Haggan were all sued in 2017 by another client of Bloom, Martin Gallan, under remarkably similar circumstances. Indeed, Bloom allowed BBJ to default and a judgment was entered against it for over $900,000 by Judge R. Brooke Jackson. *See* Civil Case No. 17-CV-00186-RBJ.

23

G.      **All of Glencove's claimed damages are non-dischargeable.**

Bloom has also previously challenged Glencove's non-dischargeability claims on the grounds that Bloom did not personally benefit from certain (but not all) of the losses underlying these claims—namely, a loss of $25,915 paid to Aircraft Finance Corporation to facilitate a loan, and certain fees and expenses related to Bloom's unlawful lien against the aircraft.[51]  The sole asserted basis for this challenge is Bloom's view that, in any § 523(a) non-dischargeability claim, the creditor must show that the debtor "received the benefits" of the claimed losses.[52] Unfortunately for Bloom, the United States Supreme Court has rejected this interpretation.

Specifically, in *Cohen v. de la Cruz*, the Supreme Court considered a judgment holding that an award of treble damages along with costs and attorneys' fees was dischargeable under § 523(a)(2)(A).  523 U.S. 213, 219 (1998).  In challenging this judgment, the petitioner argued— exactly as Bloom does—that a "debt for" money, property, or services obtained by fraud "is necessarily limited to the value of the money, property, or services received by the debtor," in effect creating a "restitutionary ceiling on the extent to which a debtor's liability for fraud is nondischargeable."  *Id.*  The petitioner maintained that, because he never "received" the money constituting the award of treble damages, costs, and attorneys' fees, such liability fell outside § 523(a)(2)(A)'s scope.  *Id.*

The Supreme Court rejected this argument on several grounds, noting that such interpretation "is at odds with the meaning of the same phrase in parallel provisions" of the Bankruptcy Code, and that the legislative history of § 523 militates against such construction. *Id.* at 219-222.   Perhaps most importantly, the Court held that the petitioner's construction conflicted with the overall purpose of § 523(a)'s discharge provisions, which, as the Court

---

[51] *See* Bloom's Reply to Glencove's Response to Motion for Summary Judgment (Doc. No. 50) at pg. 9-10.
[52] *Id.*

observed, "reflect a conclusion on the part of Congress that the creditors' interest in recovering full payment of debts in these categories outweigh[s] the debtors' interest in a complete fresh start." *Id.* at 222 (internal quotations omitted).  As the Court explained:

> Limiting the exception to the value of the money or property fraudulently obtained by the debtor could prevent even a compensatory recovery for losses occasioned by fraud.  For instance, if a debtor fraudulently represents that he will use a certain grade of shingles to roof a house and is paid accordingly, the cost of repairing any resulting water damage to the house could far exceed the payment to the debtor to install the shingles . . . [A]nother example along these lines[] involve[es] a debtor who fraudulently represents to aircraft manufacturers that his steel bolts are aircraft quality [and] obtains sales of $5,000 for the bolts, but the fraud causes a multi-million dollar airplane to crash.

*Id.*  (internal citations and quotations omitted).  In such situations, the petitioner's (and Bloom's) interpretation of § 523(a) "would allow the debtor in those situations to discharge any liability for losses caused by his fraud in excess of the amount he initially received, leaving the creditor far short of being made whole." *Id.* at 223.

    *Cohen* makes clear that debt dischargeability under § 523(a) is not contingent on the debtor's receipt of the benefits of the debt.  To the contrary, § 523(a) dischargeability extends to "all liability arising from fraud," including direct and consequential damages, statutory and exemplary damages, costs and attorneys' fees, etc., regardless of whether the debtor "obtained" the money, property, or services represented in such damages.  *Id.* at 214-15.  Accordingly, to the extent Bloom seeks to limit the scope of damages that are not dischargeable in this case, such argument must be rejected.

## H.    Bloom's reliance on contractual disclaimers is meritless.

    Finally, Bloom contends that Glencove has contractually disclaimed and/or limited any remedies or recoverable damages against Bloom arising out of the sale and/or management of the aircraft.  First, the contracts to which Bloom presumably refers are the Agent Agreement and the

Management Agreement.[53]  Of these, only the Management Agreement contains any provision regarding any "limitation" of damages or remedies.  The Agent Agreement contains no such provision.  Accordingly, Bloom's argument clearly has no applicability to any damages arising from the misrepresentation and concealment associated with the negotiations, inspections, and sale of the underlying aircraft—all of which occurred *before* the parties executed the Management Agreement.[54]

As to the Management Agreement, though ¶ 8.02 of this contract does contain a "Limitation of Liability" provision, it is not effective to restrict Glencove's damages or remedies related to the fraud claims that are the subject of this case.  Specifically, ¶ 8.02 of the Management Agreement only applies to damages "arising out of this agreement."  As previously discussed, Bloom's misrepresentations and illegal conduct breached tort duties and statutory duties imposed by either the CCPA or the Texas Property Code that exist independent of the Management Agreement.  *See Wharf*, 210 F.3d at 1226;  (10th Cir. 2000); *Alma*, 10 P.3d at 1263; *Black*, 830 P.2d at 1113.  Accordingly, Glencove is not limited to the contract remedies for these claims, even if they applied.  *Id.*

Moreover, it must be remembered that the Management Agreement between Glencove and BBJ is predicated on Bloom's fraud.  The evidence is clear that, during the negotiations and sale of the underlying aircraft, Bloom took advantage of Glencove to profit himself by outright lies and concealment.  Obviously, Bloom never disclosed these facts to Glencove prior to convincing it to enter into the subsequent Management Agreement.  As the evidence showed at trial, and which Bloom did not even seek to controvert, had Glencove known of Bloom's

---

[53] Glencove Trial Exs., 7 and 55, respectively.
[54] To the extent that Bloom also refers to the PSA, his argument falls flat because Big Horn is not a party to this action and Bloom did not sign the PSA in any capacity.  *See* Glencove Trial Ex. 24.  If even if had, the PSA was procured through fraud, which as discussed below, vitiates any disclaimers or limitations.

deception concerning the negotiations and sale of the aircraft, it *never* would have agreed to enter into any contract with him or his company concerning the management and operations for the aircraft.  Simply put, Bloom's attempt to rely on a limitation provision in a contract that itself was procured by fraud and concealment is wholly inequitable and should not be countenanced by the Court.  *See Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp.*, 24 F.3d 1190, 1195 (10th Cir. 1994) (evidence of pre-contract fraudulent conduct made to induce execution of contract is admissible to vitiate contract provisions).

## IV.
### CONCLUSION

For the foregoing reasons, Plaintiff Glencove Holdings, LLC respectfully requests the Court to consider its Post-Trial Brief, allow Glencove's claims against Bloom, and enter a judgment granting Glencove all relief requested in this adversary suit, to which it is justly entitled.

Respectfully submitted this 10th day of July, 2020.

KUTAK ROCK LLP

*/s/ Adam L. Hirsch*
Adam L. Hirsch (Colo. 44306)
Kutak Rock LLP
1801 California St., Suite 3000
Denver, CO 80202
Telephone: (303) 297-2400
Facsimile: (303) 292-7799
Email: adam.hirsch@kutakrock.com

and

*/s/ R. Edward Perkins*
R. Edward Perkins (admitted in Colo. U.S.
District Court)
SHEEHY, WARE & PAPPAS, P.C.
909 Fannin Street, Suite 2500
Houston, Texas  77010
Phone Number: (713) 951-1004
Facsimile: (713) 289-2004
E-mail: eperkins@sheehyware.com

ATTORNEYS FOR CREDITOR
GLENCOVE HOLDINGS, LLC

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on July 10, 2020, in accordance with Federal Rules of Civil Procedure, I electronically filed with the Clerk of the Court using the CM/ECF system and served by prepaid first class mail a copy of the foregoing on the following:

K. Jamie Buechler
Buechler Law Office, LLC
999 18th Street, Suite 1230-S
Denver, CO  80202
Jamie@KJBlawoffice.com
*Attorneys for Defendant Steven Bloom*

/s/ Adam L. Hirsch