# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>STEVEN W. BLOOM,<br><br>Debtor. | Bankruptcy Case No. 17-11650 TBM<br>Chapter 11 |
| GLENCOVE HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN W. BLOOM,<br><br>Defendant. | Adv. Pro. No. 17-1255 TBM<br><br><br>(Opinion in both Bankruptcy Case and<br>Adversary Proceeding) |

---

## MEMORANDUM OPINION AFTER TRIAL

---

### I.   Introduction.

Bankruptcy provides a temporary safe haven for "honest but unfortunate debtor[s]"[1] who "can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."[2]  The foundation of American insolvency law is the possibility of a discharge which provides a "fresh start" — an economic second chance which acts as a sort of safety valve in our capitalist system.  However, not all debtors are entitled to a discharge.  The Bankruptcy Code[3] "has long prohibited debtors from discharging liabilities incurred on account of their fraud . . . ."[4]  Those few debtors who engage in pre-bankruptcy dishonesty must continue to bear responsibility for the damages resulting from their misconduct.

---

[1]      *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'").

[2]      *Grogan,* 498 U.S. at 286 (quoting *Local Loan Co. v. Hunt*), 292 U.S. 234, 244 (1934)).

[3]      11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[4]      *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998).

At its core, this dispute requires the Court to decide whether Steven W. Bloom ("Mr. Bloom"), a debtor who filed for bankruptcy protection, is an "honest but unfortunate debtor" deserving a discharge of the debt he owes to his largest general unsecured creditor: Glencove Holdings, LLC ("Glencove"). No one really wants to be called out for fraud. However, the facts lead where they lead. This is what happened.

Jennifer and Huw Pierce, a couple of some means, were interested in buying a private jet. Mr. Bloom reached out to represent them as their broker. He suggested that they form a corporate entity, Glencove, to buy the aircraft. Glencove entered into an Agent Agreement with Mr. Bloom's wholly-owned company, Bloom Business Jets, LLC ("BBJ"). Glencove promised to pay $121,000 as an "Agent's Fee" for agency services. Mr. Bloom found a suitable jet and helped Glencove make an initial offer. The seller came back with a favorable counteroffer — better than Mr. Bloom had expected. At that point, Mr. Bloom saw an opportunity to buy the airplane himself (through another wholly-owned company) at a lower price and then simultaneously resell it to his client (Glencove) at a higher price. By engaging in a hidden back-to-back transaction, Mr. Bloom stood to take another $250,000 from Glencove. And that is what he did. Mr. Bloom brazenly lied to Glencove, again and again and again. He concealed from Glencove the favorable counteroffer received from the seller, and pretended that the seller was demanding a higher price. He orchestrated a complex scheme to take advantage of Glencove and, effectively, rob Glencove of the $250,000 price differential. He lied and concealed many other important details too so that the transaction would close.

There really is no other word more apt for what Mr. Bloom did than "fraud." It took Glencove many months to find out what Mr. Bloom had done. When the truth surfaced, a bitter legal dispute between Glencove and Mr. Bloom ensued. Glencove asserted causes of action in state court for fraud by false representation, fraudulent concealment, and a host of other claims. So, Mr. Bloom filed for bankruptcy protection. Glencove filed a proof of claim for its damages and also sought a determination of nondischargeability of debt by reason of "false representation, false pretenses, and actual fraud" and "willful and malicious injury" under Sections 523(a)(2)(A) and 523(a)(6).[5] Mr. Bloom contested both the debt and nondischargeability with a myriad of arguments and detours. However, there is no effective legal defense for what he did. In the end, Mr. Bloom is indebted to Glencove and such debt is nondischargeable. Mr. Bloom must continue to bear responsibility for his actions notwithstanding the bankruptcy.

---

[5]      Because the proof of claim dispute and the dischargeability issues were joined for trial, this Opinion is issued in both a Bankruptcy Case and an Adversary Proceeding. Unless otherwise indicated, the Court will refer to particular documents from the CM/ECF docket for the main Bankruptcy Case, using the convention: "Docket No. ___ in Bankruptcy Case." Similarly, the Court will refer to particular documents from the CM/ECF docket for the Adversary Proceeding using the convention: "Docket No. ___ in Adversary Proceeding."

## II.    Jurisdiction and Venue.

Pursuant to 28 U.S.C. § 1334, this Court has subject matter jurisdiction to adjudicate both of the disputes presented by the parties: allowance or disallowance of Glencove's proof of claim under Section 502; and determination of exceptions to discharge under Section 523(a).  Such issues are core proceedings per 28 U.S.C. §§157(b)(2)(A)(matters concerning administration of the estate), (b)(2)(B)(allowance or disallowance of claims against the estate), (b)(2)(I) (determinations as to the dischargeability of particular debts), and (b)(2)(O)(other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship).  Further, Glencove submitted itself to the jurisdiction of this Court by filing the Glencove Claim.  And, with respect to the Adversary Proceeding, both Glencove and Mr. Bloom expressly, knowingly, and voluntarily conceded that this Court has subject matter jurisdiction to enter final judgment on the claims and defenses.[6] Accordingly, this Court has jurisdiction over the subject matter of the disputes between Glencove and Mr. Bloom.  *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1942-49 (2015) (bankruptcy court may enter final judgment even with respect to *Stern* claims if parties consent); *see also Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 793-94 (10th Cir. 2009) (bankruptcy courts do have jurisdiction to determine nondischargeability, liquidate nondischargeable debt, and enter monetary judgment on nondischargeable debts).  Further, venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## III.    Procedural Background.

### A.    The Pre-Bankruptcy State Court Lawsuit.

Mr. Bloom and BBJ have been embroiled in a dispute with Glencove for the last four years.  The conflict relates to the acquisition and subsequent management of a private jet.  BBJ sued Glencove in Colorado state court in the case captioned: *Bloom Business Jets, LLC v. Glencove Holdings, LLC*, Case No. 2016-CV-30114 (Pitkin County District Court, Colorado) (the "Colorado Action").  Through the Colorado Action, BBJ sought a judgment against Glencove for alleged unpaid airplane management services.  Glencove counterclaimed against BBJ and also brought third-party claims against the following parties: Mr. Bloom; Big Horn Exploration, LLC ("Big Horn Exploration"), which is another company wholly owned by Mr. Bloom; Brad L. Rose, Mr. Bloom's long-time legal counsel ("Mr. Rose"); and Haggan Aviation, Inc. ("Haggan Aviation"), an aircraft repair company recommended by Mr. Bloom.[7]  Glencove's third-party claims against Mr. Bloom in the Colorado Action served as the principal impetus for Mr. Bloom deciding to seek bankruptcy relief.

---

[6]        Docket No. 21 in Adversary Proceeding at 6.
[7]        Claim No. 7-1 in Bankruptcy Case at 5-124.

**B.**     **The Bankruptcy Filing and Glencove Claim.**

Mr. Bloom filed for protection under Chapter 13 of the Bankruptcy Code on the same day Glencove asserted third-party claims against him in the Colorado Action: March 3, 2017.[8]  A few months later, Glencove submitted a $602,393 general unsecured Proof of Claim[9] (Claim No. 7-1, the "Glencove Claim").  In support of the Glencove Claim, Glencove attached a statement itemizing damages and a copy of the "Counterclaim and Third-Party Complaint" (the "Third-Party Complaint") in the Colorado Action[10] through which Glencove asserted causes of action against Mr. Bloom for fraud, fraudulent concealment and inducement, negligent misrepresentation, violation of the Colorado Consumer Protection Act, negligence and gross negligence, civil conspiracy, and attorneys' fees all related to the airplane dispute.  The Glencove Claim is the largest general unsecured claim against Mr. Bloom, and its treatment has been one of the major conflicts in Mr. Bloom's Bankruptcy Case.

A few months after Glencove filed the Glencove Claim, Mr. Bloom filed an "Objection" (the "Objection")[11] requesting that the Glencove Claim be disallowed in its entirety.  Later, Glencove submitted a "Response to Debtor's Objection," further supporting the Glencove Claim.[12]  And, Mr. Bloom tallied last with his "Response to Glencove Holdings, LLC's Response" (the "Response").[13]  The dispute concerning the Glencove Claim ultimately proceeded to trial and is now ripe for decision.

**C.**     **The Adversary Proceeding.**

On June 19, 2017, Glencove filed its "Complaint for Determination of Non-Dischargeability of Certain Debts Pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6)" (the "Complaint") against Mr. Bloom initiating an Adversary Proceeding.[14]  Through the Complaint, Glencove asserted that Mr. Bloom is indebted to Glencove and that such indebtedness should be determined to be nondischargeable based upon "false pretenses, a false representation or actual fraud" under Section 523(a)(2)(A) and "willful and malicious injury" under Section 523(a)(6).  In terms of underlying liability, the Complaint mirrors the Glencove Claim.

---

[8]     In advance of the trial, the parties filed their "Stipulations of Fact" (Docket No. 53 in the Adversary Proceeding, the "Stipulated Facts").  In this Opinion, the Court will refer to any Stipulated Fact as "Stip. Fact No.__."  Stip. Fact No. 1; Docket No. 1 in Bankruptcy Case.

[9]     The amount of the Glencove Claim was $602,393 "as of 3/3/17 [the date of the Debtor's bankruptcy petition]." Glencove also claimed additional unquantified amounts, including for attorneys' fees, costs, and interest.

[10]     Claim No. 7-1.

[11]     Docket No. 32 in Bankruptcy Case.

[12]     Docket No. 43 in Bankruptcy Case.

[13]     Docket No. 54 in Bankruptcy Case.

[14]     Docket No. 1 in Adversary Proceeding.

Mr. Bloom submitted an "Answer" (the "Answer")[15] to the Complaint wherein he generally denied liability and nondischargeability. He also asserted certain affirmative defenses and counterclaims[16] against Glencove. The dispute concerning the Complaint and Answer ultimately proceeded to trial and must be decided by the Court.

## D.   **The State Court Detour.**

On December 18, 2017, Glencove filed a "Motion for Relief from Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001(a), and L.B.R. 4001-1" (the "Motion for Relief from Stay").[17] In the Motion for Relief from Stay, Glencove observed that the Colorado Action had been stayed by virtue of Mr. Bloom's bankruptcy case (at least with respect to claims by and against Mr. Bloom) but that some discovery had already been conducted and "trial is expected to begin in the summer of 2018."[18] Glencove requested that the Court grant relief from stay to permit Glencove and Mr. Bloom to return to state court to liquidate the Glencove Claim through the Colorado Action. Glencove asserted that allowing the Colorado Action to proceed would "promote judicial economy and the expeditious and economical determination of Glencove's Claim."[19] Mr. Bloom opposed the Motion for Relief from Stay.[20]

On January 11, 2018, the Court conducted a preliminary hearing on the Motion for Relief from Stay. The Court determined that prosecution of the Colorado Action would be the most expeditious and economical path for the parties since the Colorado Action was already at an advanced stage. Thus, at the conclusion of the preliminary hearing, the Court granted the Motion for Relief from Stay to permit the Glencove Claim to be liquidated in state court through the Colorado Action.[21]

After the Court granted relief from stay, Mr. Bloom made an oral motion to hold in abeyance the dispute over the Glencove Claim and the Adversary Proceeding pending final adjudication of the Colorado Action in state court.[22] Glencove agreed with that approach. Thus, the Court ordered that the dispute over the Glencove Claim and the Adversary Proceeding be held in abeyance but also directed that the parties file periodic reports concerning the status of the Colorado Action.[23] So, the parties returned to state court in the Colorado Action.

---

[15]   Docket No. 5 in Adversary Proceeding.
[16]   Mr. Bloom did not prosecute any counterclaims against Glencove at trial. Further, Mr. Bloom did not raise any counterclaims in closing argument or post-trial briefing. Accordingly, any counterclaims against Glencove are dismissed for failure to prosecute pursuant to Fed. R. Civ. P. 41, as incorporated by Fed. R. Bankr. P. 7041.
[17]   Docket No. 87 in Bankruptcy Case.
[18]   *Id.* at 2.
[19]   *Id.* at 6.
[20]   Docket No. 95 in Bankruptcy Case.
[21]   Docket Nos. 98 and 99 in Bankruptcy Case.
[22]   *Id.*
[23]   Docket Nos. 98, 99, and 100 in Bankruptcy Case; Docket No. 23 in Adversary Proceeding.

Even though Glencove had asserted that "trial is expected to begin in the summer of 2018," almost two years passed without final adjudication of the Colorado Action.  As of December 19, 2019, the Colorado Action still had not been set for trial in the state court.  To avoid further delay in the bankruptcy process, on December 23, 2019, this Court vacated the abeyance of the Glencove Claim dispute and the Adversary Proceeding.  The Court set the disputes for trial to be conducted on June 22, 2020.[24]  Thus, the diversion and detour to state court ended but, regrettably, only after the loss of substantial time.

### E.  Bankruptcy Case Conversion and Confirmation.

Meanwhile, Mr. Bloom's Bankruptcy Case continued.  After multiple skirmishes in the Chapter 13 process related to whether Mr. Bloom was eligible for Chapter 13 relief, on November 1, 2017, Mr. Bloom requested the Court authorize conversion from Chapter 13 to Chapter 11.[25]  On November 20, 2017, the Court entered an Order converting Mr. Bloom's Bankruptcy Case to Chapter 11 reorganization.[26]

After the conversion, another year passed with little progress toward confirmation of a Chapter 11 plan.  However, on November 19, 2018, Mr. Bloom filed his first disclosure statement and Chapter 11 plan.[27]  He amended his disclosure statement and Chapter 11 plan multiple times, ending with a "Second Amended Chapter 11 Plan of Reorganization" (the "Chapter 11 Plan").[28]  The Chapter 11 Plan provided for alternative treatment of the Glencove Claim depending on: (1) whether the Court allowed the Glencove Claim and, if so, in what amount; and (2) whether the obligation to Glencove was determined to be nondischargeable under Section 523(a).[29]  On May 23, 2019, the Court confirmed Mr. Bloom's Chapter 11 Plan.[30]

### F.  Pre-Trial Proceedings and Trial.

After confirmation of Mr. Bloom's Chapter 11 Plan, the Glencove Claim dispute and the Adversary Proceeding were set for trial.  In the run-up to trial, Mr. Bloom submitted a "Motion for Summary Judgment,"[31] which Glencove opposed.[32]  The Court determined that there were genuine issues of material fact and denied summary judgment.[33]  The parties also submitted an unusually detailed set of "Stipulated Facts."[34]

---

[24]    Docket Nos. 33 and 36 in Adversary Proceeding.
[25]    Docket No. 68 in Bankruptcy Case.
[26]    Stip. Fact No. 2; Docket No. 73 in Bankruptcy Case.
[27]    Docket Nos. 164 and 165.
[28]    Docket No. 244 in Bankruptcy Case.
[29]    *Id.* at 7-8.
[30]    Docket No. 258 in Bankruptcy Case.
[31]    Docket No. 43 in Adversary Proceeding.
[32]    Docket No. 44 in Adversary Proceeding.
[33]    Docket No. 56 in Adversary Proceeding.
[34]    Docket No. 53 in Adversary Proceeding.

Meanwhile, the COVID-19 catastrophe struck.  At the final pre-trial conference, the parties presented their views on whether to continue with the trial and, if so, whether the trial should be conducted in person or by some other means.  Both parties desired to proceed to trial and consented to do so by video trial using the Zoom Government platform.[35]  Accordingly, the Court entered a "Procedure Order for Trial by Video Conference."[36]  Both parties also requested that the Court bifurcate the issue of entitlement to attorneys' fees and costs from all the other issues set for trial reserving such matter for a later date.  The Court concurred and ordered that the issue of entitlement to attorneys' fees and costs would be reserved for additional proceedings.[37]

Thereafter, the Court conducted a three-day video trial on June 22, 23, and 24, 2020.[38]  After opening statements, the Court received testimony from ten witnesses: Huw Pierce; Jennifer Pierce; John (Johnny) Barr Foster IV; Martin Orman; Brad L. Rose; Eugene V. Haggan; Mary Lynn Fisk; Dayna Olivas; Steven W. Bloom; and Jason Zilberbrand.  In addition, the Court admitted into evidence 73 exhibits.[39]  The Court received comprehensive oral closing arguments followed by written post-trial briefs.[40] Thereafter, the Court took under advisement both the Glencove Claim dispute and the Adversary Proceeding as framed by the Complaint and Answer.  Since then, the Court has studied all the admitted exhibits, reviewed the witness testimony, and considered the applicable law. The issues are fully submitted and ripe for decision.

## IV.    Factual Findings.

Based upon the evidence presented at the trial, including the testimony, admitted exhibits, and Stipulated Facts, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

### A.    Mr. Bloom and His Company: Bloom Business Jets, LLC.

Mr. Bloom is an accomplished aviation professional.  He started flying airplanes when he was only 15 years old and earned his pilot's license shortly thereafter.  A few years later, Mr. Bloom attended Metropolitan State College in Colorado then transferred to Embry Riddle Aeronautical University in Florida.  After his undergraduate experience, Mr. Bloom began his long career in aviation.  He started out as a flight line technician and then moved to numerous positions as a pilot in multiple types of aircraft.

In 1985, Mr. Bloom joined Qwest Communications International, Inc. and its various related and predecessor companies ("Qwest") as a pilot.  He spent the next 27 years with Qwest.  He advanced up the business ladder from corporate jet pilot all the way to Director of Aviation for the entire company.  In that capacity, he supervised 32

---

[35]    Docket No. 61 in Adversary Proceeding.
[36]    Docket No. 62 in Adversary Proceeding.
[37]    Docket No. 61 in Adversary Proceeding.
[38]    Docket Nos. 68, 69, and 70 in Adversary Proceeding.
[39]    Docket No. 70 in Adversary Proceeding.
[40]    Docket Nos. 74 and 75 in Adversary Proceeding.

other pilots and was responsible for the acquisition, operation, and maintenance of all of Qwest's private jets and helicopters. He earned "type-ratings" in eleven different types of aircraft, which is an unusual feat for a pilot. While at Qwest, Mr. Bloom also took advanced business courses and received an executive education certificate from the University of Virginia. After his long stint at Qwest, Mr. Bloom joined Bombardier Business Aircraft ("Bombardier") as the sales manager for the western United States. Bombardier is one of the largest manufacturers of private jet aircraft in the world. While at Bombardier, Mr. Bloom sold hundreds of private jets in hundreds of separate transactions.

More recently, Mr. Bloom went out on his own through BBJ. BBJ is a limited liability company. It was originally formed in 2001 as Bloom & Associates, LLC while Mr. Bloom was still with Qwest.[41] Bloom & Associates, LLC changed its name to Bloom Business Jets, LLC on May 15, 2014.[42] The entity was largely dormant until after the name change.[43] Mr. Bloom is the sole member and sole manager of BBJ.[44] BBJ holds itself out as being able to assist "both buyers in search of their 'perfect aircraft' and owners who wish to place their aircraft into the pre-owned resale market."[45] The company claims "an unparalleled reputation worldwide for fairness, integrity and expertise."[46]

## B.   Huw and Jennifer Pierce.

Huw and Jennifer Pierce are a married couple who reside in Houston, Texas.[47] They have two teenage children. Huw Pierce spent most of his career as an engineer. Jennifer Pierce was a real estate agent. During approximately 2007, she shifted her career track to become an owner, developer, and operator of daycares and elementary schools in the Houston metropolitan area. Those businesses have been quite successful — but at a cost. Mr. Pierce describes his wife as a "workaholic" who built up her daycare and elementary school businesses with a "hands-on" approach requiring substantial time and dedication. It was very hard for her to do so much herself. She lost out on time with her children. Mr. Pierce pitched in to help his wife. But, his wife's work commitments were still too much to handle and were taking a toll. In 2017, Mr. Pierce retired from his engineering career to work full-time with his wife in the daycare and elementary school businesses. They have worked together ever since.

---

[41]     Stip. Fact No. 12.

[42]     Stip. Fact No. 13.

[43]     The Court received no evidence concerning the business of BBJ until after the name change from Bloom & Associates, LLC to BBJ in 2014.

[44]     Stip. Fact No. 25.

[45]     Ex. 1 at 2.

[46]     *Id.*

[47]     Stip. Fact No. 28.

C.     **The Pierces Develop an Interest in Acquiring a Private Jet.**

Meanwhile, especially given Jennifer Pierce's exceedingly hectic schedule, she and her husband looked for other ways to maximize their "quality time" with their children, family, and friends.  During early 2015, Huw Pierce came up with the idea to buy a private aircraft.[48]  They thought that using a private airplane would save time in transit from their home in Houston to their rural Texas ranch.  The Pierces also travelled frequently throughout the United States and abroad.  They reasoned that they could save more time by avoiding busy commercial airports and scheduling travel with a private aircraft.  The Pierces contemplated using an airplane for business purposes too.

There was a hitch.  Neither of the Pierces were pilots.  Also, they knew very little about private aviation generally.  They were not familiar with the process for buying an airplane either.  So, Huw Pierce did some research.  They found a Texas-based aviation broker to assist them in acquiring an aircraft:  Ed Vesslee.  They engaged Mr. Vesslee as their exclusive agent for a six-month period to assist them with buying an airplane.  Mr. Vesslee focused primarily on propeller airplanes since he was most familiar with that side of the aviation business.  However, after a while it became apparent that the Pierces' travel needs pointed toward a private jet instead of a propeller airplane.

While Mr. Vesslee was researching the private aviation market and making suggestions for an aircraft purchase, he also raised financial issues.  Given the cost of an aircraft, especially a jet, the Pierces determined that they would take out a loan for part of the acquisition price.  Mr. Vesslee suggested that the Pierces contact a finance company to assist them in obtaining a loan.  He recommended Martin Orman of Aircraft Finance Corporation, an entity that specializes in aircraft financing transactions.  The Pierces contacted Mr. Orman and engaged his company with the understanding that it would receive a "1% finder's fee" for successfully securing a loan.

Meanwhile, the Pierces did not seem to be getting much of anywhere in their quest to buy an airplane.  Huw Pierce liked Mr. Vesslee personally, but he began to think that Mr. Vesslee was not the right fit as an agent for buying a private jet.  However, the Pierces and Mr. Vesslee had entered into an exclusive contract.  Mr. Pierce wanted to honor the contract, but decided that if there was no real progress during the remaining contract term, the Pierces probably would "let the contract with Mr. Vesslee expire."  Mr. Orman also sensed the same and contacted a long-time business acquaintance and friend who worked as an airplane broker specializing in private jets:  Mr. Bloom.  Mr. Orman also told the Pierces that Mr. Bloom might serve their needs better than Mr. Vesslee.

---

[48]      Stip. Fact No. 29.

### D.   Mr. Bloom Introduces Himself and Offers His Services to the Pierces.

Thereafter, Mr. Bloom seized the initiative.  Referencing his connection with Mr. Orman, on April 6, 2015, Mr. Bloom contacted Mr. Pierce to introduce himself.[49]  He hoped to be engaged as an aircraft broker for the Pierces.  Mr. Bloom provided some information about BBJ and asked to speak with Mr. Pierce.[50]   BBJ's promotional literature boasted the general value proposition:

> The Customer is our Biggest Deal.  When it comes to acquiring your own private jet or helicopter, *you need to have people you can trust on your side* . . . .[51]

Since the Pierces were still under contract with Ed Vesslee, they hesitated to proceed.  But, as that other arrangement neared termination, the Pierces expressed interest in learning more about Mr. Bloom and BBJ as well as potential private jets for sale.  Throughout the summer, Mr. Bloom stayed in contact with the Pierces and suggested various potential private jet types for the Pierces to consider.[52]  The Pierces met with Mr. Bloom and expressed some interest.  They indicated that they did not wish to spend more than $4 million to buy a private jet and wanted a good deal.  Then, they let the exclusive contract with Ed Vesslee expire and turned to Mr. Bloom for help.

On July 23, 2015, Mr. Bloom identified a 2004 Hawker XP (Serial No. 258697; Registration N137LA) as a potential acquisition (the "Airplane").[53]  The Airplane is a 10-passenger private jet with a range of 2,800 miles.[54]  The Pierces were intrigued.  Mrs. Pierce put it this way:  "I found a picture I liked."  But, before going any further, Mr. Bloom insisted that they formalize their relationship through an agent contract.  Toward that end, Mr. Bloom also recommended that the Pierces proceed through a corporate vehicle, a limited liability company, which would insulate the Pierces from any personal liability relating to the private jet.  The Pierces and Mr. Bloom agreed that the Pierces would form Glencove for that purpose.  The Pierces "followed [Mr.] Bloom's advice and, on August 7, 2015 formed Glencove, with [the Pierces] both acting as managers."[55]

### E.   Glencove Hires BBJ as its Agent: the Agent Agreement.

Meanwhile, on or about July 30, 2015, Mr. Bloom sent the Pierces a draft "Agent Agreement" (the "Agent Agreement").[56]  He prepared the Agent Agreement himself based upon a model that he had used previously which had been developed by Brad Rose, counsel for both Mr. Bloom and BBJ.  The Agent Agreement is titled "AGENT

---

[49]   Exs. 1 and CU1.
[50]   *Id.*
[51]   Exs. 1 at 4 and CU-1 at 4 (emphasis added).
[52]   Exs. 2, 3 and 4.
[53]   Ex. CU-3 at 4.
[54]   *Id.* at 5-6.
[55]   Stip. Fact No. 34.
[56]   Ex. 7.

AGREEMENT" in large, bold, and capital letters.  The preamble identified the parties this way:

> WHEREAS, Jennifer and Huw Pierce or as assigned corporation with offices at [ ][57] Glencove, Houston, Texas . . . (hereinafter "BUYER") desires to utilize the brokerage and consulting services of Bloom Business Jets, Inc. a corporation with offices at 6290 Ellingwood Point Way, Castle Pines, Colorado . . . (hereinafter "AGENT") in connection with locating and purchasing a Business Aircraft Mid Jet from a third party to be identified by AGENT and acceptable to BUYER in its sole discretion (hereinafter "BUYER"), and;
>
> WHEREAS, AGENT desires to provide such brokerages / consultancy services to Buyer,
>
> NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties agree as follows . . . .[58]

Mr. Bloom signed the Agent Agreement on July 30, 2015 as "President" under the heading "Bloom Business Jets, LLC."  Jennifer Pierce signed the Agent Agreement on August 6, 2015 as "President"; however, the Agent Agreement did not expressly identify the corporate entity for which Jennifer Pierce is President.  Prior to entering into the Agent Agreement, the Pierces received the recommendation from Martin Orman, reviewed the BBJ promotional brochure, and met with Mr. Bloom; but they did not conduct any additional investigation of Mr. Bloom and BBJ.

The Agent Agreement is an example of notably poor legal draftsmanship — starting even with identification of the parties.  On the one side, the preamble lists Bloom Business Jets, Inc. as a corporation and party.  However, both Mr. Bloom and Glencove agree that Bloom Business Jets, Inc. did not exist.  There was no corporation with that name.  Instead, Steve Bloom was sole member and manager of Bloom Business Jets, LLC, a limited liability company.  That entity name was used in the signature block.  There is another slight twist, Mr. Bloom signed as "President"; but he was not the President of Bloom Business Jets, LLC.  Instead, he was the sole member and manager.  In the end, Mr. Bloom and Glencove have acknowledged the error and concede that the correct party was Bloom Business Jets, LLC (which has previously been defined as "BBJ").  The Court finds that BBJ is one of the parties to the Agent Agreement.

On the other side, the preamble of the Agent Agreement lists "Jennifer and Huw Pierce or as assigned corporation."  The sole reference to Glencove is in the street address of the Pierces.  Only Jennifer Pierce signed the Agent Agreement — not Huw

---

[57]     Private residential address omitted.

[58]     *Id.* at 1.

Pierce.  Even then, Jennifer Pierce signed as "President" but did not identify the specific entity for which she served as President.  Adding further confusion, Glencove was not formally in existence until the day after Jennifer Pierce signed the Agent Agreement.[59] And, Jennifer Pierce was a member and manager of Glencove, not President.

So, as with BBJ, the identification of the other party also was erroneous. However, the uncontested testimony was that Mr. Bloom recommended that the Pierces establish Glencove as a limited liability company for purposes of the potential acquisition of a private jet.  The name "Glencove" derives from the Pierces' home address.  The Pierces intended that Glencove be the other party to the Agent Agreement.  The trial testimony establishes that Mr. Bloom knew that Glencove had not quite been formed on August 6, 2015.  However, he recommended that the Pierces proceed anyway with everyone understanding that Glencove would be the assigned party to the Agent Agreement and any aircraft purchase agreement.  The "or as assigned corporation" language in the preamble and the reference to "President" in the signature block also establishes a mutual intention that the other party was supposed to be a corporate entity rather than the individual Pierces.  Then, consistent with the foregoing, Glencove was formally organized the day after Jennifer Pierce signed the Agent Agreement.  From that point forward, the Pierces and Mr. Bloom considered Glencove as being party to the Agent Agreement.[60]  And, eventually, Glencove paid BBJ its "AGENT'S FEE."  Based upon the evidence, the Court finds that Glencove is the other party to the Agent Agreement.[61]

---

[59]      Ex. 6.

[60]      In his "Motion for Summary Judgment," Mr. Bloom asserted for the very first time that "Glencove Holdings, LLC is not a party to the Agent Agreement . . . ."  Docket No. 43 in Adversary Proceeding at 16. At trial, Mr. Bloom's counsel continued to assert that position.  Mr. Bloom's novel argument is contrary to his many repeated admissions and statements throughout this Adversary Proceeding and the Bankruptcy Case that Glencove was the counterparty to the Agent Agreement.  For example, in his Answer, Mr. Bloom stated:  (1) "Glencove represents and agrees to indemnify and hold Bloom harmless" [in the Agent Agreement]; and (2) "Bloom's relationship with Glencove was that of an independent agent . . ., by express contractual relationship per the Agency Agreement . . . ."  Docket No. 5 in Adversary Proceeding. Mr. Bloom never amended his Answer.  Similarly, in his Amended Disclosure Statement, Mr. Bloom stated:  "Pre-petition, Glencove Holdings, LLC engaged Mr. Bloom and LLC to assist Glencove in locating and purchasing an aircraft pursuant to an Agent Agreement between LLC and Glencove . . . ."  Docket No. 201 in Bankruptcy Case at 6.  Further, in the Objection, Mr. Bloom again reiterated that Glencove was a party to the Agent Agreement and stated: "Glencove should be judicially estopped from retroactively breaching its contract with Bloom."  Docket No. 32 in Bankruptcy Case at 2.  Thus, Mr. Bloom is foreclosed (by his own prior admissions and the overwhelming evidence at trial) from challenging Glencove as the counter-party to the Agent Agreement.

[61]      The Court believes that this finding (i.e., that Glencove was a party to the Agent Agreement) is best characterized as a factual finding.  However, to the extent that the issue involves mixed questions of fact and law or a legal conclusion, then the Court makes a legal determination (based on the foregoing facts) that Glencove was a party to the Agent Agreement.

Mr. Bloom floated another argument more recently.  He has suggested that the Agent Agreement did not create any sort of agency.[62]  Yet, the Agent Agreement uses the word "AGENT" or "AGENT'S" thirty-nine times throughout, including using the terms on every page.[63]  The Agent Agreement states that the relationship between the "AGENT and BUYER" is "on a sole and exclusive basis."[64]  BBJ committed to the following listed "obligations":

> A.  Use its best efforts to locate Aircraft which is available for immediate sale under terms and conditions which are mutually agreeable to BUYER and SELLER.
>
> B.  Assist in subsequent contract negotiations between BUYER and SELLER for the sale and purchase of such Aircraft.
>
> C.  Assist in any visual or technical inspections of the Aircraft prior to the purchase thereof.
>
> D.  Assist in importing the Aircraft if not registered with the U.S. Federal Aviation Administration . . . .
>
> AGENT will provide all services hereunder in a professional manner consistent with applicable industry standards.[65]

In return for these services, Glencove agreed to "use the brokerage services of AGENT on a sole and exclusive basis" and pay BBJ an "AGENT'S FEE."[66]  The "AGENT'S FEE" was set as the lesser of $121,000 or 3.75% of the "all-in" purchase price of the aircraft "deemed earned" upon closing and paid "out of the closing funds."[67] If Glencove chose not to purchase an aircraft, the Agent Agreement obligated it to pay BBJ $14,000 as "administrative fees" plus "reasonable out of pocket expenses."[68]  Mr. Bloom never told the Pierces that he or BBJ would try to make more than $121,000 from an aircraft acquisition.

While the foregoing constitutes the principal business terms, the Agent Agreement also contained an array of boilerplate provisions, albeit quite unartfully drafted.  The Agent Agreement provides that it is governed by Colorado law.[69]  Mr.

---

[62]   Mr. Bloom's new argument at trial that the Agent Agreement did not create any type of agency is contrary to the admissions in his pleadings.  In his Answer, Mr. Bloom stated:  "Bloom's relationship with Glencove was that of an independent agent . . ., by express contractual relationship per the Agency Agreement . . . ."  Docket No. 5 in Adversary Proceeding.

[63]   Ex. 7.

[64]   *Id.* at Art. 1.

[65]   *Id.* at Art. 2; Stip. Fact No. 36.

[66]   *Id.* at Art. 3 and 4.

[67]   *Id.* at Art. 4.

[68]   *Id.*

[69]   *Id.* at Art 11.

Bloom's counsel relied heavily on another provision in Mr. Bloom's defense: Article 9 of the Agency Agreement which bears the heading "NO EMPLOYER RELATIONSHIP" and states:

> AGENT's relationship with BUYER is that of an independent AGENT, and nothing in the Agreement is intended to or should be construed to; create a partnership, agency, joint venture or employment relationship.  Agent is not authorized to make any representation, contract or commitment on behalf of BUYER unless specifically requested or authorized in writing to do so by an authorized manager of BUYER.[70]

Article 9 also obligated BBJ, in its "sole responsibility" to timely make all tax payments and file all tax returns as well as maintain adequate records of expenses.  Mr. Bloom's counsel interprets Article 9 to negate an agency relationship.

The Court rejects that interpretation of Article 9 as unfounded factually.  It is true that Article 9 of the Agent Agreement uses the word "agency" and could be read hyper-literally to purportedly disclaim an agency relationship.  However, that position makes no sense in the context of an agency agreement as a whole.  The Court easily finds that the Agent Agreement is what it states: an Agent Agreement, the entire purpose of which was to establish an agency relationship.  After all, the Agent Agreement refers to the terms "AGENT" and "AGENT'S" thirty-nine times.  And it bears all the hallmarks of an exclusive agency relationship through which BBJ was to provide services for the benefit of Glencove in exchange for payment of an "AGENT'S FEE."  The Court credits the testimony of both of the Pierces that they both believed that Mr. Bloom was their agent and intended that the Agent Agreement create an agency relationship between Glencove and BBJ.  Mr. Bloom acknowledged as much repeatedly in his Answer.

At trial, Mr. Bloom offered a new characterization of his role.  He testified that under the Agent Agreement "I was a transaction broker.  It's clear."  The Court rejects Mr. Bloom's testimony as unsupported, self-serving, and even outlandish.  Nowhere does the Agent Agreement suggest that BBJ would be a "transaction broker" instead of an agent.  Quite to the contrary.  In the Agent Agreement, BBJ promised that it would "assist BUYER on a sole and exclusive basis."  None of the exhibits admitted into evidence uses the phrase "transaction broker" for BBJ's role.  No testimony suggested that Mr. Bloom ever informed Glencove that BBJ was merely a "transaction broker," simultaneously representing one or more adverse parties.  And, as detailed below, his testimony on this point strains credulity.  Instead, all the circumstances (including Mr. Bloom's own conduct) point toward an agency relationship.  Thus, the Court finds that the testimony overwhelmingly establishes that the Agency Agreement created an agency relationship with Glencove as principal and BBJ as agent.[71]

---

[70]     *Id.* at Art. 9.

[71]     Under Colorado law, "[t]he existence of an agency relationship is usually a question of fact." *City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r*, 105 P.3d 595, 622 (Colo. 2005); see *also Moses v.*

**F.**     **Mr. Bloom Convinces Glencove to Make an Offer for the Airplane**.

After execution of the Agent Agreement, Mr. Bloom recommended that Glencove make an offer for the Airplane.  He sent an e-mail to the Pierces on August 7, 2015 explaining:

> As you can see we do lots of home work prior to making offers.  This way we know where the market sweet spot is and we know what other like kind planes are trading for.  We want to buy around the wholesale numbers.  The traded planes are just below wholesale as you can see in the sold report.  Our buy number goal on this plane [the Airplane] should be 3.6M little less a little more.  That's the target wholesale numbers.  Our offer should start in the mid 3.3's.  The Q4 trend and demand has a slight uptick.  My feeling is this plane with one owner and low time can support the wholesale number all day long . . . .  Let's discuss as we now are ready to move fast.[72]

Glencove agreed.  Accordingly, Mr. Bloom, acting on behalf of Glencove, made an offer to purchase the Airplane from the owner of the Airplane, Loretto Aviation, LLC ("Loretto Aviation"), for somewhere in the "low 3's [$3,000,000's]."[73]  Even though Loretto Aviation never requested that its identity be kept secret, Mr. Bloom did not disclose to Glencove that Loretto Aviation was the owner of the Airplane.

In any event, Mr. Bloom followed up on the offer with the broker for Loretto Aviation: Fred Cei.  On August 7, 2015, Bloom advised Loretto Aviation's broker that "[o]ur offer is based on the actual transactions that are closing."[74]  He further noted that the price needed to be adjusted downward because "the plane has a ton of work coming due . . . .  Overall this plane has $470,000 in work [coming due] in the next 28 months excluding paint and interior."[75]  Meanwhile, Mr. Bloom failed to tell Glencove about all the projected future expenses coming due in the near term.

After having made the initial offer for the Airplane on behalf of Glencove, Mr. Bloom confirmed to Glencove that the offer had been made.  On August 8, 2015, he wrote to Glencove:

---

*Diocese of Colo.*, 863 P.2d 310, 324 (Colo. 1993) (same).  However, to the extent that the issue of agency involves mixed questions of fact and law or a legal conclusion, then the Court makes a legal determination (based on the foregoing facts) that BBJ was an agent for Glencove under the Agent Agreement.

[72]     Ex. 9 at 1 and Ex. 10 at 2.
[73]     Ex. 5.  Neither Glencove nor Mr. Bloom presented a copy of any written offer into evidence.
[74]     *Id.*
[75]     *Id.*

> Our offer expires end of day on Monday [August 10, 2015].
> The selling agent called me this morning letting me know the
> offer went to the Owner.  I guess it's owned by two partners
> that just don't use the plane much at all.[76]

At the same time, Mr. Bloom also advised Glencove:

> As far as the deposit Monday [August 10, 2015] is fine or
> even Tuesday as they won't be accepting our first go-round
> here.  We only send the deposit if they accept our offer.
> We've got a few days.  Our offer is just right.  Just high
> enough it will get there [sic] attention to play ball not so high
> that we leave any money on the table.  The deposit is put
> into escrow at the agreed LOI stage.  Then we move to a
> formal purchase agreement . . . .  I will of course coach you
> at these crossroads and all along the way.[77]

At this point, Mr. Bloom's communications to Glencove were quite clear that Mr. Bloom
was dealing with an unrelated third party.  For example, Mr. Bloom referred to an
"Owner" of the Airplane.  And, the Airplane is owned by "two partners" that do not use
the Airplane much.  Mr. Bloom also referred to a "selling agent" for the Airplane.  And,
he promised to assist Glencove through the negotiations with the owner of the Airplane.

## G.    Mr. Bloom Misleads Glencove about the Negotiations.

Loretto Aviation did not accept the initial offer for the Airplane.  Instead, on
August 11, 2015, Loretto Aviation sent a counteroffer for sale of the Airplane to "Steve
Bloom, President of Bloom Business Jets, acting on behalf of Buyer" (the "Loretto
Aviation Counteroffer").[78]  Loretto Aviation countered the earlier offer in the "low 3's
[$3,000,000's]" with an increased purchase price of $3,400,000.[79]  Further, Loretto
Aviation noted that the revised price was a "Best and Final" offer and that the Loretto
Aviation Counteroffer "shall remain in effect until . . . Friday August 14th 2015 . . . ."[80]

Up to this point, Mr. Bloom had been emailing with Glencove frequently and
relatively immediately.  But the pattern broke.  Mr. Bloom waited an entire day to mull
over the Loretto Aviation Counteroffer before communicating with Glencove.  He knew
Glencove had targeted spending "3.6M little less a little more" and that the counteroffer
was $200,000 less.  The strong inference to be drawn from the evidence is that it was at
this point in time Mr. Bloom started to construct his elaborate plan to fraudulently
deceive Glencove for the benefit of himself, BBJ, and certain of his close professional
acquaintances by virtue of a hidden "back-to-back" transaction.  Importantly, he never

---

[76]    Ex. 10 at 2.
[77]    *Id.* at 1.
[78]    Ex. 12 at 3.
[79]    *Id.*
[80]    *Id.*

disclosed the Loretto Aviation Counteroffer to Glencove.  Instead, he began lying to Glencove — again, and again, and again.

Late in the afternoon on August 12, 2015, with the $3,400,000 Loretto Aviation Counteroffer in hand, Mr. Bloom misinformed Glencove as follows in a key e-mail addressed to Jennifer Pierce:

> Good afternoon.  *Our offer came back at $3.775M.*  We've got them to accepted 99% of our terms and conditions.  We are evaluating now what are [sic] next move is going to be.  The counter offer expires Friday afternoon.  Our goal is to buy in that Wholesale range $3.665M, they told us this is the only and final counter offer.  But we hear that crap all the time.  We need to get them down another $75,000 to $90,000.  This will put us on the lower end of the budget and leave room for paint and interior.  We will need to transfer the deposit tomorrow to show them were are real and ready.  This will help in our next counter offer as it will show some strength on our side and they we've [sic] made a good faith move.  Can we discuss later today / tonight.  Can you fit a call in later?[81]

Almost everything about this communication from Mr. Bloom to Glencove was a brazen lie to deceive Glencove.  Mr. Bloom testified that the statement "they told us this is the only and final counteroffer," was "referring to Loretto [Aviation's] latest counteroffer."[82]  However, there was no counteroffer that "came back at $3.775M."  Instead, the Loretto Aviation Counteroffer (at $3,400,000) was $375,000 less than "3.775M."  Mr. Bloom did not tell Glencove about the real $3,400,000 Loretto Aviation Counteroffer.  Rather, he just made up the $3,775,000 figure in an effort to deceive Glencove for self-enrichment.

Mrs. Pierce responded less than an hour after Mr. Bloom's message.  It was obvious she was genuinely and seriously misled when she wrote:  "Thank you for the update.  I know that you are working hard to make this deal work."[83]  Then, she suggested that the $3,755,000 was too much but that she was "fine bumping up to $3.5 or $3.550" and wondered whether Mr. Bloom could "get them there?"[84]  As both of the Pierces separately confirmed in their testimony, Glencove never would have authorized counteroffering at $3,500,000 or $3,550,000 if Glencove had known that the Loretto Aviation Counteroffer already was less at $3,400,000.  The Pierces testified credibly and the point is obvious.

In any event, Mr. Bloom continued the charade.  He sent Glencove a response message a few hours later on August 12, 2015:

---

81   Ex.15 at 2-3 and Ex. CF at 1 (emphasis added).
82   Stip. Fact No. 39.
83   Ex. 15 at 2 and Ex. CF at 1.
84   *Id.*

> I'm confident that we can get them lower. Let's just see
> where we can get them. I want to be very mindful of the total
> spend and try my best to get you into the 3.7 total . . . . I
> would like to go back at $3.525. We can always go up . . . .
> We should go back at $3.525. ok with you?[85]

Again, Mr. Bloom's message to Glencove was brazenly false and misleading. Mr. Bloom was attempting, against his client's interest, to induce Glencove to make an offer of $3,525,000 even though the undisclosed Loretto Aviation Counteroffer already was less. Jennifer Pierce responded a few moments later on August 12, 2015 and stated: "I don't want to mess around here so let's do $3,550,000. And just get it done. Thanks."[86] Mrs. Pierce testified credibly that she never would have authorized a counteroffer of $3,550,000 if she had known that Loretto Aviation already was willing to sell for less.

Continuing the scam, early the next morning (August 13, 2015), Mr. Bloom provided Glencove wire instructions for making a $100,000 refundable deposit with Insured Aircraft Title Service Inc. (the "Title Company") to support the purchase of the Airplane. Promptly thereafter, Mrs. Pierce wrote Mr. Bloom to confirm that Glencove would send the $100,000 deposit that day — which it did.[87] She also asked whether the $3,550,000 offer had been accepted.[88]

Mr. Bloom responded with another fallacious whopper. He wrote to Glencove: "I've not heard back. I sent an e-mail and left a voice mail message so we should hear something in the next hour or two."[89] Those statements were false because Mr. Bloom already had heard back with the $3,400,000 Loretto Aviation Counteroffer several days earlier; but he hid that from Glencove.

Keeping up the facade of difficult negotiations, Mr. Bloom wrote to Glencove later that day (August 13, 2015) with some pure fiction:

> We are going back and forth right now and have been for the
> last three hours. We've gotten close on the numbers right
> now we are within $40,000. I'm negotiating hard. [R]ight
> now I'm working them over to deliver the plane with $60,000
> worth of maintenance items completed if we agree to the
> pricing of $3.595M. We are stuck now at this number
> Seller's not budging off this $3.595M. Sometimes we can
> make up dollars in other places. Standby . . . ."[90]

---

[85]     Ex. 15 at 1 and Ex. CF at 2-3.
[86]     Ex. 15 at 1 and Ex. CF at 2.
[87]     Ex. 19.
[88]     *Id.*
[89]     *Id.*
[90]     Ex. 16.

All Mr. Bloom's foregoing statements were false and misleading. There was no three-hour negotiation for Glencove's benefit. He was not "negotiating hard" to serve his client. And, Loretto Aviation most certainly was not stuck on "$3.595." It was all part of a design to swindle Glencove. After all, days earlier, Loretto Aviation had counteroffered at $3,400,000. It was all a big bunch of lies. But why?

**H.** **Mr. Bloom Takes Advantage of Glencove to Benefit Himself and BBJ: the Concealed Back-to-Back Transaction.**

The evidence demonstrates, unequivocally, that Mr. Bloom lied repeatedly to Glencove for the purpose of financial gain for himself, BBJ, and his professional colleagues. Under the Agent Agreement, BBJ already had agreed to a maximum "AGENT'S FEE" of $121,000[91] for the services that BBJ was supposed to render to its client: Glencove. But, Mr. Bloom wanted more. So, he crafted a back-to-back transaction and hid it from Glencove to take an additional $250,000 from Glencove and thereby boost the take to $371,000.

Mr. Bloom put his plan into action the day after he told Glencove falsely that he was "negotiating hard" on Glencove's behalf. Mr. Bloom decided to use one of his wholly-owned shell companies to buy the Airplane from Loretto Aviation and then simultaneously turn around and sell the same Airplane to Glencove for $250,000 more (thus, the term "back-to-back"). He hid the whole scheme from Glencove.

Meanwhile, unbeknownst to Glencove, Mr. Bloom had convinced Loretto Aviation to accept $3,300,000 for the Airplane — a further $100,000 discount from the $3,400,000 Loretto Aviation Counteroffer. On August 14, 2015, he followed up by having BBJ enter into a Letter of Intent with Loretto Aviation (the "LOI").[92] Under the LOI, BBJ "or Assigned" agreed to purchase the Airplane for $3,300,000 and place a $100,000 refundable deposit into escrow.[93] Mr. Bloom asked Mr. Rose, the lawyer who regularly represented both Mr. Bloom and BBJ, to reach out to Loretto Aviation's broker to confirm the LOI offer. Mr. Rose did so. In an e-mail to Loretto Aviation's broker, Mr. Rose stated that "I am not currently able to disclose the identity of the purchaser . . . ."[94] Nevertheless, Mr. Rose assured Loretto Aviation "the offer is legitimate and the buyer is ready, willing and able to proceed with the purchase under the stated terms as conditions."[95] This statement was false. Neither BBJ nor any of Mr. Bloom's companies had $3,300,000 to acquire the Airplane. Indeed, they did not even have enough money to fund the $100,000 escrow deposit required under the LOI.

---

[91]     Under the Agent Agreement, the "AGENT'S FEE" was set as the lesser of $121,000 or 3.75% of the "all-in" purchase price of the aircraft "deemed earned" upon closing and paid "out of the closing funds." Ex. 7 at Art. 4. So, there was a compensation cap. Since the purchase price for the Airplane exceeded $3,250,000, the cap was triggered and BBJ was limited to a $121,000 "AGENT'S FEE."

[92]     Ex. 18; Stip. Fact No. 42.
[93]     *Id.*
[94]     Ex. 21.
[95]     *Id.*

So, ironically, Mr. Bloom used Glencove's $100,000 escrow deposit to fulfill the deposit requirement of the LOI, against Glencove's own interests and without its permission. The same day as the LOI (August 14, 2015), Mr. Bloom communicated with the Title Company and requested a "generic deposit conf. [confirmation]" for Glencove's $100,000 escrow deposit.[96] The Title Company, which had a close and cozy relationship with Mr. Bloom, complied and issued a "generic" "Deposit Confirmation" confirming receipt of a $100,000 escrow deposit but making no reference to Glencove as the source.[97] Mr. Bloom took further steps to hide the true nature of Glencove's escrow deposit by instructing the Title Company to "Keep it [information on the Buyer] confidential please."[98] Thus, Mr. Bloom was able to use Glencove's escrow deposit effectively for his interests (and against Glencove's interests) to satisfy the escrow deposit condition in the LOI. Mr. Bloom never secured Glencove's permission to use Glencove's money in that way. Instead, Mr. Bloom concealed it all.

After all the shenanigans, Mr. Bloom told Glencove that the seller of the Airplane had agreed to accept $3,550,000.[99] Meanwhile, Loretto Aviation agreed to sell the Airplane to BBJ "or Assigned" for $3,300,000. The stars were now aligned. Mr. Bloom and his company, BBJ, were set to pocket the $250,000 difference between what Glencove would pay for the Airplane and what Mr. Bloom's entity would pay Loretto Aviation for the Airplane. All the while, Glencove, which was relying on Mr. Bloom and BBJ to represent its best interests, had no idea.[100]

At this stage, Mr. Bloom decided to bring in a wholly-owned shell company, Big Horn Exploration, LLC ("Big Horn Exploration"), to further obfuscate and hide the nature of his malfeasance from Glencove.[101] Since the structure for the scam was a back-to-back transaction for the Airplane (*i.e.*, Loretto Aviation selling to BBJ and then BBJ selling to Glencove), there was a strong likelihood that Glencove would figure out that Mr. Bloom and BBJ were actually working against the interests of Glencove. After all, it would certainly set off alarm bells if Glencove realized it was purchasing the Airplane from its own agent under the Agent Agreement. So, enter Big Horn Exploration.

Big Horn Exploration is a limited liability company owned entirely by Mr. Bloom. He is also the only member and the principal manager of Big Horn Exploration. However, Mr. Rose nominally is a manager of Big Horn Exploration too, albeit one who acts only upon the instructions of Mr. Bloom. The name and Wyoming location of Big Horn Exploration conjure up the image of an oil and gas company successful enough to own a jet. However, Big Horn Exploration has never explored anything. It is merely an empty shell with no assets. At trial (and based upon prior deposition testimony), Mr. Rose confirmed that Big Horn Exploration was used instead of BBJ so that the back-to-

---

[96]     Ex. 20 at 2.
[97]     Ex. 19 at 3.
[98]     Ex. 20 at 1-2.
[99]     Stip. Fact No. 41.
[100]    Stip. Fact No. 45 ("Bloom never informed Glencove that the deal would be structured this way.").
[101]    Mr. Bloom formed Big Horn Exploration in 2014 and he is the sole owner. Stip. Fact Nos. 26 and 27.

back transaction would not be discovered.  He also acknowledged that the entire purpose of having Big Horn Exploration participate in the back-to-back transaction was "so that there could be an [$250,000] upcharge."

On August 25, 2015, Mr. Bloom sent Glencove an "Aircraft Purchase and Sale Agreement" for purchase of the Airplane for $3,550,000 from Big Horn Exploration (the "Glencove PSA").[102]  At that time, Big Horn Exploration did not own the Airplane. Nevertheless, Mr. Bloom instructed Mr. Rose to sign the Glencove PSA on behalf of Big Horn Exploration.  Mr. Rose did as he was instructed, thereby contributing (whether knowingly or unknowingly) to the fraud.[103]  It was the first time that Glencove had heard of Big Horn Exploration.  Glencove did not know that Mr. Bloom owned Big Horn Exploration, nor that Mr. Rose was a lawyer for both Mr. Bloom and BBJ, nor that Mr. Rose signed the Glencove PSA at Mr. Bloom's direction so that Mr. Bloom's involvement would be hidden.  Mr. Bloom concealed it all from Glencove.

In any event, the Glencove PSA required that the Airplane be delivered in an "airworthy condition."[104]  Further, the Glencove PSA established a process for pre-purchase inspection followed by the buyer's election to reject, accept "as-is," or accept subject to correction of airworthiness "discrepancies" all in the form of a "Conditional Acceptance Certificate."[105]  On August 26, 2015, Mrs. Pierce executed the Glencove PSA on behalf of Glencove.[106]

To complete the back-to-back framework, a few days later (on August 31, 2015), Big Horn Exploration entered into an "Aircraft Purchase and Sale Agreement" with Loretto Aviation to buy the Airplane for $3,300,000 (the "Loretto PSA").[107]  The Loretto PSA also obligated Big Horn Exploration to make a $100,000 refundable deposit.[108]  In all material respects, the Loretto PSA mirrored the Glencove PSA.  At Mr. Bloom's instruction, Mr. Rose signed the Loretto PSA on behalf of Big Horn Exploration.[109]  Big Horn Exploration (which never had any assets) then funded the escrow deposit, not with its funds, but with Glencove's escrow deposit.  Mr. Bloom concealed the Loretto PSA and the improper use of Glencove's escrow deposit from Glencove.

Meanwhile, Glencove proceeded with efforts to obtain financing to close on acquisition of the Airplane.  Even before entering into the Agent Agreement with BBJ, the Pierces had engaged Martin Orman of Aviation Finance Corporation to assist in arranging financing for the acquisition of the Airplane.  The search for a loan was a bit rocky.  Several financial institutions rejected Glencove.  Thus, Mr. Orman turned to TruStone Financial Credit Union ("TruStone Financial"), an entity with which Mr. Orman

---

[102]   Ex 23.
[103]   *Id.* at 9-10.
[104]   *Id.* at 3.
[105]   *Id.* at 5.
[106]   Ex. 24 at 10.
[107]   Ex. 25.
[108]   *Id.* at 1.
[109]   *Id.* at 10.

worked frequently.  On September 3, 2015, a commercial lending officer at TruStone Financial informed Mr. Orman that TruStone Financial received a recommendation "from underwriting" to decline the Glencove financing.[110]  A few days later, Mrs. Pierce wrote to Martin Orman regarding a call from a bank.  She told Mr. Orman:  "As you know, I want this plane, so please do what it takes to make it happen."[111]  On September 18, 2015, TruStone Financial changed its mind and approved a loan to Glencove.[112]

Glencove (and the Pierces) executed a Promissory Note, dated September 23, 2015, to TruStone for $2,591,500 (the "Loan").[113]  The Promissory Note bears interest at the rate of 4.75% and matures on September 23, 2025.[114]  Aircraft Finance Corporation was entitled to a 1% loan origination fee ($25,915) to be paid by Glencove, which Glencove paid to Aircraft Finance Corporation at closing.

**I.**     **Mr. Bloom Lies to Glencove About Airworthy Discrepancy Repairs.**

With the Glencove PSA and the Loretto PSA executed, the parties proceeded with a pre-purchase inspection of the Airplane to identify any required airworthy discrepancies.  Loretto Aviation permitted Haggan Aviation (hand-picked by Mr. Bloom) to conduct a pre-purchase inspection of the Airplane.  On September 17, 2015, Haggan Aviation issued a "Work Order Estimate" (the "Original Work Estimate") and identified 27 "Airworthy Items" as "Discrepancies" to be repaired prior to sale of the Airplane.[115]  As the term "airworthy" suggests and the testimony confirmed, "Airworthy Items" are those items that must be repaired prior to flight to comply with government regulations and ensure safety.  The largest listed airworthy discrepancy on the Original Work Estimate was for fuel leaks, the repair cost of which was an estimated $34,418.[116]  Haggan Aviation estimated that it would cost $67,459 to fix all the airworthy discrepancies.[117]  The Original Work Estimate was sent to Glencove.

Thereafter, on September 21, 2015, Glencove executed a "Conditional Acceptance Certificate" agreeing to proceed with the purchase of the Airplane under the Glencove PSA provided that the seller agreed to make the $67,459 in repairs for all the airworthy discrepancies listed on the Original Work Estimate.[118]  Mr. Bloom informed the broker for Loretto Aviation that Loretto Aviation would need to repair the airworthy discrepancies.[119]

---

[110]     Ex. BD.
[111]     Ex. AK-2.
[112]     Ex. ED.
[113]     Ex. CU-17.
[114]     *Id.*
[115]     Ex. 29.
[116]     Ex. 29 at 5.
[117]     *Id.* at 10.
[118]     Exs. 31, 44, and 48.
[119]     Ex. 32.

Then, without Glencove's knowledge, Mr. Bloom began a negotiation with Loretto Aviation concerning the airworthy discrepancies. Loretto Aviation was reticent to make the $67,459 in repairs. Without informing Glencove, Mr. Bloom worked with Haggan Aviation and caused Haggan Aviation to reduce the amount of airworthy items.[120] On September 24, 2015, Haggan Aviation issued another "Work Order Estimate" (the "Revised Work Estimate") with fewer airworthy discrepancies.[121] In the Revised Work Estimate, Haggan Aviation estimated that repair of the revised list of airworthy discrepancies would cost $52,587.19, which was a reduction of $14,869.88 from the Original Work Estimate.[122] Glencove did not receive or approve the Revised Work Estimate. Instead, Mr. Bloom hid it.

But Loretto Aviation was not willing to pay for repair for any of the airworthy discrepancies at all. On September 25, 2015, Loretto Aviation's broker informed Mr. Bloom that Loretto Aviation "will not perform any repairs to aircraft. If buyer wishes to purchase the aircraft, they can do so in as-is condition."[123] Bloom concealed this important development from Glencove.

At this point, the entire back-to-back transaction was in jeopardy. Glencove had been led to believe by Mr. Bloom that repairs of the airworthy discrepancies in the Original Work Order would be made. But Loretto Aviation refused. And, neither BBJ nor Big Horn Exploration could fund any repairs. So, Mr. Bloom looked elsewhere. He threatened Loretto Aviation's broker by asserting some malfeasance and cajoled Loretto Aviation's broker to pay $22,000 (pursuant to a Promissory Note) for repair of some of the required airworthy discrepancies.[124] Mr. Bloom also sought to reduce the list of airworthy discrepancies — all unbeknownst to Glencove.

A few days later (on September 28, 2015), Glencove contacted Mr. Bloom to inquire about the repairs of the airworthy discrepancies from the Original Work Estimate. Mrs. Pierce wrote a simple question: "Did they get all the repairs completed on the plane yet?"[125] Mr. Bloom responded with yet another falsehood in an effort to close the transaction anyway: "The seller will pay the facility to fix the repairs. We are going to close while the repairs are ongoing since the Government may shut down."[126] Mr. Bloom also confirmed that "the repairs are underway."[127] Those statements were false. After all, just a few days earlier, Loretto Aviation stated that it would "not perform any repairs to aircraft. If buyer wishes to purchase the aircraft, they can do so in as-is condition."[128] Unbeknownst to Glencove, Mr. Bloom was trying to push through a closing while knowing full well that not all the repairs on the Original Work Estimate

---

[120]    Exs. 34, 36, 37, and 53.
[121]    Ex. 38.
[122]    Ex. 36 and Ex. 38 at 9.
[123]    Ex. 39.
[124]    Ex. 41.
[125]    Ex. 44.
[126]    *Id.*
[127]    *Id.*
[128]    Ex. 39.

23

would ever be made.  Relying on Mr. Bloom's assurances and advice, Glencove proceeded.

**J.      The Back-to-Back Transactions Close and Glencove Is Fleeced of $250,000.**

On the same day that Mr. Bloom was trying to assuage Glencove's concerns with falsities about the repairs of the airworthy discrepancies, he intensified his efforts to close the back-to-back transactions quickly.  Aware of the fragile ground on which he walked, but knowing that he was about to realize a $250,000 windfall, Mr. Bloom instructed Mr. Rose to notify the Title Company about distribution of such proceeds.  On September 28, 2015, Mr. Rose wrote the Title Company that the $250,000 in additional proceeds should be disbursed by the Title Company as follows:

| | |
|---|---|
| $ 29,633.66 | Brad Rose |
| $ 90,000.00 | Aircraft Finance Corp. |
| $130,366.34 | BBJ |

Total:  $250,000.00[129]

Mr. Rose also indicated that $22,000 should be taken from the Loretto Aviation's proceeds (presumably from its broker's commission) to pay Haggan Aviation for some repairs.  Neither Mr. Bloom nor BBJ disclosed any of this to Glencove.

The next day (September 29, 2015), the sale and purchase of the Airplane closed.[130]  However, unbeknownst to Glencove, there were actually two transactions: the back-to-backs.  First, Loretto Aviation sold the Airplane to Big Horn Exploration for $3,300,000.  Then, simultaneously, Big Horn Exploration sold the Airplane to Glencove for $3,550,000.[131]  Neither Mr. Bloom, nor BBJ, nor Big Horn Exploration ever put any of their own money at risk to execute the back-to-back transactions.  Instead, they improperly used Glencove's $100,000 escrow deposit and then the purchase price paid by Glencove to accomplish everything.  And, at least as of the closing, Glencove was none the wiser because Mr. Bloom successfully concealed the back-to-backs while purporting to be acting on behalf of Glencove.

At the closing, Glencove paid the $3,550,000 purchase price.  And unbeknownst to Glencove, Glencove effectively funded $130,366.34 to BBJ, an additional $90,000 to Aircraft Finance Corporation, and $29,633.66 to Mr. Rose.  Shortly after the closing, Glencove also paid BBJ its $121,000 "AGENT'S FEE" and paid Aircraft Finance Corporation its $25,915 finder's fee for the Loan.  To complete the closing, Mr. Bloom signed an "Aircraft Delivery Receipt."[132]  Notably, Mr. Bloom, who now denies an agency relationship with Glencove, signed the Aircraft Delivery Receipt personally as

---

[129]   Ex. 42 at 3.
[130]   Stip. Fact No. 15.
[131]   Ex. 48.
[132]   Ex. EF.

"Agent For Glencove Holdings, LLC."[133]  Mr. Rose signed as manager for Big Horn Exploration.[134]

Meanwhile, after the rushed closing, not all the airworthy discrepancies from the Original Work Estimate were repaired.  So, Mr. Bloom developed a deceptive workaround.  On October 16, 2015, Haggan Aviation issued an invoice addressed to Loretto Aviation's broker for repairing just $37,888.24 of airworthy discrepancies — not the $67,459 from the Original Work Estimate or even the $52,587.19 from the Revised Work Estimate.[135]  Haggan Aviation applied $22,000, apparently received from Loretto Aviation's broker, to a portion of the bill.  Then, with respect to the remaining $15,888.24 on the invoice, Haggan Aviation wrote it off because of its close relationship with Mr. Bloom.

In the end, Haggan Aviation never repaired all the fuel leaks identified on the Original Work Estimate (although Haggan Aviation's principal later asserted that there never were any fuel leaks).  And neither Loretto Aviation, Big Horn Exploration, nor BBJ paid anything for airworthy discrepancy repairs for the airplane.  Instead, it appears that Loretto Aviation's broker used a portion of his commission to pay $22,000 because of Bloom's coercion and in order to make sure that Loretto Aviation was able to close the sale of the Airplane.  Again, Glencove knew none of this because Mr. Bloom intentionally misled and did not inform Glencove about the repair issues throughout.

## K.    Glencove and BBJ Enter Into a Management Services Agreement for the Airplane.

A month and a half after the closing, on November 12, 2015, Glencove (unaware of Mr. Bloom's many misrepresentations and concealments in connection with acquisition of the Airplane) entered into an "Aircraft Management Services Agreement" with BBJ (the "Management Services Agreement").[136]  Under the Management Services Agreement, BBJ agreed to provide "full-service executive aircraft management and pilot services" in connection with operation of the Airplane for a monthly management fee of $3,800.[137]  BBJ agreed to bill Glencove monthly for all "Incidental Costs and Expenses, all Direct Operating Costs, all Fixed and Variable Operating Costs, and all Flight Crew Employment Costs" (as defined in the Management Services Agreement).[138]  Glencove committed to pay such amounts.[139]  The parties also agreed that Glencove would pay for fuel and hangar charges directly with its credit card.  Mr. Pierce testified credibly that BBJ never paid for any hangar charges.  The Court accepts that Glencove paid for all hangar charges itself.

---

[133]    *Id.*
[134]    *Id.*
[135]    Ex. 52 at 12.
[136]    Ex. 55; Stip. Fact No. 16.
[137]    Ex. 55 at 2 and 15; Stip. Fact No. 17.
[138]    Ex. 55 at 7.
[139]    *Id.*

To ensure that BBJ was not "obligated to advance its own funds to pay any costs or expenses attributable to the operation of the Aircraft," Glencove committed to establishing an "Operating Deposit" of $35,000 "immediately upon execution" of the Management Services Agreement.[140]  The parties both acknowledged in their testimony that they agreed to reduce the amount of the "evergreen" operating deposit to $25,000. Glencove did not pay the operating deposit when it executed the Management Services Agreement.  So, on November 19, 2015, Mr. Bloom wrote to Glencove requesting funding of the operating deposit.[141]  Mrs. Pierce responded the next day.  She apologized for the delay, indicated that she would wire the funds, and instructed that if BBJ had "to pay for anything before then please put it on our [credit] card you used before so you are not out."[142]  Then, Glencove funded the operational account with $25,000 on November 25, 2015 (13 days after execution of the Management Services Agreement).[143]

**L.      BBJ Misbills Glencove Repeatedly and Cannot Reconcile Its Accounting**.

BBJ incorrectly billed Glencove under the Management Services Agreement ultimately leading to a rift between Glencove and BBJ.  Things started out all right.  BBJ sent Glencove a $14,247.97 invoice (No. 1057), dated November 3, 2015, for services mostly in the pre-Management Services Agreement period of October 2015.[144] Glencove paid the first invoice.  Then, contrary to the Management Services Agreement, BBJ failed to send an invoice to Glencove in December 2015 (for November 2015 services).  Instead, BBJ skipped the month and then sent Glencove a $45,811.11 invoice (No. 1001), dated January 8, 2016, for services primarily in November and December 2015, but also including October 2015 charges pre-dating the Management Services Agreement.[145]  BBJ applied the $25,000 operating deposit from Glencove and billed for the remaining $20,811.11.[146]  Glencove paid the bill but complained about BBJ's failure to timely send invoices with supporting receipts.  The next month, BBJ sent Glencove a $12,392.93 invoice (No. 1006), dated February 3, 2016, for services primarily in January 2016.[147]  Again, Glencove paid the invoice.

Around the same time, Glencove made two larger payments to overfund the operating account under the Management Services Agreement: (1) $50,000 on February 8, 2016; (2) and $70,000 on February 29, 2016.  Then, BBJ sent Glencove a statement (No. 210), dated March 9, 2016, for services primarily in February 2016.[148]  In that statement, BBJ failed to account for the $50,000 operating deposit made by Glencove on February 8, 2016.  However, after applying funds from the operating

---

140   *Id.* at 7 and 15.
141   Ex. BE at 1.
142   Ex. BE at 4.
143   Ex. BE at 3.
144   Ex. G.
145   Ex. I.
146   *Id.*
147   Ex. 79.
148   Ex. 63.

deposit, BBJ still indicated that the operating fund had a $55,955.47 balance.[149]  BBJ did not send an invoice in April 2016 (for March 2016 services).  Instead, BBJ skipped another month of billing.  By this stage, the inconsistent billing (*i.e.,* skipping two months) coupled with the failure to acknowledge BBJ's receipt of the $50,000 operating deposit caused a rupture in the relationship.  Glencove terminated the Management Services Agreement on May 10, 2016.[150]

Thereafter, on May 26, 2016, BBJ sent Glencove a statement (No. 216) asserting an amount due of $46,231.55 (the "May Statement").[151]  The May Statement is an exercise in accounting gibberish.  It is not itemized in sufficient detail to permit reconciliation with the attached mass of allegedly supporting receipts.  With respect to the twelve subcomponents listed in the "Amount" column, they do not add up to the listed "Amount Due" of $46,231.55.  Further, the May Statement still did not account for the $50,000 operating deposit made by Glencove on February 8, 2016.  Even accepting BBJ's own calculations, if the $50,000 operating deposit had been properly credited, BBJ owed Glencove a refund, not the other way around.

In the meantime, Glencove also discovered some other service and billing problems.  CAMP is an important third-party system for jet aircraft engine health monitoring.  The system requires a download of engine data each month.  BBJ was supposed to perform the downloads.  However, BBJ failed to connect the Airplane to the CAMP system for electronic downloads after the Management Services Agreement and through at least April 30, 2016.[152]  That meant that the Airplane's engines were not being properly monitored causing a violation of Glencove's Loan from TruStone Financial.  Furthermore, as of May 6, 2016, BBJ had not paid any CAMP charges and had not informed Glencove that the CAMP invoices were seriously delinquent.[153]  So, Glencove was in danger of CAMP terminating the Airplane from its program entirely.  Mr. Bloom concealed the problem from Glencove.  All the foregoing might be characterized merely as some unimportant billing discrepancies were it not for the fact that Mr. Bloom used BBJ's own, rather obviously wrong, billings in an aggressive effort to damage Glencove when filing a lien against the Airplane.

**M.** **Bloom Directs the Filing of a Lien Against the Airplane.**

On June 21, 2016, Mr. Bloom directed BBJ to file a "Mechanic's or Materialman's Lien" (the "Lien") with the Federal Aviation Administration.[154]  In the Lien, BBJ asserted that BBJ held a claim against Glencove for $46,231[155] based upon the Management

---

[149]    *Id.*
[150]    Stip. Fact No. 19.
[151]    Ex. B.
[152]    Ex. BO at 1 and 6.
[153]    *See* Ex. BM at 2.
[154]    Ex. 73 at 3; Stip. Fact No. 55.
[155]    Although the Lien twice claimed that $46,231 was owed by Glencove to BBJ, the Lien also asserted a different figure: $48,131.65.  The higher number appears to be some sort of error since the $46,231 ties directly to the May Statement.

Services Agreement for labor and materials last performed or furnished for the Airplane on May 18, 2016.[156]  BBJ asserted the Lien under "the laws of the State of Texas."[157]  Mr. Bloom attested to the accuracy of the Lien and his signature was notarized.[158]  Thereafter, at Mr. Bloom's direction, BBJ physically placed a "possessory lien" — a writing actually attached to the outside of the Airplane — on the Airplane and claimed that BBJ "is in possession, legally and physically of this Aircraft.  This Aircraft may not be moved . . . ."[159]

The amount BBJ claimed on the Lien matches exactly with the May Statement.  However, as set forth above, the May Statement was facially erroneous.  The Texas Aircraft Repair and Maintenance Lien Statute referenced by BBJ in the Lien applies only to "[a] person who stores, fuels, repairs, or performs maintenance work on an aircraft. . . ."[160]  However, BBJ never stored, fueled, repaired or performed maintenance work on the Airplane itself.  According to Huw Pierce's testimony, BBJ also never paid for the hangar for the Airplane.  And, per Mr. Pierce's testimony, the fuel charges listed on the May Statement were paid directly by Glencove.[161]  The only remaining charges on the May Statement were for two aircraft trips ("HOU-SDF" and "HOU-ERV"), some navigational charts, and BBJ's monthly management fee.  None of those charges constitutes amounts due for storage, fuel, repairs, or maintenance.

Based upon the foregoing, the Court finds that Mr. Bloom directed BBJ to file the Lien knowing that it was spurious and unsupported in terms of both the amount and the character of the charges.  Similar to the strong-arm tactics Mr. Bloom had employed with Loretto Aviation's broker to extract an additional $22,000 to pay for the airworthy discrepancies, the Court infers the Mr. Bloom and BBJ's intent in filing the Lien was to improperly extract more money from Glencove, ground the Airplane, and jeopardize Glencove's loan.

Eventually, BBJ acknowledged some of its errors by filing an Amended Lien on July 8, 2016, reducing the amount claimed to $23,157.47, and then by filing a second Amended Lien on August 5, 2016, further reducing the amount claimed to $13,143.57.[162]  The subsequent amendments, which reduced the Lien amount by approximately 72%, further demonstrate that there was no factual basis for the original $46,231 asserted by BBJ in the Lien.  Although Glencove contested the reduced

---

[156]    Ex. 73 at 3.
[157]    *Id.*
[158]    *Id.*
[159]    Ex. DG.
[160]    TEX. PROP. CODE ANN. § 70.301 states: "(a)  A person who stores, fuels, repairs, or performs maintenance work on an aircraft has a lien on the aircraft for: (1) the amount due under a contract for the storage, fuel, repairs, or maintenance work; or (2) if no amount is specified by contract, the reasonable and usual compensation for the storage, fuel, repairs, or maintenance work."
[161]    Mr. Pierce's testimony about fuel charges is substantiated by the May Statement.  There were four fuel charges listed on the May Statement.  But three of them were marked with the designation "*Glencove Holdings deducted charges from company credit card."
[162]    Ex. 73 at 1-2.

$13,143.57 amount, it ultimately paid BBJ such amount to release the Lien and avoid default under the TruStone Financial Loan.[163]

## N.     The Parties End the Relationship and Move to Litigation.

Since the filing of the Lien, Glencove, BBJ, and Mr. Bloom (and others) have been involved in continuous litigation in a number of courts in Colorado and Texas.  BBJ sued Glencove in Colorado in the Colorado Action.  Thereafter, Glencove counterclaimed against BBJ and also brought third-party claims against Mr. Bloom, Big Horn Exploration, Mr. Rose, and Haggan Aviation.  It was in the course of this litigation that Glencove first discovered the extent of Mr. Bloom's misrepresentations, concealment, and lies related to the purchase of the Airplane and the hidden back-to-back transactions.  Nevertheless, Glencove has retained ownership of the Airplane and continued to operate it for personal and business travel.[164]

## O.     Glencove's Damages Claim.

At trial, Glencove claimed the following damages against Mr. Bloom:

1.     $250,000 for the improper "upcharge" paid to Big Horn Exploration and distributed to BBJ, Brad Rose and Aircraft Finance Corporation;
2.     $120,000 for the "AGENT'S FEE" paid to BBJ;[165]
3.     $67,835 for maintenance and repair items identified in the Original Work Order which were not performed;
4.     $25,915 for the origination fee paid to Aircraft Finance Corp. for the Loan;
5.     $2,194 for the lender fee paid to TruStone Financial for the Loan;
6.     $55,812 in extra interest paid of a $250,000 portion of the Loan;
7.     $15,000 on overcharges under the Management Services Agreement;
8.     $13,143 for removal of the Lien;
9.     $471,310 in attorneys' fees and costs.

The foregoing amounts total $1,021,209 as of April 30, 2020.  The Court received evidence supporting all of the damages asserted by Glencove except the amount for attorneys' fees and costs.  As set forth above, at the request of both Mr. Bloom and Glencove, the Court reserved the issue of attorneys' fees and costs until a later stage in the Adversary Proceeding.  With respect to the other damages, the Court finds that Glencove proved that it incurred damages; however, as explained below, the Court determines that some adjustments are necessary.

---

[163]     Ex. 90 at 156 (the filing of a lien against the Airplane is a violation of Glencove's obligations under the Loan).
[164]     Stip. Fact Nos. 23 and 24.
[165]     Under the Agent Agreement, the "AGENT'S FEE" was capped at $121,000 and the testimony at trial indicated that Glencove paid that amount.  However, Glencove has used a slightly smaller figure ($120,000) in its damages calculations.  The Court accepts the smaller number for purposes of damages.

P.      **Industry Standards.**

Mr. Bloom defended his conduct asserting that it was not inconsistent with standards governing the aviation industry.  More specifically, he pointed to the Agency Agreement which provided: "AGENT will provide all services hereunder in a professional manner consistent with applicable industry standards."[166] At the same time, he contended his expert would testify that "no set of ethical standards exist in General or Business Aviation creating guidelines for aircraft brokers." [167]  Both Glencove and Mr. Bloom presented expert testimony on the industry standards which govern brokers in the aircraft resale industry.  Glencove called John (Johnny) Barr Foster IV.  Mr. Bloom called Jason Zilberbrand.

Mr. Foster is the President and Chief Executive Officer of Ogara Jets, a prominent aircraft brokerage firm.  Ogara Jets also acts as a dealer in aircraft for its own account.  Mr. Foster joined Ogara Jets in 1991.  He served in numerous roles, including as aircraft market researcher, sales associate, and Vice-President, before assuming his current role as President and Chief Executive Officer.  Mr. Ogara has been directly and personally involved in over 400 aircraft purchase and sale transactions.  He represents both buyers and sellers of used private jets.  Ogara Jets is a member of the International Aircraft Dealers Association (formerly known as the National Aircraft Resellers Association) ("IADA"), which is the largest industry trade group focusing specifically on the role of brokers and dealers in private aircraft transactions.  Mr. Foster is a former Board Member and Chairman of IADA.  The Court finds that Mr. Foster is an exceptionally well-qualified, knowledgeable, and credible expert with respect to the role of brokers and dealers in private aircraft resale transactions.

Jason Zilberbrand is the President and Chief Technical Officer of VREF Aircraft Value Reference and Appraisal Services ("VREF").  VREF operates as a sort of "Kelly's Blue Book" for aircraft valuation.  Mr. Zilberbrand is a certified aircraft appraiser and a member of the American Society of Appraisers and National Aircraft Appraisal Association.  He has performed thousands of aircraft appraisals.  Mr. Zilberbrand joined VREF in 2018.  Earlier in his career, Mr. Zilberbrand worked as a Vice-President of Sales for Jet Support Services, Inc., selling "hourly costs maintenance programs for turbine-powered aircraft."  After about 10 years in that sector of the aviation industry, Mr. Zilberbrand started The Jet Collection, a broker and dealer in private aircraft.  Mr. Zilberbrand spent ten years running The Jet Collection.  Then, he joined Aurum Jets for a few years before starting at VREF.  At Aurum Jets, Mr. Zilberbrand focused on the liquidation of Russian aviation assets, including both aircraft and unairworthy assets. The Court finds that Mr. Zilberbrand is very well-qualified and knowledgeable about aircraft valuation and appraisals.  He also is qualified with respect to the role of brokers and dealers in private aircraft resale transactions, although somewhat less so than Mr. Foster.  Mr. Zilberbrand was a mostly-credible witness although some aspects of his testimony are suspect.

---

[166]      Ex. 7 at 1, Art. 2.

[167]      Docket No. 43 in the Adversary Case ¶ 45.

Both Mr. Foster and Mr. Zilberbrand testified about industry standards governing brokers in the aircraft resale industry.  They agreed that there are no federal or state statutes or regulations that govern the conduct of aircraft brokers.  So, to that extent, aircraft brokers are largely "self-regulated."  However, Mr. Foster testified that ethical guidance from various aviation trade organizations establishes at least some baseline for the aviation industry that essentially mirrors standards for ethical conduct in all industries.

For example, Mr. Foster pointed to the "Code of Ethics" promulgated by IADA which provides that "All IADA Members":

> •    Shall create and maintain a reputation for honesty, integrity and transparency . . . .
>
> •    When specifically acting as an exclusive agent for an exclusive buyer or seller, shall not accept commission from more than one party to a transaction without the full knowledge of the principal(s) of the transaction . . . .
>
> •    Shall avoid exaggeration, misrepresentation, or concealment of all known pertinent facts relating to a transaction . . . .
>
> •    Shall reveal their true ownership or interest in any aircraft they represent to the purchaser or his/her representative . . . .[168]

The March 8, 2018 "Statement Regarding Ethical Conduct" of the National Air Transportation Association ("NATA") is somewhat similar and states:

> General aviation businesses gain credibility by acting with honesty and integrity, upholding their commitments, and acting in a manner that builds trust through honorable conduct.  General aviation businesses should adhere to the highest ethical standards and not tolerate any attempts to deceive or fail to disclose relevant information in a transaction.  A key element of integrity is acting in good faith towards, and on behalf of, its customers and competitors. The avoidance of conflicts of interests both by personnel and the business is important to garnering trust by those with which it does business . . . .  For those businesses that act in a fiduciary relationship with a customer, for example, a conflict of interest may occur when a kick-back, rebate, or commission is retained by the business or its personnel and

---

[168]    Ex. 84 at 4-5.

is not fully disclosed and approved in writing by the customer.[169]

The National Business Aviation Association (the "NBAA") adopted an "Ethical Business Aviation Transactions" standard which also has commonalities with the foregoing:

> All business aviation professionals must always conduct him/herself in an honest and ethical manner.  Everyone must consistently adhere to the highest standards of personal and professional integrity and not tolerate any attempts to deceive or evade responsibility for actions . . . .  A "conflict of interest" occurs when a person's private interest interferes in any way . . . with that of the company the professional is representing . . . .  Conflicts of interest may also arise when an individual . . . solicits, is offered, or receives improper personal benefits or emoluments (*e.g.* finders fees, kick-backs, undisclosed rebates or commissions) as a result of his or her position working for the company.[170]

Mr. Foster conceded that none of the foregoing ethical industry standards are binding and enforceable by a regulatory body.  Further, neither Mr. Bloom nor BBJ are members of IADA.  The Court received no evidence that Mr. Bloom and BBJ are or were members of either NATA and NBAA.  The Court observes that the NATA ethical statement post-dates the Agent Agreement.

Regardless, Mr. Foster testified that these statements have common themes and, in effect, evidence fundamental industry standards for aircraft brokers.  Mr. Foster opined that aircraft brokers: must follow "sound ethical guidelines"; cannot substitute "their own wants for those of their clients"; "cannot allow personal gain to interfere with obligations to clients"; "cannot fail to disclose material information" to the client including "price, profit, and personal gain"; and "cannot mislead clients."  When asked whether industry standards permit aircraft brokers "to lie to a client", Mr. Foster responded unequivocally:  "No.  Lying is never appropriate."

To a remarkable extent, Mr. Zilberbrand agreed with the foregoing.  Initially in his testimony, he contended that there are not any ethical industry standards that are binding and enforceable by a regulatory body.  And, he pointed out that industry organizations such as IADA, NATA, and NBAA are voluntary organizations that issue guidelines applicable only to their members.  The Court accepts these statements.  However, on cross-examination, Mr. Zilberbrand acknowledged that "there are standards."  He stated that aircraft brokers are "unregulated" (in terms of formal enforceable governmental laws or regulations), "but there are standards" which are "normal business standards."  Honesty to a client is one of those industry standards.  Mr. Zilberbrand agreed that if an aircraft broker lies to a client, such conduct "violate[s]

---

[169]     Ex. 82 at 2.
[170]     Ex. 83 at 1.

applicable standards." Both Mr. Foster and Mr. Zilberbrand also agreed that they have never been involved in an undisclosed back-to-back transaction such as orchestrated by Mr. Bloom. Further, they both conceded that, while back-to-back transactions are not per se prohibited by industry standards, any proposed back-to-back transaction must be fully disclosed to the client and approved by the client.

From the expert testimony, the Court finds that there are industry standards governing aircraft brokers including, at least, the following: (1) aircraft brokers should not lie to their clients; (2) aircraft brokers should disclose pertinent facts to their clients (including any potential back-to-back transaction); and (3) aircraft brokers should not deceive their clients for their own gain. Based on the Court's prior factual findings concerning Mr. Bloom's conduct, Mr. Bloom violated all of those basic standards.[171]

## Q.   Credibility Findings.

At trial, the Court received key testimony from Huw Pierce, Jennifer Pierce, and Mr. Bloom. Given the importance of their testimony, the Court makes additional credibility determinations.

### 1.   Credibility Findings for the Pierces' Testimony.

The Court finds that Huw Pierce and Jennifer Pierce both testified credibly. To a significant degree, their testimony was directly corroborated by documentation admitted into evidence. Nevertheless, Mr. Bloom's counsel tried to discredit the Pierces in multiple ways. For example, Mr. Bloom seemed to suggest that the Pierces could not afford to buy the Airplane. Mr. Pierce's counsel conducted lengthy examination of the Pierces and Mr. Orman to establish that the Pierces were turned down for a loan by several financial institutions. The Court finds that line of inquiry irrelevant. And, even assuming that the Pierces were rejected for loans by several financial institutions, the record reflects that the Pierces put down more than $1,000,000 of their own funds to purchase the Airplane. They also qualified for, and received, a $2,591,500 Loan from TruStone Financial. Somewhat contradictorily, Mr. Bloom also attempted to discredit the Pierces as rich. Mr. Bloom highlighted that the Pierces owned multiple homes and properties and that they had in the past purchased luxury items such as boats. Mr. Bloom also emphasized their extensive travel, including to the Caribbean and the Kentucky Derby. Again, all such evidence is irrelevant. And, being wealthy, or poor, or somewhere in between does not impact credibility.

Mr. Bloom also elicited testimony that the Pierces (particularly Huw Pierce) were angry and threatening. For example, one current employee of BBJ (Mary Lynn Fisk)

---

[171]     The Court earlier noted that some of Mr. Zilberbrand's testimony was suspect and not credible. For example, he testified that "based on the documents, I didn't see anything out of the norm" in Mr. Bloom's conduct and he "didn't see any red flags." The general import of this testimony was a very weak effort to opine that what Mr. Bloom did was permissible in terms of industry norms. But, that opinion is not credible in light of Mr. Zilberbrand's concession that aircraft brokers should not lie to their clients. Mr. Bloom lied repeatedly.

and one former employee of BBJ (Dayna Olivas) testified that, after disputes surfaced under the Management Services Agreement, Mr. Pierce had conversations with them in which Mr. Pierce acted aggressively.  Ms. Fisk recalled that Mr. Pierce "stated disrespectful things" and she "felt threatened."  Ms. Olivas similarly indicated that she was very "rattled" and "upset" after a call with Mr. Pierce.  She stated that she had never "been treated that way by a client or at work."  As a result, she "felt threatened" and was "glad she lived in a gated community."  On cross examination, Mr. Pierce also admitted that he contacted the Federal Bureau of Investigations and the Internal Revenue Service about Mr. Bloom and the Colorado State Bar about Mr. Rose.  Glencove also asserted legal claims against BBJ, Mr. Bloom, Mr. Rose, Big Horn Exploration, and Haggan Aviation in Texas and in the Colorado Action.

This Court does not encourage or condone overly aggressive or threatening behavior.  But, the foregoing evidence advanced by Mr. Bloom is largely irrelevant and does negate the Pierces' truthfulness or credibility.  Instead, such evidence mainly shows that the Pierces were hopping mad and upset with Mr. Bloom over the mis-billing, lies, and deception that they discovered after Glencove purchased the Airplane.  Given Mr. Bloom's conduct, the Pierces have every right to be angry.

## 2. Credibility Findings for Mr. Bloom's Testimony.

The Court's assessment of Mr. Bloom's credibility stands in stark contrast to the credibility of the Pierces.  Regrettably, the Court finds that Mr. Bloom was not credible at all.  As set forth above, Mr. Bloom lied to the Pierces and deceived them repeatedly throughout 2015.  During the trial, he continued with the same façade.  For example, he testified: "I was a transaction broker.  It's clear."  But that testimony is directly contravened by the Agent Agreement.  Furthermore, in his own contemporaneous e-mails to the Pierces, Mr. Bloom repeatedly convinced the Pierces that he was acting on Glencove's behalf — not as some sort of transaction broker.  He stated: "I will of course coach you at these crossroads and all along the way . . . ."[172]  And, dozens of times he used the words "our," "us, and "we" in referring to his supposed efforts to help Glencove: "our buy number goal"; "our offer"; "our goal"; "this will put us on the lower end"; "we need to get them down"; "we will need to transfer the deposit"; and "our next counter offer."[173]  Never once did Mr. Bloom tell Glencove that he was a transaction broker acting on his own behalf and for his own interests.  Indeed, Mr. Bloom signed a "Aircraft Delivery Receipt" in which he represented that he was "Agent for Glencove Holdings, LLC."[174]  No document admitted into evidence corroborates Mr. Bloom's new-found contention that he was a transaction broker.

Mr. Bloom further damaged his credibility by arguing absurdities.  For example, on August 13, 2015, in an email to Glencove, Mr. Bloom painted a picture of hard-fought negotiations with the owner of the Airplane on Glencove's behalf.  He wrote:  "We are

---

[172]   Ex. 10 at 1.
[173]   *See e.g.*, Exs. 9, 10 and 12.
[174]   Ex. EF.

going back and forth right now and have been for the last three hours  We've gotten
close on the numbers . . . .  I'm negotiating hard.  [R]ight now I'm working them
over . . . ."[175]  At trial, including in closing arguments, Mr. Bloom tried to explain away
these damning statements by suggesting that he was negotiating for Glencove against
Big Horn Exploration (not Loretto Aviation).  But, Mr. Bloom owns and controls Big Horn
Exploration.  So, Mr. Bloom's preposterous argument is that he was effectively
negotiating hard against himself for three hours.  By presenting that sort of absurdity to
the Court, Mr. Bloom undercut his position and left his credibility is tatters.  Other
examples of Mr. Bloom's revisionist history and attempts at misdirection abound.

The Court carefully observed Mr. Bloom's demeanor throughout his testimony.
The Court also compared his testimony to the documentary record, including Mr.
Bloom's own contemporaneous e-mail messages written to Glencove.  In the end, the
Court is forced to conclude that Mr. Bloom lacks credibility.

## V.      Conclusions of Law.

### A.      Allocation of Burdens of Proof.

#### 1.      Allowance or Disallowance of Glencove Claim.

Section 501 provides that a creditor may file a proof of claim.  Section 502 states
that a proof of claim filed under Section 501 "is deemed allowed, unless a party in
interest . . . objects."  11 U.S.C. § 502(a).  When a proof of claim meets the formal
requirements of Fed. R. Bankr. P. 3001, such proof of claim constitutes "prima facie
evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  To
overcome that presumption, "the objecting party has the burden of going forward with
evidence supporting the objection."  *Abboud v. Abboud (In re Abboud),* 232 B.R. 793,
796 (Bankr. N.D. Okla.), *aff'd,* 237 B.R. 777 (10th Cir. BAP 1999).  Such evidence must
be of probative force equal to that of the allegations contained in the proof of claim.  *Id.*
Once the objecting party (Mr. Bloom) has reached such threshold, the creditor
(Glencove) has the ultimate burden of persuasion as to the validity and amount of the
claim.  *Agricredit Corp. v. Harrison (In re Harrison),* 987 F. 2d 677, 680 (10th Cir.1993);
*Allen v. Geneva Steel Co. (In re Geneva Steel Co.),* 260 B.R. 517, 524 (10th Cir. BAP
2001).

#### 2.      Determination of Dischargeability or Nondischargeability of Debt.

Glencove bears the burden of establishing nondischargeability of a particular
debt under Section 523(a) by a preponderance of the evidence.  *Grogan,* 498 U.S. at
286-87 ("requiring the creditor to establish by a preponderance of the evidence that his
claim is not dischargeable reflects a fair balance between these conflicting interests.");
*Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015) (requiring
creditor to prove Section 523(a) claims by a preponderance of the evidence).
Additionally, exceptions to discharge under Section 523(a) "are to be narrowly

---

[175]      Ex. 16.

construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997). *See also Sawaged v. Sawaged (In re Sawaged)*, 2011 WL 880464, at *3 (Bankr. D. Colo., Mar. 15, 2011) (same).

## B.   **The Glencove Claim Is Allowed.**

The Glencove Claim is a general unsecured Proof of Claim against Mr. Bloom based upon the Third-Party Complaint asserted by Glencove against Mr. Bloom in the Colorado Action. Glencove alleged seven distinct causes of action against Mr. Bloom for: (1) fraud; (2) fraudulent concealment and inducement; (3) negligent misrepresentation; (4) violation of the Colorado Consumer Protection Act; (5) negligence and gross negligence; (6) civil conspiracy; and (7) attorneys' fees. All of the claims relate to the dispute over the Airplane. A few months after Glencove filed the Glencove Claim, Mr. Bloom submitted the Objection and requested that the Glencove Claim be disallowed in its entirety. The allowance or disallowance of the Glencove Claim requires the Court to apply state law. *Grogan*, 498 U.S. at 283 ("The validity of a creditor's claim is determined by rules of state law.") Both Glencove and Mr. Bloom invite the Court to utilize Colorado law. So, the Court turns to the underlying claims.

### 1.   **Glencove Established that Mr. Bloom Engaged in Fraud.**

Fraud is an intentional tort that has been recognized in Colorado since Statehood. *See Wheeler v. Dunn*, 22 P. 827, 833 (Colo. 1889) (identifying elements of fraud by misrepresentation claim). "[T]he constituents of fraud, though manifesting themselves in a multitude of forms, are so well recognized that they may be said to be elementary." *Morrison v. Goodspeed*, 68 P.2d 458, 477 (Colo. 1937). The Colorado Supreme Court repeatedly has confirmed the legal elements required for establishing a fraud claim based upon misrepresentation:

> (1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it is false; (3) ignorance on the part of the one to whom the representation is made of the falsity; (4) representation made with intention that it be acted upon; and (5) representation resulting in damage.

*Kinsey v. Preeson*, 746 P.2d 542, 550 (Colo. 1987) (citing *Trimble v. City and Cty. of Denver*, 697 P.2d 716 (Colo. 1985)). *See also Concord Realty Co. v. Cont'l Funding Corp.*, 776 P.2d 1114, 1118 (Colo. 1989) (same list of fraud elements); *Brody v. Bock*, 897 P.2d 769, 775-76 (Colo. 1995) (same); *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005) (same); *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012) (same); *Bristol Bay Prods., LLC v. Lampack,* 312 P.3d 1155, 1160 (Colo. 2013) (same). Although often described as a five-part test, the fifth element of fraud — damages — contains further requirements. The Colorado Supreme Court confirmed that the damages element should be "unpack[ed] . . . into its three discrete sub-parts, requiring

the plaintiff to prove separately actual reliance, the reasonableness of that reliance, and that the plaintiff's reliance caused its damages. *Bristol Bay*, 312 P.3d at 1160 (citing Colorado Jury Instructions – Civil. 19:1 (2013) (listing seven requirements for fraud instead of five elements). Federal courts applying Colorado law also rely upon the same formulation of fraud. *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 569 F. Supp.2d 1135, 1140 (D. Colo. 2008).

### a. Mr. Bloom Made Numerous False Representations of Material Facts to Glencove.

As detailed in the Factual Findings, during their relationship, Mr. Bloom made dozens of misrepresentations of material existing facts to Glencove pertaining to the Airplane. The Court identifies only the most important false representations, which the Court will refer to as the "False Representations":

- On August 12, 2015, Mr. Bloom misinformed Glencove:

  "*Our offer came back at $3.775M.* We've got them to accepted 99% of our terms and conditions. We are evaluating now what are [sic] next move is going to be. The counter offer expires Friday afternoon. Our goal is to buy in that Wholesale range $3.665M, they told us this is the only and final counter offer. But we hear that crap all the time. We need to get them down another $75,000 to $90,000. This will put us on the lower end of the budget and leave room for paint and interior."[176]

  These statements were false. The "offer" did not "come back at $3.775M." Instead, the day before the message, Loretto Aviation (the owner of the Airplane) submitted the Loretto Aviation Counteroffer at $3,400,000.[177] Mr. Bloom simply made up the fictitious "$3.775M" offer and hid the real Loretto Aviation Counteroffer from Glencove. The other statements also are false by reinforcing the central lie. Mr. Bloom pretended "[w]e need to get them down another $75,000 to $90,000" so as to arrive at a price in the "Wholesale range $3.665M." However, Loretto Aviation already had countered below the "Wholesale range $3.665M."

- On August 12, 2015, Mr. Bloom misled Glencove again:

  "I'm confident that we can get them lower. Let's just see where we can get them. I want to be very mindful of the total spend and try my best to get you into the 3.7 total . . . . I would like to go back at $3.525. We can always go up . . . . We should go back at $3.525. ok with you?"[178]

---

[176]   Ex.15 at 2 and Ex. CF at 1 (emphasis added).
[177]   Ex. 12; Stip. Fact No. 38.
[178]   Exs. 15 at 1 and CF at 2-3.

These statements were false because they were based upon the fictitious "3.775M" offer Mr. Bloom invented. Mr. Bloom was not "confident that we can get them lower" through further negotiations. Instead, Loretto Aviation already had submitted the Loretto Aviation Counteroffer for $3,400,000.

- On August 13, 2015, Mr. Bloom lied to Glencove again:

  "I've not heard back [referring to Glencove's initial offer in the "low 3's" [$3,000,000]]. I sent an e-mail and left a voice mail message so we should hear something in the next hour or two."[179]

  These statements were false. Mr. Bloom was not waiting to "hear back" from anyone. Mr. Bloom already had received the $3,400,000 Loretto Aviation Counteroffer two days earlier but concealed it from Glencove.

- On August 13, 2015, Mr. Bloom sent another misrepresentation to Glencove:

  "We are going back and forth right now and have been for the last three hours. We've gotten close on the numbers right now we are within $40,000. I'm negotiating hard. [R]ight now I'm working them over to deliver the plane with $60,000 worth of maintenance items completed if we agree to the pricing of $3.595M. We are stuck now at this number Seller's not budging off this $3.595M . . . ."[180]

  These statements were false. There was no three hour negotiation for Glencove's benefit. Mr. Bloom was not "negotiating hard" to serve Glencove. He was not "working them [the seller] over" either. And, Loretto Aviation was not stuck on "$3.595." After all, days earlier Mr. Bloom received the Loretto Aviation Counteroffer at $3,400,000 which Mr. Bloom concealed from Glencove.

- On or around August 14, 2015, Mr. Bloom misled Glencove again by informing Glencove that the seller of the Airplane had agreed to accept $3,550,000 as the purchase price for the Airplane.

  This statement was false. By that date, Loretto Aviation had agreed to sell the Airplane for $3,300,000 — not $3,550,000. Mr. Bloom concealed the $250,000 difference.

- On September 28, 2015, Mr. Bloom spouted another lie regarding airworthy discrepancy repairs to the Airplane. Glencove had executed a "Conditional Acceptance Certificate" agreeing to proceed with the

---

[179]   Ex. 19.
[180]   Ex. 16.

transaction provided that the seller agreed to make $67,459 in airworthy discrepancy repairs listed on the Haggan Aviation Original Work Estimate. Before closing on the sale, Glencove inquired:  "Did they get all the repairs completed on the plane yet?"  Mr. Bloom responded:  "The seller will pay the facility to fix the repairs" and "the repairs are underway."[181]

These statements were false.  Just days earlier, on September 25, 2015, Loretto Aviation informed Mr. Bloom that Loretto Aviation "will not perform any repairs to the aircraft.  If buyer wishes to purchase the aircraft, they can do so in as-is condition."[182]  Mr. Bloom hid that critical information from Glencove and then told Glencove the opposite all so that the transaction would close.

All the False Representations pertain to material existing facts.  They are facts, not opinions, because such misrepresentations are susceptible to proof (including through documentation such as the Loretto Aviation Counteroffer and e-mails).  *See Knight v. Cantrell*, 390 P.2d 948, 951 (Colo. 1964) (reversing fraud judgment because statement "it is a good house" is an opinion not susceptible to proof).  Further, all the False Representations are material since they concern the type of key information about pricing, negotiations, repairs, and other terms to which a reasonable person would attach importance in an aircraft acquisition.  *See Rocky Mountain Expl., Inc v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo. 2018) ("A fact is material if a reasonable person under the circumstances would attach importance to it in determining his or her course of action.");  *Denberg v. Loretto Heights Coll.*, 694 P.2d 375, 377 (Colo. App. 1984) (citing *Wade v. Olinger Life Ins. Co.,* 560 P.2d 446 (Colo. 1977) (same)).

### b.   Mr. Bloom Had Knowledge of the Facts and the Falsity of His Representations to Glencove.

With respect to each of the False Representations, the evidence dictates that Mr. Bloom knew the truth but instead communicated false information to Glencove.  His knowledge of the actual facts is not disputed.  Instead, the Stipulations of Fact, coupled with unrebutted testimony which was corroborated by contemporaneous documentation (including e-mails and contracts), establish Mr. Bloom's knowledge of the falsity of his communications to Glencove.  For the most part, in his testimony, Mr. Bloom did not attempt to contest, explain, or even address the myriad of False Representations.  Instead, he merely seemed content with suggesting that his fraudulent conduct was acceptable.

### c.   Glencove Was Ignorant of the Facts and the Falsity of the Mr. Bloom's Representations.

---

[181]   Ex. 44.
[182]   Ex. 39.

At Mr. Bloom's behest, Glencove entered into the Agent Agreement with BBJ believing that both Mr. Bloom and BBJ would act in the interests of Glencove. After all, BBJ was Glencove's agent under the Agent Agreement and BBJ was solely owned by Mr. Bloom. Because of the concealment and falsities perpetrated by Mr. Bloom and BBJ, Glencove was ignorant of the untruthfulness of the False Representations. More specifically, with respect to each of the False Representations, the evidence establishes that Glencove did not know at the time that such representations were false. Most importantly, Mr. Bloom never told Glencove about the Loretto Aviation Counteroffer or that Loretto Aviation agreed to sell the Airplane for $3,300,000 instead of $3,550,000.

### d. Mr. Bloom Made the False Representations Intending that Glencove Act on the Information He Provided.

The evidence proves that Mr. Bloom embarked on a very conscious plan to deceive and damage Glencove in order to enrich himself, BBJ, and his close professional associates. Mr. Bloom knew and intended that Glencove would rely on him and act on the False Representations. Most of the False Representations were directed at the single most important term in any commercial transaction: price.

Mr. Bloom had received the Loretto Aviation Counteroffer to purchase the Airplane for $3,400,000 on August 11, 2015, but he hid that information from Glencove. The next day he communicated a total lie to Glencove: "Our offer came back at $3.775M." With a counteroffer of $3,400,000 already on the table, common sense dictates that Glencove would not have offered to pay more. In addition to common sense, both of the Pierces credibly and expressly testified that Glencove never would have offered to pay more than the owner of the Airplane demanded — if they had known the truth about the Loretto Aviation Counteroffer. But Mr. Bloom hid the truth and convinced Glencove to bid $3,550,000 through his deception and additional False Representations.

Then, Mr. Bloom made further False Representations pretending to be negotiating on behalf of Glencove. But he was not acting on its behalf. His intent was to cheat Glencove. In the end, Loretto Aviation agreed to accept $3,300,000 for the Airplane; but Mr. Bloom told Glencove that the owner agreed to $3,550,000. Before, the closing of the transaction, Mr. Bloom made further False Representations concerning the airworthy discrepancy repairs. Mr. Bloom told Glencove that the repairs based on the Haggan Aviation Original Work Estimate were underway and would be completed and paid for by the seller. However, he knew that was false too. Nevertheless, he convinced Glencove to proceed. Why? So that he would receive both the $121,000 "AGENT'S FEE" plus the hidden $250,000 "upcharge" windfall that he could distribute to BBJ, Mr. Rose, and Aircraft Finance Corporation. The evidence shows that Mr. Bloom took advantage of Glencove knowingly and intended that Glencove would act on the False Representations.

### e.    Glencove Relied on the False Representations and Was Damaged.

As noted above, the Colorado Supreme Court identified three sub-parts to the elements which must be proven to support an award for damages for fraud.  *Bristol Bay*, 312 P.3d at 1160.  Here, Glencove has the burden of proving those three sub-parts: its "actual reliance [on the False Representations]; the reasonableness of that reliance; and that the plaintiff's reliance caused its damages."  *Id.*; *see also Fasing v. LaFond*, 944 P.2d 608, 612 (Colo. App. 1997) ("an element of [the fraudulent misrepresentation claim] is reasonable reliance on the alleged misrepresentations."); *Frontier Expl., Inc. v. Am. Nat'l Fire Ins. Co.*, 849 P.2d 887, 891 (Colo. App. 1992) ("False representation requires . . . justifiable reliance by the one to whom the representation is made.")  Glencove met its burden as to each of the sub-parts.

### i.    Glencove Actually Relied on the False Representations.

The uncontroverted evidence recounted above proves that Glencove relied upon the False Representations concerning price and the airworthy discrepancy repairs.  But for the False Representations, Glencove never would have agreed to bid $3,550,000 for the Airplane.  Furthermore, the testimony from the Pierces confirms that Glencove would not have closed the acquisition of the Airplane if Glencove had known the truth — (1) that Mr. Bloom had in hand the Seller's counteroffer for $3,400,000; (2) that Mr. Bloom orchestrated a hidden back-to-back transaction to increase his take by $250,000 through a series of lies; and (3) that Loretto Aviation had refused to make all the airworthy discrepancy repairs in the Haggan Aviation Original Work Estimate.  Glencove's actual reliance is patent and not contested by Mr. Bloom.

### ii.    Glencove's Reliance Was Reasonable.

Mr. Bloom unconvincingly argued that Glencove's reliance was unreasonable.  He suggested that Glencove should have further investigated Mr. Bloom and conducted its own independent title search with the Federal Aviation Administration to identify the true owner of the Airplane: Loretto Aviation.  As best the Court understands Mr. Bloom's legal position, he contends that if Glencove had performed such additional investigations, Glencove might have been tipped off to Mr. Bloom's fraud with the back-to-back transaction and could have terminated its relationship with BBJ and Mr. Bloom.  The argument rings hollow, especially coming from the fraudster who pretended to be acting in Glencove's interest but who went to great lengths to conceal the truth throughout the aircraft acquisition process.

Mr. Bloom cultivated the relationship with Glencove, and the Pierces, who very apparently had not ever purchased an aircraft before and knew little about the industry or airplanes.  Mr. Orman of Aircraft Finance Corporation, who had been helping them with obtaining financing for a purchase of an aircraft and who was someone they thought they could trust, referred the Pierces to Mr. Bloom.  Mr. Bloom followed up and introduced himself.  He presented an impressive description of himself and BBJ

including his significant experience in aircraft acquisitions.  In BBJ's promotional brochure, he touted himself as someone to be trusted: "you need to have people you can trust on your side."

The Pierces did not agree to engage BBJ and Mr. Bloom right away.  Instead, they honored their relationship with their prior agent: Mr. Vesslee.  And, then they met in person with Mr. Bloom to assess his qualifications, experience, and proposed terms of engagement.  Under the circumstances, neither the Pierces nor Glencove were required to engage in any further investigation of Mr. Bloom.

Mr. Bloom convinced Glencove to enter into the Agent Agreement with BBJ.  His use of an exclusive Agent Agreement was designed to ensure that Glencove would rely on BBJ and Mr. Bloom.  Mr. Bloom prepared the Agent Agreement himself, inserting the word "AGENT" thirty-nine times.  And, he repeatedly led the Pierces to believe that he was acting on Glencove's behalf by using the words "our," "us, and "we" in referring to his supposed efforts to help Glencove: "our buy number goal"; "our offer"; "our goal"; "this will put us on the lower end"; "we need to get them down"; "we will need to transfer the deposit"; and "our next counter offer."[183]

Both of the Pierces testified credibly that they believed BBJ and Mr. Bloom would act in the best interests of Glencove.  In his Answer (which he has never amended), Mr. Bloom repeatedly characterized himself as an agent for Glencove.[184]  Even Mr. Bloom's own expert witness, Jason Zilberbrand, conceded the existence of an agency relationship.

The word "agent" has a plain meaning in the context of business transactions: someone who acts for and represents another.  *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE at 32 (Houghton Mifflin Harcourt Pub., 5th Ed. 2011) ("agent" means "[o]ne empowered to act for or represent another"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 40 (G.C. Merriam Co. 1968) ("one that acts for or in place of another by authority from him; as a representative . . . .).  The commonly-accepted meaning was known to Mr. Bloom and Glencove.  Jennifer Pierce knew what the word "agent" meant since she was a real estate agent earlier in her career.  And it is common knowledge that agents are not supposed to lie to their principals.  The Pierces, Mr. Bloom, and the two expert witnesses (Mr. Foster and Mr. Zilberbrand) all confirmed as much in their testimony.  Instead, agents have fiduciary duties to their principals, including a duty to act loyally for the benefit of the principal and avoid self-dealing.

Colorado law follows the ordinary meaning of the terms "agent" and "agency." In *Stortroen v. Beneficial Fin. Co. of Colorado.*, 736 P.2d 391, 395-96 (Colo. 1987), the Colorado Supreme Court stated:

---

[183]   *See e.g.*, Exs. 9, 10, 12.

[184]   Docket No. 5 in Adversary Proceeding at 5 ("Bloom's relationship with Glencove was that of an independent agent"; *Id.* ¶¶ 5 and 7 ("Bloom was . . . an agreed to independent agent . . . ."; "Bloom is not legally or contractually required as an independent agent . . . .").

> Agency is the fiduciary relation which results from the
> manifestation of consent by one person to another that the
> other shall act on his behalf and subject to his control, and
> consent by the other so to act. The one for whom the action
> is to be taken is the principal, and the one who is to act is the
> agent. Agency is thus a legal relation having its source in
> the mutual consent of the parties. The consensual
> arrangement may but need not amount to a contract.
> Furthermore, an agency relation may exist even though the
> parties do not call it an agency and do not subjectively intend
> that legal consequences flow from their relation.

*Id.* at 395-96 (citing RESTATEMENT (SECOND) OF AGENCY (ALI 1958)). *See also City of Aurora,* 105 P.3d at 622 (same). "Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.*" Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 491-93 (Colo. 1989) (citing with approval RESTATEMENT (SECOND) OF AGENCY § 387 (ALI 1958)). More than a century ago, the Colorado Supreme Court ruled that an agent is prohibited from representing both the seller and the buyer in the same transaction unless the parties know of and consent to the arrangement. *Finnerty v. Fritz,* 5 Colo. 174, 175-76 (1879).

The Court already has determined that BBJ was an agent for Glencove under the Agent Agreement. As explained later in this Opinion, the Court also finds that Mr. Bloom was an agent for Glencove, even though he is not a party to the Agent Agreement. But, the point for now in considering the reliance issues is that Mr. Bloom and BBJ enticed Glencove to rely on them through theirs words, conduct, and the Agent Agreement. And the Court finds that such reliance was entirely reasonable from an objective perspective. Glencove had no reason to go to the Federal Aviation Administration and investigate the ownership of the Airplane because it was properly relying on BBJ and Mr. Bloom to do so — as their agents. Glencove did not discover Mr. Bloom's fraud until well after the closing of the acquisition of the Airplane. Until that time, there were no signals or red flags to alert Glencove to the fraud being perpetrated on it. So, Glencove's reliance on Mr. Bloom and the False Representations was reasonable.

### iii.   The "Fact of Damages" and the Amount of Damages.

Under Colorado law, "[t]he defrauded party may recover such damages as are a natural and proximate consequence of the fraud." *Trimble*, 697 P.2d at 724; *see also Russell v. First Am. Mortg. Co.*, 565 P.2d 972, 974 (1977). The general principle in fraud cases is "to make the injured party whole." *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (1994). Frequently, the measure of damages for fraud is based on "out-of-pocket costs" or "benefit of the bargain" damages. *See Associated Mortg. Corp. v. Weaver (In re Weaver)*, 579 B.R. 865, 905-07 (Bankr. D. Colo. 2018) (explaining Colorado state law on damages for fraud); *W. Cities Broad., Inc. v. Schueller*, 830 P.2d 1074, 1077 (Colo. App. 1991), *aff'd* 849 P.2d 44 (Colo.1993) (referring to fraud

damages for "the benefit of the claimant's bargain"); *see also* RESTATEMENT (SECOND) OF TORTS § 549 (ALI 1958) (referring in commentary to both "out-of-pocket" and "benefit-of-the-bargain" measures of damages).[185]   However, "[t]he trial court, as trier of fact, has wide discretion in fixing the measure and amount of damages."  *Ballow*, 878 P.2d at 677 (citing *Bigler v. Richards*, 377 P.2d 552, 553 (1963)).  If the legal injury "is of an economic character . . . legal redress in the form of compensation should be equal to the injury."  *Dep't of Health v. Donahue*, 690 P.2d 243, 250 (Colo. 1984); *see also* RESTATEMENT (THIRD) OF TORTS § 9 (ALI 2020) ("One who fraudulently makes a material misrepresentation of fact . . . for the purpose of inducing another to act . . . is subject to liability for economic loss caused by the other's justifiable reliance on the misrepresentation).

Glencove is obligated to prove both the "fact of damages" and the "amount of damages."  With respect to the "fact of damages" the plaintiff bears the burden to establish a causal connection between the False Representations and the damages. "[I]t is axiomatic that before damages . . . may be awarded, one who seeks them must establish that the damages are traceable to and are the direct result of the wrong to be redressed."  *Graphic Directions, Inc. v. Bush*, 862 P.2d, 1020, 1025 (Colo. App. 1993) (citing *Isaac v. Am. Heritage Bank & Tr. Co.,* 675 P.2d 742, 745 (Colo. 1984)).

With respect to the "amount of damages," Glencove bears the burden to "provide a reasonable basis for computation so as to enable the fact-finder to arrive at a fair approximation of the loss sustained."  *W. Cities*, 830 P.2d at 1077 (citing *Tull v. Gundersons, Inc.*, 709 P.2d 940 (Colo. 1985)).  Put another way, "the plaintiff [must] submit substantial evidence, which taken together with reasonable inferences to be drawn therefrom, provides a reasonable basis for computation of the damage." *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1383 (Colo. 1993).

Mr. Bloom's fraudulent conduct proximately damaged Glencove.  Glencove was deceived into paying $250,000 more for the Airplane than Loretto Aviation sold it for. *See Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 759 (Ill. App. 2013) ("where fraud resulted in an inflated sale price, the proper calculation for damages is the difference between what the defrauded party paid and what it would have paid had there been no fraud.").  But for the fraud, Glencove would have paid $3,300,000 for the Airplane.  Mr. Bloom captured the $250,000 difference between what Glencove actually paid and what it should have paid.  Mr. Bloom then directed the distribution of the ill-gotten proceeds to himself and his cohorts.  Furthermore, because of Mr. Bloom's fraud, Glencove paid BBJ $120,000 as an "AGENT'S FEE" notwithstanding that Mr. Bloom and BBJ deceived Glencove and failed to act in its best interests.  *See Russell*, 565 P.2d at 974 ("the

---

[185]   Section 549 of the RESTATEMENT (SECOND) OF TORTS (ALI 1977) states: "(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.  (2) The recipient of a fraudulent misrepresentation in business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty."

defrauded party may recover any additional damages which are a natural and proximate consequence of the defendant's misrepresentations."). Generally, "the broker's concealment from the principal of information that bears upon the transaction in question will defeat the broker's claim for compensation." *Moore & Co. v. T-A-L-L, Inc.*, 792 P.2d 794, 799 (Colo. 1990) (broker's breach of fiduciary duty forfeits commission even in absence of actual monetary loss as a result of the breach). The evidence at trial showed that Glencove would not have gone through with the acquisition of the Airplane and would not have incurred the "AGENT'S FEE" if it had known about Mr. Bloom's fraud. So, Glencove may recover the $120,000 "AGENT'S FEE" too.

In addition to the foregoing, Glencove claimed certain additional damages related to financing the Airplane acquisition including: (1) $55,812 in extra interest on the $250,000 portion of the Loan; (2) $25,915 for the origination fee paid to Aircraft Finance Corporation; and (3) $2,194 for a lender fee paid to TruStone Financial for the Loan. Glencove's interest calculation is supported by the evidence and limited only to the $250,000 portion of the Loan which was necessitated by Mr. Bloom's fraud. Thus, Glencove is entitled to damages in the amount of $55,812 for interest on the Loan caused by Mr. Bloom's fraud. *See Russell,* 565 P.2d at 974 (allowing additional interest as part of fraud damages); *McNeil v. Allen*, 534 P.2d 813, 818-19 (Colo. App. 1975) (allowing additional interest as damages and ruling that "[a]n injured party may recover such damages as are the natural and probable result of the injury sustained by virtue of a tortious act [fraud]").

With respect to the $25,915 origination fee paid by Glencove to Aircraft Finance Corporation, the evidence established that Glencove agreed to pay a one percent (1%) origination fee to the company. However, Glencove is requesting recovery of the entire origination fee rather than just the portion attributable to the extra $250,000 necessitated by Mr. Bloom's fraud. Glencove's request is an overreach. Since Aircraft Finance Corporation did assist in obtaining the $2,591,500 Loan, the recovery against Mr. Bloom must be limited only to the origination fee charged for the $250,000 portion of the Loan caused by Mr. Bloom's fraud (*i.e.,* one percent (1%) of $250,000). That amount is $2,500, not $25,915.

The same analysis applies to the $2,194 lender fee charged by TruStone Financial. Glencove appears to be requesting the entire lender fee for the Loan. However, only the portion of the fee attributable to the extra $250,000 of the Loan caused by Mr. Bloom's fraud is recoverable from Mr. Bloom. Thus, Glencove may only recover $211 of the lender fee. Such amount is calculated as follows: $2,194 lender fee multiplied by 9.6% (which is the ratio that $250,000 bears to the total Loan).

Glencove also claims $67,835 for maintenance and repair items identified on the Original Work Order which were not performed. However, Haggan Aviation did eventually perform $37,888 of the repairs. So, such amount should be subtracted from the damages requested ($67,835) leaving net damages for unperformed airworthy discrepancy repairs of $29,947. That amount is recoverable from Mr. Bloom because

he misled Glencove into closing the acquisition knowing such repairs would not be completed.

Glencove further requested $15,000 for overcharges under the Management Services Agreement.  The Court declines to award such amount as damages for fraud.  In the first instance, Mr. Bloom is not a party to the Management Services Agreement and these alleged damages appear to be primarily contract-based.  Furthermore, the False Representations (which all pre-date the closing of the Airplane acquisition) do not pertain to the Management Services Agreement.  Put another way, the False Representations did not proximately cause the alleged damages under the Management Services Agreement.  Although Glencove suggests that it would not have bought the Airplane or entered into the Management Services Agreement if it had known the truth about the False Representations, those assertions are far too indirect to provide a basis for recovery of the overcharges under a contract that was entered into in a transaction that was separate from and occurred well after the fraudulent Airplane acquisition transaction.  And, the alleged overbilling occurred later still.  The Court also finds that Glencove failed to "submit substantial evidence" of the specific amount of overcharges to form a "reasonable basis for computation of the damage."  *Pomeranz*, 843 P.2d at 1383.

Finally, Glencove also asked for reimbursement of the $13,143 it paid to BBJ to release the Lien.  Mr. Bloom may have committed a tort in relation to filing the Lien.  The Lien appears to have been spurious.  However, the False Representations (which all pre-date the closing of the Airplane acquisition) did not proximately cause the alleged $13,143 damages for release of the Lien.  Although Glencove suggests that it would not have bought the Airplane if it had known the truth about the False Representations, that assertion is far too indirect to recover for releasing the Lien more than six months later.  Furthermore, the filing of the Lien (even if inaccurate) does not technically constitute fraud by false representation under Colorado law.  That is because Glencove was not ignorant of the falsity of the Lien and deceived into relying on the Lien.  To the contrary, Glencove promptly contested the Lien.  So Glencove has not proved the elements of fraud by false representation in relation to the Lien.

Based upon the foregoing, the Court awards damages traceable to the False Representations as follows:

1. $250,000 for the improper "upcharge" paid to Big Horn Exploration and distributed to BBJ, Brad Rose, and Aircraft Finance Corporation;
2. $120,000 for the "AGENT'S FEE" paid to BBJ;
3. $29,947 for maintenance and repair items identified in the Original Work Order which were not performed;
4. $2,500 for a portion of the origination fee paid to Aircraft Finance Corporation for the Loan;
5. $211 for a portion of the lender fee paid to TruStone Financial for the Loan; and
6. $55,812 in extra interest paid on a $250,000 portion of the Loan.

The total of the foregoing is $458,470, which amount the Court determines is damages properly assessed against Mr. Bloom for fraud by false representation, which amount is allowable in the Glencove Claim.  Glencove also has requested $471,310 in attorneys' fees and costs.  However, both Glencove and Mr. Bloom agreed that issues related to an award of attorneys' fees and costs should be reserved for further proceedings.  Thus, the Court will not award any amounts for attorneys' fees and costs at this stage.

### 2.   Glencove Established that Mr. Bloom Engaged in Fraudulent Concealment.

Under Colorado law, fraudulent concealment is a separate intentional tort closely related to fraud by false representation.  In fact, early Colorado cases merged the claims when identifying the "constituents of fraud."  *See Morrison*, 68 P.2d at 477-78 (jointly identifying the elements of fraud to include false representation and fraudulent concealment).  Colorado courts repeatedly have confirmed the legal elements required for establishing a fraud concealment claim:

> (1) the defendant's concealment of a material existing fact that in equity or good conscience should be disclosed, (2) the defendant's knowledge that the fact is being concealed, (3) the plaintiff's ignorance of the fact, (4) the defendant's intent that the plaintiff act on the concealed fact, and (5) the plaintiff's action on the concealment resulting in damage.

*Berger v. Sec. Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1385 (Colo. App. 1990); *see also Ackmann v. Merchs. Mortg. & Tr. Corp.*, 645 P.2d 7, 13 (Colo. 1982) (similar list of fraudulent concealment elements); *Morrison*, 68 P.2d at 477-78 (similar list of fraudulent concealment elements); *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 918 (Colo. App. 1991).

The elements of a fraud by false representation claim are very similar to the requirements for a fraudulent concealment cause of action.  Obviously, one difference is that false representation involves an actual affirmative statement whereas fraudulent concealment is a tort of omission (*i.e.,* the defendant concealed material facts).  So, these two claims are like different sides of the same coin.  But, beyond that, the key conceptual difference is that fraudulent concealment requires the existence of a duty to disclose: the defendant must conceal a material fact "that in equity or good conscience should be disclosed."  *Berger*, 795 P.2d at 1385.  Stated differently, "[t]o succeed on a claim for fraudulent concealment or nondisclosure, a plaintiff must thus show that the defendant had a duty to disclose the material information."  *Rocky Mountain Expl.*, 420 P.3d at 234 (citing *Mallon Oil Co. v. Bowen/Edwards Assoc., Inc.*, 965 P.2d 105, 111 (Colo. 1998)).  "Whether a defendant had a duty to disclose a particular fact is a question of law."  *Burman*, 821 P.2d at 918; *Berger*, 795 P.2d at 1383.

How does a trial court determine whether such duty to disclose exists? Obviously, if there is "a fiduciary or other similar relation of trust between them," then a duty of disclosure is present.  RESTATEMENT (SECOND) OF TORTS § 551(2)(a) (ALI 1977); *see also* RESTATEMENT (THIRD) OF TORTS § 13 (ALI 2020) ("a duty exists when . . . the actor is in a fiduciary or confidential relationship with another . . .").  Agency is a type of fiduciary or confidential relationship which requires disclosure.  Further, in *Burman*, the Colorado Court of Appeals explained:

> A party to a business transaction has a duty to disclose to the other party facts basic to the transaction if (1) he knows that the other is about to enter into it under a mistake as to them and (2) the other party, because of the relationship between them, the customs of the trade, or other objective circumstances, would reasonably expect a disclosure of those facts.  More specifically, a party has a duty to disclose if he has stated facts that he knows will create a false impression unless other facts are disclosed.

*Burman*, 821 P.2d at 918 (citing *Berger*, 795 P.2d at 1383 and RESTATEMENT (SECOND) OF TORTS § 551(2) (ALI 1977).

### a.  Mr. Bloom Concealed Numerous Material Facts from Glencove.

During their relationship, Mr. Bloom concealed dozens of material existing facts from Glencove pertaining to the Airplane.  The most important facts, among the many that Mr. Bloom concealed from Glencove, are the following (the "Concealed Facts"):

• Mr. Bloom concealed from Glencove that the true seller of the Airplane was Loretto Aviation, not Big Horn Exploration.

• Mr. Bloom concealed the Loretto Aviation Counteroffer from Glencove.

• Mr. Bloom concealed from Glencove the need for over $470,000 in upcoming needed repairs to the Airplane.

• Mr. Bloom concealed from Glencove the nature of negotiations with Loretto Aviation.

• Mr. Bloom concealed the misuse of Glencove's $100,000 escrow deposit from Glencove.

• Mr. Bloom concealed from Glencove that Loretto Aviation agreed to sell the Airplane for $3,300,000.

• Mr. Bloom concealed the LOI with Loretto Aviation from Glencove.

- Mr. Bloom concealed from Glencove his interest as sole member and as a manager of Big Horn Exploration.

- Mr. Bloom concealed from Glencove that Big Horn Exploration did not have any assets and did not own the Airplane.

- Mr. Bloom concealed from Glencove that Brad Rose was both his personal lawyer and the lawyer for BBJ.

- Mr. Bloom concealed the Loretto PSA from Glencove.

- Mr. Bloom concealed the entire back-to-back structure that he had developed to take an additional $250,000 from Glencove.

- Mr. Bloom concealed from Glencove the status of the airworthy discrepancy repairs and his efforts to reduce the amount of repairs to the Airplane.

- Mr. Bloom concealed from Glencove his communications with Loretto Aviation through which Loretto Aviation refused to make any repairs to the Airplane.

- Mr. Bloom concealed from Glencove the instructions to the Title Company to pay $29,636.66 to Brad Rose, $90,000 to Aircraft Finance Corporation, and $130,366.34 to BBJ from the $250,000 "upcharge."

- Mr. Bloom concealed from Glencove his execution of the Aircraft Delivery Receipt through which Mr. Bloom accepted the Airplane as "agent for Glencove Holdings, LLC" but without arrangements for completing all the airworthy discrepancy repairs listed on the Original Work Order.

- Mr. Bloom concealed that the closing for the Airplane was designed as a back-to-back transaction with a sale from Loretto Aviation to Big Horn Exploration followed immediately by a sale from Big Horn Exploration to Glencove.

All the Concealed Facts were established at trial, not by circumstantial evidence or inferences drawn from the testimony of witnesses, but through documents such as the Loretto Counteroffer, the LOI, the Loretto PSA, the Aircraft Delivery Receipt,[186] e-mails, and the like.  They are not mere opinions.  *See Knight*, 390 P.2d at 951.  Further, all the Concealed Facts are material because they concerned the type of key information about pricing, negotiations, repairs, and other terms which a reasonable person would attach importance to in the context of an aircraft acquisition.  *See Rocky Mountain Expl.*, 420 P.3d at 234; *Denberg*, 694 P.2d at 377.

---

[186]   Exs. 12, 18, 25 and EF respectively.

### b.   Mr. Bloom Had a Duty to Glencove to Disclose the Concealed Facts.

The failure to disclose the Concealed Facts to Glencove is actionable only if Mr. Bloom had a duty to disclose the Concealed Facts. *Rocky Mountain Expl.,* 420 P.3d at 234; *Mallon Oil*, 965 P.2d at 111; *Burman*, 821 P.2d at 918; *Berger*, 795 P.2d at 1383. He did. Mr. Bloom's duty to disclose the Concealed Facts arose in multiple ways. Most importantly, he was Glencove's agent for the Airplane acquisition (even though he is not a party to the Agent Agreement). But, even if Mr. Bloom was not Glencove's agent, he still had a duty to disclose the Concealed Facts based upon the relationship with Glencove, the customs of the trade (*i.e.*, industry standards), and other objective circumstances. Furthermore, since he affirmatively made misrepresentations to Glencove relating to the Airplane acquisition, Mr. Bloom had a duty to disclose the Concealed Facts lest there be a false impression.

### i.   Mr. Bloom Was Glencove's Agent for Purposes of the Airplane Acquisition.

In the early stages of the litigation in this Court, Mr. Bloom repeatedly acknowledged that he was an agent for Glencove (albeit as an "independent agent"). For example, in his Answer (which has not been amended), Mr. Bloom admitted: "Bloom's relationship with Glencove was that of an independent agent . . . , by express contractual relationship per the Agency Agreement . . ." .[187] This admission is consistent with the factual record and Mr. Bloom's conduct. For example, in order to close the acquisition of the Airplane and accept the Airplane without completion of all the airworthy discrepancy repairs, he personally executed an Aircraft Delivery Receipt as "Agent for Glencove Holdings, LLC."[188] Even Mr. Bloom's own expert witness, Mr. Zilberbrand, confirmed that Mr. Bloom acted as an agent for Glencove. He testified:

> Q.   [D]id you form any opinions regarding . . . the role that . . . Mr. Bloom played in the transaction?
>
> A.   . . . from reading the documentation and the agreements that were signed, it appears that he was hired to represent the purchasers as an exclusive agent.

Despite admitting his agency role in his Answer, asserting that he was Glencove's agent in the Aircraft Delivery Receipt, his own conduct, and his own expert's opinion, Mr. Bloom now changes course and contends that he was not Glencove's agent at all.[189] His defense is to hide behind BBJ and contend he was not a party to the

---

[187]   Docket No. 5 in Adversary Proceeding.

[188]   Ex. EF.

[189]   Glencove also has changed its position regarding Mr. Bloom's role as agent throughout the course of the dispute albeit only in briefing, not in a pleading under Fed. R. Civ. P. 7, as incorporated by Fed. R. Bankr. P. 7007. For example, in its Response in support of the Glencove Claim, Glencove

Agent Agreement in his personal capacity.  As a strict technical and legal matter, Mr. Bloom is correct: he did not sign the Agent Agreement in his personal capacity.  So be it.  He is not a party to the Agent Agreement.

However, a contract is not required for an agency relationship.  Instead, the Colorado Supreme Court has determined that "[a]gency is . . . a legal relation having its source in the mutual consent of the parties.  A *consensual arrangement may but need not amount to a contract.*"  *Stortroen*, 736 P.2d at 395 (emphasis added); *see also Am. Family Mut. Ins. Co. v. Tamko Bldg. Prods., Inc.,* 178 F.Supp.3d. 1121, 1126, n. 3 (D. Colo. 2016) (citing *Mullin v. Hyatt Residential Group, Inc.*, 82 F.Supp.2d. 1248, 1258 (D. Colo. 2015) ("An agency relationship need not be contractual, and may exist even though the parties do not call it an agency and do not subjectively intend that legal consequences flow from their relation.")); *City of Aurora,* 105 P.3d at 622 (no need for contract to establish agency).  So, even if Mr. Bloom was not a signatory to the Agent Agreement in his personal capacity, that does not negate an agency relationship.

Next, ironically and contradictorily, Mr. Bloom points the Court to the text of Agent Agreement anyway.  Mr. Bloom contends that the Agent Agreement did not really create an agency relationship.  The argument evidences some serious chutzpa since the Agent Agreement uses the term "AGENT" or "AGENT'S" thirty-nine times and the entire clear purpose and intent of the Agent Agreement was precisely to create an agency relationship.  The Agent Agreement has all the hallmarks of traditional agency: one party acting for and representing another with respect to a proposed transaction. *See Stortroen*, 736 P.2d at 395 (defining agency); RESTATEMENT (SECOND) OF AGENCY § 1 (ALI 1958) (defining agency); RESTATEMENT (THIRD) OF AGENCY § 1.01 (ALI 2006) (defining agency).

Mr. Bloom is left in the untenable position of arguing against the obvious with respect to the Agent Agreement.  However, he has a little legal peppercorn to tether his argument:  a single sentence in Article 9 of the Agent Agreement.  That part of the Agent Agreement states the following after the heading "NO EMPLOYER RELATIONSHIP":

> AGENT's relationship with BUYER is that of an independent AGENT, and nothing in the Agreement is intended to or should be construed to; create a partnership, agency, joint venture or employment relationship.

From this one sentence, Mr. Bloom crafts two defenses, albeit contradictory.  First, he suggests that this sentence means that there is no agency relationship.  In other words,

---

stated: "Glencove does not allege that Bloom was its agent."  Docket No. 43 in Bankruptcy Case at 3. But later, Glencove argued that "Bloom was Glencove's agent and, therefore, was bound by an agent's duties . . . ."  Docket No. 44 in Adversary Proceeding at 23.  At and after trial, Glencove also argued for agency.  Docket No. 75 in Adversary Proceeding at 1 ("Debtor Defendant Steven Bloom . . . became Glencove's exclusive agent for the transaction.").  So, like Mr. Bloom, Glencove's legal theories evolved over time.  The Court gives the benefit of the doubt to both sides and considers their most-recent arguments in light of the evidence presented at trial.

notwithstanding its title and the repeated use of the words "AGENT" and "AGENT'S," the Agent Agreement has been magically transformed into its polar opposite: a Non-Agent Agreement.  Second, Mr. Bloom latches on to the one-time use of the word "independent" to assert that he is not really an agent but rather is a "transaction broker" who can represent all sides to the transaction for acquisition of the Airplane.  Neither of these positions is tenable.

Article 9 does not convert the Agent Agreement into a Non-Agent Agreement.  In construing a contract, the Court should "give effect to the intent of the parties" as evidenced by the language of the instrument and must construe the contract "as a whole" giving effect to "every provision."  *Town of Estes Park v. N. Colo. Water Conservancy Dist.,* 677 P.2d 320, 326 (Colo. 1984).  The Court should be guided by "plain and generally-accepted meaning."  *E. Ridge of Fort Collins, LLC v. Larimer and Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005).  The clear intent of the parties to the Agent Agreement (Glencove and BBJ) was to create an agency relationship.

Article 9 appears to be unartfully drafted boilerplate directed to disclaiming an "employer relationship."  That is the title of the Article and the import of the provision.  Thus, the main focus is on ensuring that the "AGENT" must file its own tax returns and maintain its own records.  The clause protects Glencove so that Glencove is not obligated to pay BBJ's "social security, federal, state or any other employee payroll taxes."  It is true that the first sentence of Article 9 references "agency."  But, in the context of the Agent Agreement as a whole, the provision simply confirms that BBJ will not be a general agent for all purposes and instead is a special agent only with respect to the acquisition of the Airplane.  *See Stortroen*, 736 P.2d at 395 ("Agents may be classified into two general types.  A general agent is 'an agent authorized to conduct a series of transactions involving a continuity of service' . . . and does not require fresh authorization for each transaction.  A special agent is defined as 'an agent authorized to conduct a single transaction . . . not involving continuity of service.'").[190]

Mr. Bloom also suggests that the one-time use of the word "independent" in front of "AGENT" somehow transformed him from an agent into a "transaction broker" with no duties to Glencove.  The Court rejects the argument.  In the context of Article 9 of the Agent Agreement, the plain meaning of the word "independent" is that the agent has no "employ[ment] relationship" with the principal.  In other words, the intent was that that the agent would be an independent contractor.  *See* RESTATEMENT (SECOND) OF AGENCY § 14N (ALI 1958) ("One who contracts to act on behalf of another and subject to the

---

[190]     Arguably, the use of the word "agency" in Article 9 of the Agent Agreement might be considered ambiguous.  "To ascertain whether certain provisions of an agreement are ambiguous, the language used must be examined and construed in harmony with the plain and generally accepted meaning of the words employed and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter."  *Christmas v. Cooley,* 406 P.2d 333, 335 (Colo. 1965).  But, even if ambiguous, where a doubt exists as to the proper construction of a given clause, "a contract is construed most strongly against the drafter."  *Cheyenne Mountain School District No. 12 v. Thompson*, 861 P.2d 711, 716 (Colo. 1993); *Christmas,* 406 P.2d at 336 (same).  Mr. Bloom drafted the Agent Agreement.  So, his new interpretation of Article 9 of the Agent Agreement is not entitled to much weight.

other's control except with respect to his physical conduct is an agent and also an independent contractor.");[191] *Television Events & Mktg., Inc. v. Amcon Distrib. Co.,* 526 F. Supp. 1118, 1128-29 (D. Hawaii 2007) ("Simply characterizing Thornton as an independent contractor, however, does not negate his status as an agent."); *Baker Bus Serv., Inc. v. Keith*, 416 A.2d 727, 730 (Me. 1980) ("The distinction between an agent-servant and an agent-independent contractor is whether the agent's performance with respect to his physical conduct is subject to another's control or right to control."). In other words, to say that someone is an "independent agent" does not mean such person is no longer an agent.

Finally, Mr. Bloom's new assertion that he was only a "transaction broker," is groundless. The Agent Agreement does not characterize him as a "transaction broker" and none of the extensive communications between Mr. Bloom and Glencove use the term. Under Colorado agency law, there is no general category of "transaction brokers." Instead, the phrase seems to be a new legal construct of Mr. Bloom's pulled from real estate broker law. Mr. Bloom cites: Colo. Rev. Stat. § 12-10-407(1).[192] But that provision governs only "the relationships between real estate brokers and sellers, landlords, buyers, and tenants in real estate transactions." Colo. Rev. Stat. § 12-10-401. So, it is inapplicable. And, importantly, a real estate broker is required to make a full written disclosure of the broker's role. Under Colo. Rev. Stat. § 12-10-408(2)(a)(i), "a transaction broker shall disclose in writing to the party to be assisted that the broker is not acting as agent for the party and that the broker is acting as a transaction-broker." Mr. Bloom did not make such any such disclosure. The evidence establishes definitively that he was not operating as a "transaction broker."

In the end, after diverting through Mr. Bloom's many contradictory and confusing legal arguments concerning agency, the Court concludes that Mr. Bloom was Glencove's agent even though he is not a party to the Agent Agreement. That is because Mr. Bloom undertook the role to act for and represent Glencove with respect to the Airplane acquisition. He repeatedly held himself out to be Glencove's agent orally and in writing. The Pierces thought that Mr. Bloom was Glencove's agent in the same way as a real estate agent. And, Mr. Bloom confirmed as much through his communications with Glencove wherein he convinced Glencove that he was acting on its behalf by using the words "our," "us, and "we" in referring to his supposed efforts to

---

[191]    Comment a to Restatement (Second) of Agency § 14N (ALI 1958) further clarifies: "'[I]ndependent contractor' is a term which is antithetical to the word 'servant,' although not to the word 'agent.' In fact, most persons knowns as agents, that is brokers, factors, attorneys . . . and selling agencies are independent contractors . . . . However, they fall within the category of agents. They are fiduciaries; they owe to the principal the basic obligations of agency: loyalty and obedience. . . ."

[192]    Mr. Bloom's statutory citation is technically incorrect. The Colorado legislature repealed, reenacted, and renumbered the statutes governing real estate transaction brokers effective as of October 1, 2019, which was several years after the parties entered into the Agent Agreement and the acquisition of the Airplane. The statute referenced by Mr. Bloom, Colo. Rev. Stat. § 12-10-407(1), is the new statute. The statute in effect in 2015 was Colo. Rev. Stat. § 12-61-807(1). The Court understands that the text of the statutes regulating real estate transaction brokers did not change; only the numbering scheme was modified. So, while technically incorrect, the Court proceeds, as the parties did, by referring to the new citations for the same old statutes pertaining to real estate transaction brokers.

help Glencove: "our buy number goal"; "our offer"; "our goal"; "this will put us on the lower end"; "we need to get them down"; "we'll need to transfer the deposit"; and "our next counter offer."[193]  "The existence of an agency relationship can be proven by the conduct of the parties."  *Moses*, 863 P.2d at 324.

Finally, even Mr. Bloom's testimony at trial effectively establishes the manifestation of consent to agency and his agent role.  He stated:

> Q.   Mr. Bloom, you understood, didn't you, that Glencove was relying on you to give them the guidance they needed in order to make their purchasing decision with respect to the aircraft.  That was the whole purpose of engaging with them, right?
>
> A.   Yes.
>
> Q.   And you understood that it would be important in that context for you to be honest in communications with them?
>
> A.   Yes.
>
> Q.   And the whole purpose of getting Glencove and the Pierces to sign off on the Agent Agreement was so that you could go out and talk to the Fred Cei's of the world [Loretto Aviation's agent] and try and find a plane that they would have an interest in buying and then negotiate a sales price for that plane, right?
>
> A.   Yes.

Mr. Bloom's own acknowledgements at trial speak volumes and contradict his current non-agency position.

### ii.   As an Agent, Mr. Bloom Had a Duty to Disclose the Concealed Facts to Glencove.

As Glencove's agent, Mr. Bloom had a "fiduciary relation" with Glencove. *Stortroen*, 736 P. 2d at 395; *see also* RESTATEMENT (THIRD) OF AGENCY § 13 (ALI 2006) ("Agency is [a] fiduciary relationship.").  Colorado courts frequently rely on versions of the American Law Institute RESTATEMENT OF AGENCY "as a formulation of the law that is applicable to agency issues."  *State Farm Mut. Auto. Ins. Co. v. Johnson*, 396 P.3d 651, 655 (Colo. 2017) (relying on Chapter 2 of RESTATEMENT (THIRD) OF AGENCY in construing Colorado agency law); *Grease Monkey Int'l, Inc. v. Montoya,* 904 P.2d 468, 470 n.2 and 475 (Colo. 1995) (relying on RESTATEMENT (SECOND) OF AGENCY §§ 261 and 262 in

---

[193]   *See e.g.*, Exs. 9, 10, 12.

construing Colorado agency law); *Stortroen*, 736 P.2d at 395-96 (relying on RESTATEMENT (SECOND) OF AGENCY §§ 1, 3, and 5 in construing Colorado agency law).

Mr. Bloom's agency fiduciary duties required him: "to act loyally for [Glencove's] benefit;" to refrain from self-interest; to refrain from representing any party adverse to Glencove; to refrain from competing against Glencove; to act with care, competence, and diligence; to act reasonably and refrain from conduct likely to damage Glencove; and to provide relevant facts to Glencove.[194] *See also Jet Courier Serv.,* 771 P.2d at 492-93 (relying on RESTATEMENT (SECOND) OF AGENCY §§ 387 and 393 (ALI 1958) in construing Colorado agency law and confirming that agent had duty of loyalty and duty not to compete with principal).

In the context of the fraudulent concealment claim advanced by Glencove, Mr. Bloom's paramount duty was to provide information he knew Glencove would want to have. The RESTATEMENT (THIRD) OF AGENCY § 8.11 (ALI 2006) provides a summary of the duty which is applicable under Colorado law:

> An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when
>
> (1) subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal; and
>
> (2) the facts can be provided to the principal without violating a superior duty owed by the agent to another person.

All the Concealed Facts are important facts that Glencove would have wished to know, that Mr. Bloom knew it would wish to know, and that were material to Mr. Bloom's duties to Glencove. After all, the Concealed Facts concern key information about pricing, negotiations, repairs, and other terms which any reasonable principal would attach importance to in an aircraft acquisition. Pricing information is especially

---

[194] The duties of an agent set forth in the RESTATEMENT (THIRD) OF AGENCY (ALI 2006) include the following: § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); § 8.02 ("An agent has a duty not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal or otherwise through the agent's use of the agent's position."); § 8.03 ("An agent has a duty not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship.); § 8.04 ("Throughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors."); § 8.08 ("Subject to any agreement with the principal, an agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances."); and § 8.10 ("An agent has a duty, within the scope of the agency relationship, to act reasonably and to refrain from conduct that is likely to damage the principal's enterprise.").

significant.  The RESTATEMENT (THIRD) OF AGENCY provides an apt illustration of the principle (albeit in the context of the agent representing the seller, not the buyer):

> P, who owns Blackacre, lists it for sale with A.  T makes an offer to buy Blackacre for $100,000.  Before T's offer is accepted, A learns that S is willing to pay $120,000 for Blackacre.  As A knows, P would desire to have this information.  A has a duty to use reasonable effort to provide the information to P.

RESTATEMENT (THIRD) OF AGENCY § 8.11 cmt. b, illus. 4 (ALI 2006).

Mr. Bloom knew that Loretto Aviation was willing to sell the Airplane for $3,300,000, but he concealed that information from Glencove and instead enticed Glencove to offer $3,550,000.  Mr. Bloom could have easily provided all the Concealed Facts (including pricing information) to Glencove without violating a superior duty owed to anyone else.  There is not a hint in the evidence that Loretto Aviation wanted its identity to be kept confidential.  Nor was there any evidence that any of the other Concealed Facts were confidential.  So, as a matter of Colorado agency law, Mr. Bloom was under a duty to disclose all the Concealed Facts to Glencove.  He failed to do so and instead intentionally hid the Concealed Facts from Glencove for his own pecuniary interests.

### iii.   Independent of Agency, Mr. Bloom Had a Duty to Disclose the Concealed Facts to Glencove.

Even if Mr. Bloom was not Glencove's agent, he still had a duty to disclose the Concealed Facts to Glencove.  In the absence of a fiduciary relationship, a duty to disclose may still arise "because of the relationship between [the parties], the customs of the trade, or other objective circumstances."  *Burman*, 821 P.2d at 918.  "More specifically, a party has a duty to disclose if he has stated facts that he knows will create a false impression unless other facts are disclosed."  *Id.*; *Berger*, 795 P.2d at 1383.

The "relationship between [Glencove and Mr. Bloom]" and "the other objective circumstances" dictate that Mr. Bloom had a duty to disclose the Concealed Facts to Glencove.  After all, Mr. Bloom was not a stranger to Glencove.  Instead, he actively solicited a relationship and communicated with Glencove extensively.  Throughout all the exchanges, he led Glencove to believe that he was acting on Glencove's behalf.  Furthermore, he made many affirmative statements to Glencove regarding pricing, negotiations, repairs, and other terms, statements he knew would create a false impression.  Given the foregoing, he had a duty to disclose the Concealed Facts to dispel the false impression he had created.

Furthermore, the "customs of the trade" support the existence of a duty to disclose.  Based upon the testimony of expert witnesses offered by Glencove and Mr. Bloom — Mr. Foster and Mr. Zilberbrand — as well as ethics information from various

aviation organizations (IADA, NATA, and NBAA), the Court already has determined that the following industry standards apply to aircraft brokers like Mr. Bloom:  (1) aircraft brokers should not lie to their clients; (2) aircraft brokers should disclose pertinent facts to their clients; and (3) aircraft brokers should not deceive their clients for their own gain.  Thus, on the basis of "customs of the trade", Mr. Bloom had an obligation to disclose the Concealed Facts.

### c.    Mr. Bloom Had Knowledge of the Concealed Facts.

With respect to each of the Concealed Facts, the evidence dictates that Mr. Bloom knew the truth but instead hid the Concealed Facts from Glencove.  Mr. Bloom's knowledge of the actual facts in not disputed.  Instead, the Stipulations of Fact coupled with unrebutted testimony and corroborated by contemporaneous documentation (including e-mails and contracts) establishes Mr. Bloom's knowledge.  For the most part, in his testimony, Mr. Bloom did not attempt to contest, explain, or even address the myriad of Concealed Facts.  Instead, he merely seemed to suggest that he did not have to tell Glencove anything.

### d.    Glencove Was Ignorant of the Concealed Facts.

The evidence is equally compelling that Glencove was ignorant of all the Concealed Facts.  The Pierces testified credibly that they did not learn of the true facts until they began litigating with Mr. Bloom after terminating the Management Services Agreement.  Most importantly, the evidence is unrefuted that Mr. Bloom never told Glencove about the Loretto Aviation Counteroffer or that Loretto Aviation agreed to sell the Airplane for $3,300,000 (instead of $3,550,000).

### e.    Mr. Bloom Intended that Glencove Act on the Concealed Facts.

The evidence proves that Mr. Bloom embarked on a very conscious plan to deceive and damage Glencove to enrich himself, BBJ, and his close professional associates.  Mr. Bloom had received the Loretto Aviation Counteroffer to purchase the Airplane for $3,400,000 on August 11, 2015, but he hid that information from Glencove.  The next day he communicated a total lie to Glencove:  "Our offer came back at $3.775M."  Mr. Bloom knew and intended that Glencove would rely on him and act in the dark without knowledge of the Concealed Facts, facts which concerned the single most important term in any commercial transaction: price.  Certainly, with a counteroffer of $3,400,000 already on the table, Glencove would not have offered to pay more, had Glencove known the truth.  Instead, Mr. Bloom hid the pricing information from Glencove and convinced Glencove to bid $3,550,000 through his deception.  Mr. Bloom concealed critical information from Glencove so that he would score both the $121,000 "AGENT'S FEE" plus the hidden $250,000 "upcharge" windfall that he could distribute to BBJ, Mr. Rose, and Aircraft Finance Corporation.  The evidence shows that Mr. Bloom took advantage of Glencove knowing and intending that Glencove would act on the Concealed Facts.

              f.      **Glencove Was Damaged.**

The same general damages principles already discussed in connection with Glencove's fraud by false representation claim also apply to the fraudulent concealment cause of action. *See Trimble*, 697 P.2d at 724 ("[t]he defrauded party may recover such damages as are a natural and proximate consequence of the fraud."); *Ballow*, 878 P.2d at 677 (damages are "to make the injured party whole"; and "trial court . . . has wide discretion in fixing the measure and amount of damages."). As with the Glencove's fraud by false representation claim, Mr. Bloom's fraudulent concealment directly, proximately damaged Glencove.

Glencove was deceived into paying $250,000 more for the Airplane than Loretto Aviation sold it for. Mr. Bloom directed the distribution of the ill-gotten proceeds. Furthermore, because of Mr. Bloom's fraudulent concealment, Glencove paid BBJ $120,000 as an "AGENT'S FEE" for BBJ notwithstanding that Mr. Bloom and BBJ deceived Glencove and failed to act in their best interests. In addition to the foregoing, the Court determines that certain other related damages must be awarded to Glencove for fraudulent concealment including: (1) $55,812 in extra interest on a $250,000 portion of the Loan; (2) $2,500 for a portion of the origination fee paid to Aircraft Finance Corporation for the Loan; (3) $211 for a portion of the lender fee paid to TruStone Financial for the Loan; and (4) $29,947 for maintenance and repair items identified in the Original Work Order which were not performed. These are the same additional damages already awarded on Glencove's fraud claim. Thus, the Court incorporates the same rationale for the fraud damages award which applies equally to the fraudulent concealment claim.

The foregoing totals to $458,470, which amount the Court determines are damages properly assessed against Mr. Bloom for fraudulent concealment and allowable in the Glencove Claim. As with the fraudulent misrepresentation claim, Glencove also has requested $471,310 in attorneys' fees and costs. However, the parties have agreed to reserve the issue for further proceedings. Thus, the Court will not award any amounts for attorneys' fees and costs at this stage.

          3.      **The Court Need Not Consider the Other Causes of Action.**

In addition to fraud and fraudulent concealment, Glencove asserted five other causes of action against Mr. Bloom as set forth in the Third-Party Complaint incorporated into the Glencove Claim (negligent misrepresentation, violation of the Colorado Consumer Protection Act, negligence and gross negligence, and civil conspiracy). Glencove requested the same damages through each of the other causes of action. Given the Court's foregoing disposition of the fraud by false representation and fraudulent concealment claims (*i.e.,* allowing the Glencove Claim in the amount of $458,470 plus reserving the issue of additional attorneys' fees and costs), the Court need not consider the myriad of other claims against Mr. Bloom. Instead, in the exercise of the Court's discretion, and for purposes of judicial economy and efficiency as well as case administration, the Court declines to adjudicate the additional causes of

action against Mr. Bloom asserted in the Glencove Claim.  It is enough that the Court already allowed the Glencove Claim on the basis of the fraud and fraudulent concealment causes of action.

### 4.    Mr. Bloom Failed to Establish Any Other Defenses to the Glencove Claim for Fraud and Fraudulent Concealment.

Throughout the Court's analysis of Glencove's fraud by false representation and fraudulent concealment claims, the Court has considered and made legal determinations denying most of Mr. Bloom's arguments and defenses on the merits of the underlying Colorado state law causes of action.  It has been difficult because Mr. Bloom repeatedly changed his positions and threw a multitude of arguments against the wall.  However, a few leftovers warrant discussion.

### a.    Mr. Bloom's Economic Loss Rule Defense Fails.

As the day of reckoning, the trial, approached, Mr. Bloom experienced another legal epiphany: the "economic loss rule."  Mr. Bloom did not mention the economic loss rule in either his Answer to the Complaint or in his Objection to the Glencove Claim. Instead, as trial drew near, he first advanced this new defense in his Motion for Summary Judgment.[195]  He repeated it again in his closing argument at trial and after trial in his post-trial brief.[196]  To summarize, he contends that Colorado's "economic loss rule bars recovery on post-contractual claims for fraudulent concealment and fraudulent misrepresentations which arise out of contract rather than tort duties."[197]  In making this argument, Mr. Bloom relies on a decision from the Colorado Supreme Court, *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256 (Colo. 2000), and a trilogy of subsequent Colorado Court of Appeals cases: *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282 (Colo. App. 2009); *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226 (Colo. App. 2012); and *Top Rail Ranch Estates, LLC v. Walker*, 327 P.3d 321 (Colo. App. 2014).

Glencove emphasizes the irony of Mr. Bloom's reliance on the economic loss rule and notes that "throughout this case, Bloom has adamantly maintained that he is not even a party to the Agent Agreement."  Glencove argues, among other things, that the Colorado economic loss rule does not apply to intentional torts such as fraud by false representation and fraudulent concealment, since those claims arise out of common law duties independent of contract.

### i.    In *Town of Alma,* the Colorado Supreme Court Adopted the Economic Loss Rule for Negligence Claims Based Upon Contract.

---

[195]    Docket No. 43 in Adversary Proceeding at 21-22 and 25 and 28.
[196]    Docket No. 74 in Adversary Proceeding at 16-18.
[197]    Docket No. 43 in Adversary Proceeding at 21-22 and 25.

The Colorado Supreme Court adopted the economic loss rule in *Town of Alma*, 10 P.3d 1256.  In that case, a town and landowners sued a contractor over leaks in newly-installed water distribution system.  They asserted claims for both breach of contract and negligence (negligence and negligence *per se*).  There were no causes of action for intentional torts.  The contractor contended that the negligence claims should be dismissed because the negligence claims were based solely on the breach of a contractual duty resulting in purely economic loss.

In *Town of Alma*, the Colorado Supreme Court traced the origins of the economic loss rule in other jurisdictions noting that the doctrine "emerged largely from the development of products liability jurisprudence" involving claims of negligence.  *Id.* at 1259-60.[198]  Next the Colorado Supreme Court turned to the history of the economic loss rule in Colorado subordinate courts and acknowledged that the Colorado Court of Appeals "first adopted" the economic loss rule in *Jardel Enters., Inc. v. Triconsultants, Inc.*, 770 P.2d 1301 (Colo. App. 1988).  In *Jardel,* the Colorado Court of Appeals ruled:

> As a general rule, no cause of action lies in tort when purely economic damage is caused by negligent breach of a contractual duty.  This economic loss rule prevents recovery for negligence when the duty breached is a contractual duty and the harm incurred is the result of failure of the purpose of the contract.

*Jardel*, 770 P.2d at 1303.  So, the focus of the *Jardel* decision was on the non-intentional tort of negligence.  The Colorado Supreme Court observed that six Colorado Court of Appeals decisions subsequent to the *Jardel* case also applied the economic loss rule to bar negligence claims.[199]

Informed by the historical jurisprudential developments regarding negligence causes of action, in *Town of Alma*, the Colorado Supreme Court stated:

> [W]e now expressly adopt the economic loss rule.  We hold that a party suffering only economic loss from the breach of

---

[198]    The Colorado Supreme Court stated that "the economic loss rule was born" from a sentence in *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965) holding: "Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone."  *Town of Alma*, 10 P.3d at 1260 (citing *Seely*, 403 P.2d at 151).  The *Seely* decision arose in the context of a products liability breach of warranty claim and did not involve intentional torts.

[199]    *See Town of Alma v. Azco Construction, Inc.,* 985 P.2d 56 (Colo. App. 1999); *Grynberg v. Agri Tech, Inc.,* 985 P.2d 59, 63 (Colo. App. 1999) (holding that economic loss rule barred negligence claim for failure to receive particular return on cattle investment program); *Terrones v. Tapia,* 967 P.2d 216, 220 (Colo. App.1998) (holding that economic loss rule bars negligence claim for lost profits as result of restaurant owner's inability to use drive-through window); *Chellsen v. Pena,* 857 P.2d 472, 477 (Colo. App. 1992) (citing economic loss rule to bar action for negligent termination of employment); *Scott Co. of Cal. v. MK–Ferguson Co.,* 832 P.2d 1000, 1005 (Colo. App.1991) (holding that rule bars subcontractor's negligence claim because no independent duty was breached); *Centennial Square, Ltd. v. Resolution Tr. Co.,* 815 P.2d 1002, 1004 (Colo. App. 1991) (upholding dismissal of borrowers' negligence claim against lender because no independent duty was breached).

> an express or implied contractual duty may not assert a tort
> claim for such breach absent an independent duty of care
> under tort law.

*Town of Alma*, 10 P.3d at 1264.  In doing so, it advised that "[t]he key to determining the availability of a contract or tort action lies in determining the source of the duty that forms the basis of the action."  *Id.* at 1262.  Since the negligence claim at issue in *Town of Alma* flowed from a breach of contract, the Colorado Supreme Court ultimately decided that it was barred by the economic loss doctrine.  *Id.* at 1266.

Analyzing "the source of the duty" for tort actions, in *Town of Alma* the Colorado Supreme Court identified two circumstances in which a duty arises independent of contract and so is not barred by the economic loss doctrine: fiduciary relationships; and intentional torts.  With respect to fiduciary relationships, the Colorado Supreme Court noted that "some special relationships by their nature automatically trigger an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship" and gave three examples by citation to prior decisions: the attorney-client relationship; the physician-patient relationship; and the quasi-fiduciary insurer-insured relationship.  *Id.* at 1263.[200]

With respect to intentional torts, the Colorado Supreme Court held that:

> . . . certain common law claims that sound in tort and are
> expressly designed to remedy economic loss may exist
> independent of a breach of contract claim.  *See Brody v.
> Bock,* 897 P.2d 769, 776 (Colo. 1995) (common law fraud
> claim is based on violation of a duty independent of
> contract); *Keller v. A.O. Smith Harvestore Prods., Inc.,* 819
> P.2d 69, 73 (Colo. 1991) (negligent misrepresentation is a
> tort claim based "not on principles of contractual obligation
> but on principles of duty and reasonable conduct.").  In these
> situations where we have recognized the existence of a duty
> *independent* of any contractual obligations, the economic
> loss rule has no application and does not bar a plaintiff's tort
> claim because the claim is based on a recognized
> independent duty of care and thus does not fall within the
> scope of the rule.

*Id.* at 1263 (emphasis in original).  So, by citation to *Brody*, 897 P.2d 769, the Colorado Supreme Court held that the economic loss rule does not apply to fraud-based claims.

---

[200]     The Colorado Supreme Court identified the "special relationships" by citations as follows:  "*See, e.g., Bebo Constr. Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78, 83 (Colo. 1999) (attorney-client relationship creates independent duty of care); *Greenberg v. Perkins,* 845 P.2d 530, 534 (Colo. 1993) (physician-patient relationship creates independent duty of care, as does physician's independent medical examination of non-patient; *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138, 1141–42 (Colo. 1984) (quasi-fiduciary nature of insurer-insured relationship creates independent duty of care)."  *Town of Alma*, 10 P.3d at 1263.

That holding was reinforced by a footnote appended to the foregoing text in which the Colorado Supreme Court added:

> In this regard we observe that although some jurisdictions have characterized these types of cases [fraud] as "exceptions" to the economic loss rule, they are more appropriately viewed as simply outside the scope of the rule. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 46–47 (Tex. 1998) (noting that fraudulent inducement claim in Texas is based on violation of independent duty, precluding application of economic loss rule).

*Town of Alma*, 10 P.3d at 1263 n.10.

### ii.     The Colorado Court of Appeals Expands the Economic Loss Rule.

Just before the *Town of Alma* decision, the United States Court of Appeals for the Tenth Circuit characterized the state of the Colorado economic loss rule this way: "It is settled in Colorado that the economic loss rule applies only to tort claims based upon negligence, and only *some* negligence claims."  *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000) (declining to reverse fraud judgment on the basis of Colorado economic loss rule because plaintiff's "fraud claim, although premised on representations made in the course of contractual negotiations, likewise arose independently.").  Before and after the *Town of Alma* decision:

> Colorado courts and commentators were of the view that a claim for certain intentional torts, including fraud, would not be barred by the economic loss rule — at least under certain circumstances.

N. Reid Neureiter and Rebecca G. Payne, *Colorado's Current Formulation of the Economic Loss Rule Bars Claims for Post-Contractual Fraud*, 41 COLO. LAW. 33, 34 (Dec. 2012); *see also Brody*, 897 P.2d at 776 (common law fraud is based on violation of a duty independent of contract); *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1194 (Colo. App. 2008) (agreeing with Florida decisions holding that "intentional tort claims such as fraud and conversion are not barred by the economic loss rule."); *Williams Field Servs. Grp., LLC v. Gen. Elec. Int'l Inc.*, 2009 WL 151723, at *5 ("N.D. Okla. Jan. 22, 2009) ("[T]he Tenth Circuit stated with no uncertainty that the economic loss rule [under Colorado law] does not apply to intentional torts."); Craig K. Lawler, *Foreseeability and the Economic Loss Rule — Part I*, 33 COLO. LAW. 81, 82 (July 2004) ("intentional torts, including varieties of fraud . . . have been recognized as independent duty exceptions to the economic loss rule.")  Craig K. Lawler, *Independent Duties and Colorado's Economic Loss Rule — Part II,* 35 COLO. LAW. 33, 36 (March 2006) ("The Colorado

Supreme Court has recognized common law fraud as a general exception to the economic loss rule.").

However, about a decade after the Colorado Supreme Court adopted the economic loss rule in *Town of Alma*, the Colorado Court of Appeals issued some surprising decisions suggesting that intentional torts (such as fraud by false representation and fraudulent concealment) also may be barred by the economic loss rule. Mr. Bloom correctly cites several such cases.

*Hamon Contractors*, 229 P.3d 282, is the leading case reaching that conclusion. The dispute involved a public works project. The plaintiff general contractor sued a project administrator and assistant city engineer for a variety of claims including fraudulent concealment and fraudulent representation. The claims had a nexus with the contract between the City of Louisville and the general contractor. The trial court dismissed the intentional tort claims by applying the economic loss rule. A division of the Colorado Court of Appeals affirmed and held: "The economic loss rule can apply to fraud or other intentional tort claims based upon post-contractual conduct." *Id.* at 289. Until that decision, no Colorado appellate court applied the economic loss rule to intentional torts.

Subsequently, various divisions of the Colorado Court of Appeals split on application of the economic loss rule to intentional torts. A group of appellate decisions, relying extensively on the *Hamon Contractors* case, applied the economic loss doctrine to bar various intentional torts. *Makoto USA, Inc. v. Russell,* 250 P.3d 625 (Colo. App. 2009) (citing *Hamon Contractors* decision and relying on economic loss doctrine to bar statutory civil theft claim); *Former TCHR,* 317 P.3d at 1233 (finding *Hamon Contractors* case "instructive" and applying economic loss rule to dismiss fraud claim); and *Top Rail Ranch,* 327 P.3d at 329 (repeatedly citing *Hamon Contractors* and deciding that "the implied covenant of good faith and fair dealing, which exists in every contract, may bar identical fraud claims under the economic loss rule.").

Another division of the Colorado Court of Appeals broke step with and criticized the *Hamon Contractors* and *Former TCHR* cases: *In re Estate of Gattis*, 318 P.3d 549, 557 (Colo. App. 2013) ("we reject the suggestion in *Hamon* that other jurisdictions uniformly allow the economic loss rule to trump fraud claims relating to the subject matter of a contract."). In the context of a residential real estate transaction, the *Gattis* court refused to apply the economic loss rule to a fraudulent nondisclosure claim. *Id.* It justified its departure from the *Hamon Contractors* line of cases by citing another appellate decision, *People ex rel. A.V.,* 297 P.3d 1019 (Colo. App. 2012), for the proposition that "[o]ne division [of the Colorado Court of Appeals] is not bound by the holding of another division."). *Id.* at 556. So, until recently, Colorado law was in a somewhat of a muddle concerning the application of the economic loss rule to intentional torts like fraud by false representation and fraudulent concealment.

### iii.    Recent Precedent Dictates that Fraud Claims Are Outside the Scope of the Economic Loss Rule.

In 2019, the Colorado Supreme Court revisited the economic loss rule in the context of a civil theft claim related to an employment contract. *Bermel v. Blueradios, Inc.*, 440 P.3d 1150 (Colo. 2019). Although neither Mr. Bloom nor Glencove cited the recent *Bermel* decision, it is key to resolving Mr. Bloom's economic loss rule defense. The Colorado Supreme Court started by observing that "[o]ur previous cases have applied the economic loss rule to bar only certain common law negligence claims." *Id.* at 1153; *see also id.* at 1153 and 1155 ("we have applied the [economic loss] rule only to common law tort claims for negligence and negligent misrepresentation" and "Notably, however, since adopting the economic loss rule, we have applied it only to bar common law tort claims of negligence or negligent misrepresentation").

Focusing on the statutory nature of the civil theft claim, the Colorado Supreme Court decided that the economic loss rule did not bar that type of claim. However, the opinion is broader. The appellate court also addressed intentionally wrongful conduct more generally. The Colorado Supreme Court instructed that

> . . . the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation.

*Bermel*, 440 P.3d at 1154 n.6. And, the appellate court also cited a law journal article with approval "noting the well-accepted exclusion of intentional torts from the economic loss rule." *Id.* at 1154 n.5 and 1159 (citing Catherine M. Sharkey, *In Search of the Cheapest Cost Avoider: Another View of the Economic Loss Rule,* 85 U. Cɪɴ. L. Rᴇᴠ. 1017, 1017-18 (2018)). The foregoing statements might be classified as dicta since they were not strictly necessary to decide the discrete statutory civil theft claim asserted in *Bermel*. However, the Colorado Supreme Court's observations must be considered with the *Town of Alma* ruling in which the Colorado Supreme Court also placed intentional torts outside the scope of the economic loss rule. Read together, the Court concludes that under Colorado law the economic loss rule does not bar causes of action for fraud.

The Court's assessment of the import of *Bermel* is shared by other Federal Courts. For example, in *Western State Bank v. Cosey, L.L.C.*, 2019 WL 5694271 (D. Colo. Nov. 4, 2019), the plaintiff sued for fraud (as well as civil theft). The defendant asserted that the economic loss rule barred the fraud claim. U.S. District Judge Kane analyzed *Bermel* and decided succinctly: "Western State's [plaintiff] fraud claim alleges an intentional tort. So, under *Bermel*, the economic loss rule would not bar Western State's fraud claim." *Id.* at *4. A month later, U.S. District Judge Jackson arrived at the same conclusion in *Mcwhinney Holding Co., LLLP v. Poag*, 2019 WL 9467529 (D. Colo. Dec. 6, 2019). In that case, the plaintiffs alleged claims for "post-contractual intentional torts" including fraudulent concealment and fraudulent misrepresentation. *Id.* at *1. In 2018, Judge Jackson dismissed the intentional tort claims based upon application of the

economic loss rule.  *Id.*  However, after the Colorado Supreme Court clarified the scope of the economic loss rule in the *Bermel* opinion, the plaintiffs asked for reconsideration. Judge Jackson concurred and granted reconsideration, ruling:

> The *Bermel* footnote [Footnote No. 6] clarifies that intentional torts depend on duties independent of contract and therefore are not barred by the economic loss rule . . . .  The plain language clearly indicates the [Colorado Supreme Court] does not believe intentional torts should be covered by the economic loss rule.

*Id.* at *2.

### iv.    The Economic Loss Rule Does Not Bar Glencove's Fraud by False Representation and Fraudulent Concealment Claims.

Although the Court has been forced to engage in a detour through the development of the economic loss rule in Colorado, the Court ultimately decides that Mr. Bloom's economic loss rule defense is not viable for multiple reasons.  First, in the Court's measured view (and with due respect to several contrary Colorado Court of Appeals decisions pre-dating the *Bermel* decision), Glencove's intentional tort claims against Mr. Bloom (including fraud by false representation and fraudulent concealment) are simply "outside the scope" of the economic loss rule.  That conclusion is dictated by the *Town of Alma* decision in which the Colorado Supreme Court originally adopted the economic loss rule.  10 P.3d 1256.  The exclusion of intentional torts is evident from the appellate court's reliance on *Brody*, 897 P.2d 769, as well as Footnote No. 10, in which the Colorado Supreme Court recognized that fraud claims "are more appropriately viewed as simply outside the scope of the rule."  *Town of Alma*, 10 P.3d at 1263, n.10. Even though several intervening decisions of the Colorado Court of Appeals created some doubt about the scope of the economic loss rule, the Colorado Supreme Court clarified the issue in the *Bermel* case. 440 P.3d 1150.  That decision (particularly Footnote No. 6) confirms that intentional torts depend on duties independent of contract and thus are not barred by the economic loss rule.  *Id.* at 1154 n.6.

However, even if the economic loss rule was not inapplicable *per se*, the Court would still find that Mr. Bloom failed to establish a viable economic loss rule defense. Glencove did not enter into a contract with Mr. Bloom.  He was not a party to the Agent Agreement, the Glencove PSA, or the Management Services Agreement.  Glencove has not asserted any breach of contract claim against Mr. Bloom.  Instead, Glencove asserts that Mr. Bloom made the False Representations and hid the Concealed Facts all in an effort to induce Glencove to enter into and close the Glencove PSA and purchase the Airplane for $250,000 more than demanded by the seller, Loretto Aviation,

through the mechanism of concealed back-to-back transactions.[201]  Thus, the False Representations and Concealed Facts all involve pre-contractual conduct vis-à-vis the Glencove PSA.  Pre-contractual fraud generally arises independent of the contract.  *See Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 607 (Colo. 2016) (plaintiff's "tort claims are based upon misrepresentations made prior to the formation of the contracts . . . . [so] are not barred by the economic loss rule); *United Int'l Holdings*, at 1227 (referring to "representations made in the course of contractual negotiations"); *Mcwhinney*, 2019 WL 9467529, at *2 (recognizing "the distinction between pre-contractual and post-contractual conduct"); *Hamon Contractors*, 229 P.3d at 289 (stating economic loss rule applies to "post-contractual conduct").

The Court also finds that the tort duties implicated in this dispute arose independent of any contractual duty under the Glencove PSA for several reasons.  First, as already determined, Mr. Bloom was an agent of Glencove and had fiduciary duties for the benefit of Glencove.  *See Stortroen*, 736 P. 2d at 395; RESTATEMENT (THIRD) OF AGENCY § 13 (ALI 2006) ("Agency is [a] fiduciary relationship.").  Mr. Bloom's agency fiduciary duties required him: to act loyally to Glencove; to refrain from self-interest; to refrain from representing any party adverse to Glencove; to refrain from competing against Glencove; to act with care, competence, and diligence; to act reasonably and refrain from conduct likely to damage Glencove; and to provide relevant facts to Glencove.  RESTATEMENT (THIRD) OF AGENCY §§ 8.01, 8.02, 8.03, 8.04, 8.08, 8.10 and 8.11 (ALI 2006).  All of these duties arose because of a "special relationship" outside of contract.  Under the *Town of Alma* decision, the "special relationship" in an exception to the economic loss rule in the same way as the attorney-client relationship, the physician-patient relationship, and similar relationships.  So, tort claims against Mr. Bloom as a fiduciary are not foreclosed by any contract in the same way that legal and medical malpractice claims are not foreclosed by attorney-client and physician-patient contracts.

Furthermore, Mr. Bloom's duty not to commit fraud (*i.e.*, not to lie and hide relevant information) arose independent of any contract.  As already demonstrated by the Court's determinations that Mr. Bloom is liable for fraud by false representation and fraudulent concealment, such conclusions did not depend for their existence on any breach of contract.  In fact, the Court has not decided that BBJ breached the Agent Agreement or the Management Services Agreement nor that Big Horn Exploration breached the Glencove PSA.  Finally, none of the contracts (the Agent Agreement, Glencove PSA, or Management Services Agreement) expressly addresses the core duties at issue (*i.e.*, not to lie and hide relevant information).  So, in sum, even if intentional torts fell within the scope of the economic loss rule, the Court decides that Mr. Bloom failed to prove the requirements for the defense.

---

[201]     Mr. Bloom fixes on the Agent Agreement instead.  However, that is misdirection.  Glencove does not suggest that Mr. Bloom made false representations or fraudulently concealed facts to induce Glencove to enter into the Agent Agreement with BBJ.  Instead, Glencove's focus is on the fraudulently induced Glencove PSA.

### b.   The Piercing the Corporate Veil Argument Fails.

Post-trial, Mr. Bloom presented a "piercing the corporate veil argument."  He contends:

> Glencove failed to meet its burden of proof at trial to establish that the corporate veil of [BBJ] should be pierced. Absent meeting the high burden required to pierce, Mr. Bloom cannot be held individually liable for the actions of either BBJ or [Big Horn Exploration].[202]

Furthermore, Mr. Bloom suggested that he met his duty of "good faith and fair dealing" in the performance of his work for BBJ and Big Horn Exploration, his wholly-owned limited liability companies.[203]  As part of the same argument, Mr. Bloom also analyzes various legal duties pertaining to "insurance contracts."[204]

Although Mr. Bloom's presentation on piercing the corporate veil was lengthy, the Court summarily rejects it.  Glencove did not allege a cause of action for piercing the corporate veil of either BBJ or of Big Horn Exploration in the Glencove Claim or the Complaint.  Thus, it is not necessary for this Court to adjudicate such claim and the Court need not (and may not) adjudicate the liability of either BBJ or Big Horn Exploration, because neither is a party to this dispute.

The fraud by false representation and fraudulent concealment claims against Mr. Bloom are direct claims against him (not BBJ or Big Horn Exploration) for his own conduct.  He is the only person who made the multiple False Representations to Glencove.  He also fraudulently concealed the myriad of Concealed Facts from Glencove.  So, while the Court suspects that both BBJ and Big Horn Exploration are culpable as well, the Court's decision only addresses Mr. Bloom's direct liability.  The other sub-components of Mr. Bloom's alter ego argument (*i.e.,* (1) that Mr. Bloom met his duties of "good faith and fair dealing" to BBJ and Big Horn Exploration; and (2) legal principles governing insurance contracts should be applied) fall very wide of the mark.  Perhaps BBJ and Big Horn Exploration have claims against Mr. Bloom for his misconduct even though he owns the entities; but that is of no current moment in this dispute.  And, neither the Glencove Claim nor the Complaint involves insurance contracts.  So, it is all much ado about nothing.

### 5.   The Glencove Claim Is Allowed.

Glencove met its burden to prove the validity of the Glencove Claim based upon fraud by false representation and fraudulent concealment.  Mr. Bloom failed to establish any viable defenses.  Accordingly, the Glencove Claim is allowed as a general

---

[202]   Docket No. 75 in Adversary Proceeding at 3-8.
[203]   *Id.* at 5-6.
[204]   *Id.* at 6-8.

unsecured claim against Mr. Bloom in the amount of $458,470, plus post-judgment interest at the Colorado statutory post-judgment interest rate pursuant to COLO. REV. STAT. § 5-12-102(4) (the "Debt"). The issue of attorneys' fees and costs is reserved. Accordingly, the Court shall enter a separate Judgment allowing the Glencove Claim.

## C.   The Debt Evidenced by the Glencove Claim is Nondischargeable under Section 523(a).

In its Complaint in the Adversary Proceeding, Glencove alleged that the Debt evidenced by the Glencove Claim is nondischargeable under Section 523(a)(2)(A) because the Debt is for money "obtained by false pretenses, a false representation, or actual fraud." Compl. ¶ 36. Additionally, Glencove asserted that such Debt also is nondischargeable as "willful and malicious injury" under Section 523(a)(6).

### 1.   The General Framework for Dischargeability Determinations.

Section 523(a) nondischargeability claims all require a two-part analysis. First, "the bankruptcy court must determine the validity of the debt under applicable law." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016); *see also Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. BAP 2003) (if the alleged debt is for fraud, "state law of fraud controls with respect to whether fraud has occurred"). This is referred to as the "claim on the debt" component. *Thompson*, 555 B.R. at 8. Second, if there is a valid debt, "the bankruptcy court must determine the dischargeability of that debt under Section 523." *Id.*; *see also Lang*, 293 B.R. at 513 ("bankruptcy law controls with respect to the determination of nondischargeability"). This is referred to as the "dischargeability" component. *Thompson*, 555 B.R. at 8. In the context of claims based upon fraud and fraudulent concealment, there may be substantial overlap between the "claim on the debt" and the "dischargeability" components.

### 2.   Glencove Established the "Claim on the Debt" Because the Court Allowed the Glencove Claim.

The first part of the dischargeability analysis starts with the Court deciding whether there is a valid debt. *Thompson*, 555 B.R. at 8. The term "debt" is defined in Section 101(12) as "liability on a claim." And, under Section 101(5), a "claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5)(A).

As set forth above, the Court considered the Glencove Claim and entered judgment in favor of Glencove and against Mr. Bloom for fraud and fraudulent concealment under Colorado state law thereby allowing the Glencove Claim in the amount of $458,470 on the basis of fraud and fraudulent concealment plus reserving the issue of additional attorneys' fees and costs. Thus, by virtue of proving up the Glencove Claim, Glencove established the existence of the Debt and met the "claim on the debt" component of Section 523(a). The second part of the dischargeability analysis

requires the Court to decide whether the Debt is nondischargeable as a matter of federal bankruptcy law under Section 523(a).

### 3. Glencove Met Its Burden to Prove Nondischargeability of the Debt Under Section 523(a)(2)(A).

Glencove's first nondischargeability claim is under Section 523(a)(2)(A) which states:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt — . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — (A) *false pretenses, a false representation, or actual fraud,* other than a statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C. § 523(a)(2)(A) (emphasis added).  Thus, there are three sub-types of Section 523(a)(2)(A) causes of action: a false representation, false pretenses, or actual fraud.

### a. The Debt is Nondischargeable Since It Stems From False Representations.

Although Glencove has parroted the statutory phrase "false pretenses, a false representation, or actual fraud,"[205] Glencove appears to focus on the "false representation" part of Section 523(a)(2)(A).  Glencove repeatedly refers to "false representations and/or material omissions."[206]  To establish a Section 523(a)(2)(A) "false representation" claim, Glencove must demonstrate the following elements by a preponderance of the evidence:

> (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was [justifiable][207]; and (5) the false representation resulted in damages to the creditor.

*Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *see also Riebesell*, 586 F.3d at 789.

---

[205]     Compl. ¶ 36.
[206]     Compl. ¶¶ 37-40.
[207]     In *Fowler Brothers*, 91 F.3d at 1373, the Tenth Circuit states that the reliance must be "reasonable."  However, that does not mean "'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's representation."  *Riebesell*, 586 F.3d at 791. Instead, under *Field v. Mans*, 516 U.S. 59, 74-75 (1995), the reliance must be "justifiable."

The elements required to establish a Section 523(a)(2)(A) fraud claim are virtually the same as the elements required for establishing a cause of action for fraud by false representation under Colorado state law. *Compare Fowler Brothers*, 91 F.3d at 1373 (listing Section 523(a)(2)(A) elements) with *Kinsey*, 746 P.2d at 550 (listing of Colorado state law elements for fraud by false representation). In fact, most courts construe the requirements for Colorado common law fraud and fraudulent representation under Section 523(a)(2)(A) identically. *See Nier v. Hansen (In re Hansen)*, 131 B.R. 167 (D. Colo. 1991), *aff'd*, 977 F.2d 595 (10th Cir. 1992) (Table) ("The requirements to prove common law fraud in Colorado are the same as the elements to establish non-dischargeability under § 523 and need not be repeated . . . ."); *Nw. Nat'l Ins. Co. v. Barnhart (In re Barnhart)*, 112 B.R. 392, 394 (D. Colo. 1990) ("the elements for a finding of common law fraud under Colorado law are the same as those under federal law [Section 523(a)(2)(A)]").

But there is a minor difference. Most, but not all Colorado decisions, require that the creditor "reasonably rely" on the actionable false representations. *Bristol Bay*, 312 P.3d at 1160 (referring to "reasonable reliance"); *Fasing*, 944 P.2d at 612 (same); *but see Frontier Expl.*, 849 P.2d at 891 ("false representation requires . . . justifiable reliance"). Section 523(a)(2)(A), however, requires "justifiable reliance." *Field*, 516 U.S. at 61.

These standards are slightly different. Reasonable reliance is an objective standard based upon whether a reasonable person would have relied on the alleged false representations. Justifiable reliance is a "less demanding [standard]" than reasonable reliance. *Id.*; *see also* Richard Levin and Henry J. Sommer, 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][d] (Matthew Bender 16th ed. Supp. 2020) (justifiable reliance is "a less exacting standard" than reasonable reliance). Instead of an objective standard, justifiable reliance is a subjective standard that focuses on the "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases." *Riebesell*, 586 F.3d at 792; *see also Wharton v. Flanagan (In re Flanagan)*, 2014 WL 3932647, at *7 (Bankr. D. Colo. 2014) (noting difference between "reasonable reliance" and "justifiable reliance"). Justifiable reliance requires "the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it." *Riebesell*, 586 F.3d at 792.

The Court has already determined that Glencove reasonably relied on Mr. Bloom's False Representations. Since justifiable reliance is a lower standard than reasonable reliance, that should end the inquiry. However, for good measure, the Court also concludes that Glencove justifiably relied on Mr. Bloom's False Representations. Glencove's reliance was justifiable because the Pierces had no experience or knowledge concerning aircraft acquisitions. Instead, they turned to professionals to assist them: first to Mr. Vesslee, then to Mr. Orman, the principal of Aircraft Finance Corporation, and, ultimately, to Mr. Bloom. Mr. Orman, who was assisting the Pierces in obtaining financing to purchase an aircraft, recommended Mr. Bloom to the Pierces. The Pierces vetted Mr. Bloom by reviewing the promotional materials for his company,

BBJ, and by meeting in person with Mr. Bloom.  His credentials appeared solid.  Indeed, Mr. Bloom had been engaged in the aircraft industry for his entire career in various capacities, including in transactions for the sales of personal aircraft.  Mr. Bloom convinced Glencove that he would act on Glencove's behalf by his words and actions. Both of the Pierces credibly testified that they relied on Mr. Bloom and believed that he would act in the best interests of Glencove.  Glencove examined the facts it was provided during the process.  But, it was not readily apparent that any of the False Representations were untrue when they were made.  *Field*, 516 U.S. at 70-71 (citing examples that reliance can be justifiable without an investigation if there are no red flags).  Based on these facts (and the other facts identified in reaching the Court's decision on reasonable reliance), the Court finds that Glencove justifiably relied on Mr. Bloom.

The remaining elements of a Section 523(a)(2)(A) claim mirror those of common law fraud by false representation under Colorado law.  Because the Court already analyzed such elements under Colorado law, the Court will not repeat such conclusions. Instead, the Court incorporates its prior analysis and determinations.  Accordingly, Glencove has met its burden to prove that the Debt owed to it is nondischargeable under the false representation component of Section 523(a)(2)(A).

### b.   The Debt is Nondischargeable Since It Stems From False Pretenses.

Glencove also asserts that the Debt is nondischargeable under the "false pretenses" part of Section 523(a)(2)(A).  The statutory phrase "false pretenses"  is defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."  *Munoz*, 536 B.R. at 884 n.12; *see also FIA Card Services, N.A. v. Quinn (In re Quinn),* 492 B.R. 341, 345 (Bankr. N.D. Ga. 2013) ("False pretenses is defined as '[A] series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.'").  False pretenses claims require intentional misconduct by the debtor.

The Court already determined that Mr. Bloom engaged in a pattern of fraud by making the False Representations and hiding the Concealed Facts.  His fraudulent conduct extended over a substantial period of time (primarily from August 11, 2015 when Mr. Bloom received and hid the Loretto Aviation Counteroffer through September 29, 2015 when the purchase of the Airplane closed).  Mr. Bloom executed the fraud through various means including e-mails, exchanges of documents, and telephone calls.  Considered collectively, the Court's findings of fact concerning the False Representations and Concealed Facts prove beyond peradventure that Mr. Bloom created a false and misleading set of circumstances as well as a false and misleading understanding of the aircraft acquisition transaction.  He hid the entire back-to-back nature of the fraud.  The Court already found, and reiterates, that Mr. Bloom's

71

misconduct was intentional, designed for his own pecuniary interests and that of his professional colleagues.  Furthermore, Glencove was wrongfully induced by Mr. Bloom to transfer property including: $250,000 for the improper "upcharge" paid to Big Horn Exploration and distributed to BBJ, Brad L. Rose and Aircraft Finance Corporation; $120,000 for the "AGENT'S FEE" paid to BBJ; $2,500 for a portion of the origination fee paid to Aircraft Finance Corporation for the Loan; $211 for a portion of the lender fee paid to TruStone Financial for the Loan; and $55,812 in extra interest paid on a $250,000 portion of the Loan.  Glencove has suffered the loss of $29,947 for the cost of the maintenance and repair items identified in the Original Work Order which were not performed as a consequence of Mr. Bloom's fraud.  The foregoing, coupled with the Court's other findings of fact, dictates that the Debt is nondischargeable under the "false pretenses" component of Section 523(a)(2)(A).

### c.   The Debt is Nondischargeable Since It Stems From Actual Fraud.

Glencove also asserts that the Debt is nondischargeable for "actual fraud" under Section 523(a)(2)(A).  Recently, the United States Supreme Court defined the parameters of the "actual fraud" part of Section 523(a)(2)(A).  In *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016), the Supreme Court stated:

> "Actual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that "involv[es] moral turpitude or intentional wrong."  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or morality."  Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id.* at 1586 (citations omitted).  The term "fraud" does not lend to a single and simple definition:

> Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely.  *See* 1 J. Story, Commentaries on Equity Jurisprudence § 189, p. 221 (6th ed. 1853) (Story) ("Fraud ... being so various in its nature, and so extensive in its application to human concerns, it would be difficult to enumerate all the instances in which Courts of Equity will grant relief under this head"). There is no need to adopt a definition for all times and all circumstances here . . . .

*Id.* at 1586-87.

This Court already made extensive findings of fact regarding the False Representations Mr. Bloom made to Glencove and the critical Concealed Facts which he hid from it.  The Court's findings lead to no other conclusion than that Mr. Bloom engaged in a very brazen fraudulent scheme certain to damage Glencove.  The fraud he perpetrated involved moral turpitude and intentional wrong.  What Mr. Bloom did was deception and trickery in its most devious form.  Indeed, Mr. Bloom's actions were the very archtype of actual fraud.  As a result, Glencove met its burden to prove that the Debt is nondischargeable by reason of actual fraud under Section 523(a)(2)(A).

### d.   Extent of Section 523(a)(2)(A) Nondischargeability under *de la Cruz*.

Mr. Bloom has posited various arguments seeking to limit the extent of any debt to be excepted from his discharge only to moneys directly received by Mr. Bloom.[208] His position must be rejected.  The United States Supreme Court's binding decision in the *de la Cruz* case, 523 U.S. 213, is dispositive on the issue.  In rejecting the debtor's similar argument trying to limit the amount of a debt to be excepted from discharge, the Supreme Court ruled:

> The conclusion that § 523(a)(2)(A) bars the discharge of all liability arising from fraud is further borne out by the implications of petitioner's alternative construction.  The various exceptions to discharge in § 523(a) reflect a conclusion on the part of Congress "that the creditors' interest in recovering full payment of debts in these categories outweigh[s] the debtors' interest in a complete fresh start."  But if, as petitioner would have it, the fraud exception only barred discharge of the value of any money, property, etc., fraudulently obtained by the debtor, the objective of ensuring full recovery by the creditor would be ill served.  Limiting the exception to the value of the money or property fraudulently obtained by the debtor could prevent even a compensatory recovery for losses occasioned by fraud.

*de la Cruz*, 523 U.S. at 222.  The Supreme Court offered two examples:

> For instance, if a debtor fraudulently represents that he will use a certain grade of shingles to roof a house and is paid accordingly, the cost of repairing any resulting water damage to the house could far exceed the payment to the debtor to install the shingles.   The United States . . . posits another example along these lines, involving "a debtor who fraudulently represents to aircraft manufacturers that his

---

[208]    For example, Mr. Bloom contended: "Glencove fails to prove that Mr. Bloom received the benefits of the property."  Docket No. 50 in Adversary Proceeding at 10.

> steel bolts are aircraft quality [and] obtains sales of $5,000"
> for the bolts, but "the fraud causes a multi-million dollar
> airplane to crash."

*Id.* In the end, the objective of Section 523(a) is to make the creditor whole if fraud is proved. So, the debt to be excepted from discharge extends to all liability arising from fraud, including direct and consequential damages, exemplary damages, and costs and attorneys' fees all of which may exceed the value obtained by the debtor. *Id.* at 223; *see also Munoz,* 536 B.R. at 883*; Nat'l Dev. Servs., Inc. v. Denbleyker (In re Denbleyker),* 251 B.R. 891, 898-99 (Bankr. D. Colo. 2000) ("any debt arising from the fraud is excepted from discharge). Accordingly, the entire Debt is nondischargeable including the improper $250,000 "upcharge" plus all the other associated damages flowing from the fraud.

### 4. **Glencove Met Its Burden to Prove Nondischargeability of the Debt Under Section 523(a)(6).**

Glencove also asserts that the debt owed to it is nondischargeable under Section 523(a)(6). Section 523(a)(6) provides succinctly for the nondischargeability of any debt

> . . . for willful and malicious injury by the debtor to another
> entity or to the property of another entity.

As the text of the statute makes plain, nondischargeability under Section 523(a)(6) requires both a "willful injury" and a "malicious injury." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both*, an objection to discharge [under Section 523(a)(6)] must fail."). Stated differently, Section 523(a)(6) "requires proof of two distinct elements — the injury must be both 'willful' *and* 'malicious.' Analyzing and applying 'willful' and 'malicious' separately is the better approach." *First Am. Title Ins. Co. v. Smith (In re Smith)*, ___ B.R. ___, 2020 WL 4783895, at *5 (10th Cir. BAP Aug. 18, 2020).

Section 523(a)(6) is not some sort of catch-all that trumps the requirements of other nondischargeability provisions like Section 523(a)(2)(A). So, the Court must be cognizant of the interplay between various parts of Section 523(a). That said, there is potential overlap. The United States Supreme Court put it this way:

> . . . the debtors who make false representations under
> § 523(a)(2)(A) could likewise also inflict "willful and malicious
> injury" under § 523(a)(6). There is, in short, overlap but that
> overlap appears inevitable.

*Husky Int'l*, 136 S. Ct. at 1588; *see also* Richard Levin and Henry J. Sommer, 4 COLLIER ON BANKRUPTCY ¶ 523.12[1] (Matthew Bender 16th ed. Supp. 2020) ("debts procured by fraud may be nondischargeable under section 523(a)(6) as arising from conduct causing willful and malicious injury"). On the other hand, not every false representation

satisfying Section 523(a)(2)(A) requirements may rise to the level of "willful and malicious injury" under Section 523(a)(6). *See Panalis*, 357 F.3d at 1129 ("intent to deceive is far from an intent to willfully and maliciously physically injure [plaintiff]"). As explained below, this is one of those cases in which the same operative facts proving the debtor's egregious and intentional conduct overlaps and satisfies the requirements of both Sections 523(a)(2)(A) and (a)(6).

### a. Mr. Bloom Committed Willful Injury.

According to the United States Supreme Court, to satisfy the willful injury part of Section 523(a)(6), Glencove must prove "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in the original). So the focus is whether the debtor acted with the "actual intent to cause injury." *Id.* "Willful" injury is a higher standard than "'reckless' or 'negligent'" injury. *Id.* Thus, "debts arising [merely] from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64. Explaining further, the Supreme Court observed that:

> [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require the actor to intend "the *consequences* of an act," not simply "the act itself."

*Id.* at 61-62 (emphasis in original). To establish a willful injury, a creditor may use "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or [ ] indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur." *Smith*, 2020 WL 4783895, at *5; *see also Panalis*, 357 F.3d at 1129 ("to constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it.'"); *Cocoma v. Nigam (In re Nigam)*, 780 Fed. Appx. 559, 563 (10th Cir. 2019) (unpublished table decision) (reaffirming *Panalis* formulation of willful injury); *Via Christi Regional Medical Center v. Englehart (In re Englehart)*, 229 F.3d 1163 (10th Cir. 2000) (unpublished) ("§ 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur.") It is a subjective standard. *Smith*, 2020 WL 4783895, at *5.

The evidence establishes that Mr. Bloom willfully injured Glencove and Glencove's property. Mr. Bloom intended that his conduct would cause consequences and a particularized injury to Glencove: an improper overcharge of $250,000 and associated damages. He desired to cause that injury and knew it would occur (or, at a minimum, that it was substantially certain to occur). After all, Mr. Bloom depended on that specific injury (*i.e.,* taking $250,000 from Glencove) to enrich himself and his close professional colleagues. In fact, taking property from Glencove and injuring Glencove was the very essence or *raison d'etre* of the back-to-back scheme. Mr. Bloom's

extensive efforts to conceal what he did (including through the use of Big Horn Exploration) further show that he knew that his conduct was wrongful.

### b.    Mr. Bloom Committed a Malicious Injury.

The standard for "malicious" injury is different than "willful" injury.  Something else is required.  But what?  The exact formulation is a little confusing.  In *Panalis,* the Tenth Circuit relied on other appellate precedent concluding that "the term 'malicious' requires proof 'that the debtor either intend[ed] the resulting injury or intentionally [took] action that [was] substantially certain to cause injury.'"  *Panalis*, 357 F.3d at 1129 (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).  That standard sounds strikingly similar to "willful" injury.  However, since it has been endorsed by the Tenth Circuit, subordinate courts within the Tenth Circuit regularly use that formulation.  *See Diamond v. Vickery (In re Vickery)*, 526 B.R. 872, 880 (D. Colo. 2015) (relying on *Panalis* to define "malicious" injury).

Very recently, the United States Bankruptcy Appellate Panel for the Tenth Circuit (the "Tenth Circuit BAP") clarified the meaning of "malicious" injury.  The Tenth Circuit BAP characterized the *Panalis* definition of the term "malicious" injury as non-binding dicta.  *Smith*, 2020 WL 4783895, at *9 ("That definition [in *Panalis*] of malicious was not necessary to the Tenth Circuit's decision . . . and is dicta . . . we are not bound by dicta.").  Further, the Tenth Circuit BAP implied that the *Panalis* formulation also was mistaken.  *Id.* at *4 (in *Panalis*, the Tenth Circuit "defined 'willful' and then quoted an Eleventh Circuit case for a definition of 'malicious' that comes from that court's definition of 'willful.'"); *see also id.* at n.106 (explaining further).  Accordingly, the Tenth Circuit BAP suggested resort to an earlier Tenth Circuit decision: *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524 (10th Cir. 1993).  Per the Tenth Circuit BAP, the definition of "malicious" injury adopted in *Pasek* means that the debtor's conduct must be wrongful and without just cause or excuse.  The appellate panel explained in more detail:

> For an injury to be "malicious," "evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite 'malice' in addition to 'willfulness' is present."  [A]ll the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-à-vis the actual injury caused the creditor . . . [T]he malicious element [requires] an act taken in conscious disregard of one's duties and without just cause or excuse, even in the absence of personal hatred, spite or ill-will, or wrongful and without just cause or excuse.

*Smith*, 2020 WL 4783895, at *10 (citations and quotations omitted).  So, malice can be shown if the injury was wrongful and inflicted "without just cause or excuse."  *Wagner v. Wagner (In re Wagner)*, 492 B.R. 43, 55 (Bankr. D. Colo. 2014), *aff'd*, 527 B.R. 416 (10th Cir. BAP 2015); *Steward Software Co., LLC v. Kopcho (In re Kopcho)*, 2014 WL 3933657, at *6 (Bankr. D. Colo. Aug. 12, 2014) (same).

Where does all this leave the "malicious" injury inquiry in this Adversary Proceeding?  The Court is quite reluctant to characterize the definition of "malicious" endorsed in *Panalis* as mere dicta.  And, it is most certainly not the Court's purview to suggest that the *Panalis* formulation was incorrect.  However, whether the Court follows the *Panalis* or *Smith* approaches, the final result is the same: Mr. Bloom committed malicious injury.

Applying the *Panalis* approach to malicious injury, Mr. Bloom committed malicious injury because he intended that his conduct would cause injury to Glencove.  He desired to cause that injury and knew it would occur.  He depended on that specific injury (*i.e.,* taking $250,000 from Glencove) to enrich himself and his close professional colleagues.  That is why Mr. Bloom structured the back-to-back transactions in the first place.  So, his conduct was malicious.

Applying the *Smith* understanding of malicious injury, the Court has considered the totality of the circumstances.  Mr. Bloom committed malicious injury because his conduct was wrongful and without just cause or excuse.  Cheating his client, Glencove, out of $250,000 and causing it other associated damages was an act of moral turpitude and malice.  He knowingly and consciously violated his duties to Glencove, including his fiduciary duties.  He also violated industry standards.  He lied again, and again, and again to make more money.  Perhaps he did not have any personal hatred of Glencove and the Pierces while he deceived them and took their money, but there is no evidence of any "just cause or excuse" for Mr. Bloom's misconduct.  Thus, Glencove satisfied its burden to establish nondischargeability under Section 523(a)(6) by virtue of willful and malicious injury.  *See Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 687-88 (10th Cir. BAP 2006) (affirming Section 523(a)(6) judgment based upon the debtors' "diversion of more than $200,000 in accounts receivable").

### c.    Extent of Nondischargeability under Section 523(a)(6).

In terms of the amount of debt to be determined nondischargeable under Section 523(a)(6), Mr. Bloom seems to suggest that the debt should be limited to only the "willful and malicious injury" he intended to inflict upon Glencove, which in this case is the $250,000 difference between the actual purchase price of the Aircraft and the price he represented to the Pierces.  There is some allure to this position, since injuries within the scope of Section 523(a)(6) are limited and "must be desired and in fact anticipated by the debtor."  *Hernandez v. Musgrave (In re Musgrave)*, 2011 WL 312883, at *11 (10th Cir. BAP Feb. 2, 2011) (unpublished).  Certainly, it is clear that Mr. Bloom desired to rob Glencove of $250,000.  That much is clear.  Beyond that the evidence is more ambiguous whether Mr. Bloom desired to cause specific additional damages such as additional interest on the Loan, the lender fee for the Loan, the origination fee for the

Loan, the unperformed airworthy discrepancy repairs, and the "AGENT'S FEE" paid to BBJ.  But, as set forth above, Glencove *did* suffer those additional damages which are awardable under Colorado state law.

But the question is whether all the foregoing damages should be determined to be nondischargeable under Section 523(a)(6).  Although this is a difficult question, the United States Supreme Court's decision in *de la Cruz*, 523 U.S. 213, provides the answer.  The *de la Cruz* case involved a Section 523(a)(2)(A) nondischargeability claim.  However, the import of the decision is broader and applies more generally to Section 523(a) claims.  That is because the Supreme Court engaged in a statutory interpretation exercise focusing on the meaning of the phrase: "debt for."  That phrase is used in both Section 523(a)(2)(A) and Section 523(a)(6).  The Supreme Court likened "debt for" to "any debt 'respecting'" or "any debt 'arising from.'"  *Id.* at 218.  To bolster its analysis, the Supreme Court examined all the subsections of Section 523(a) that use the phrase "debt for" including the "willful and malicious injury" statute now located in Section 523(a)(6).  The Supreme Court concluded that the term "debt for" in the other parts of Section 523(a) means "debt arising from" or "debt on account of."  *Id.* at 219-20.  Ultimately, the holding of *de la Cruz* is:

> . . . . the text of Section 523(a)(2)(A), the meaning of parallel provisions in the statute [including Section 523(a)(6)], the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that 'any debt . . . for money, property, services, or credit, to the extent obtained by fraud' encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.

*Id.* at 223.

The *de la Cruz* rationale and reasoning applies equally to nondischargeability claims under Section 523(a)(6) and dictates that nondischargeability is not limited only to the $250,000 overcharge that Mr. Bloom took from Glencove.  Instead, it extends to all damages under state law arising from, respecting, or on account of the willful and malicious injury.  Indeed, every reported decision the Court has located on the topic confirms that the *de la Cruz* approach applies to actions under Section 523(a)(6).  *Murphy v. Spencer (In re Spencer)*, 2016 WL 1556033, at *3 (Bankr. D.N.M. Apr. 14, 2016) ("The holding and reasoning of *Cohen* applies to actions under § 523(a)(6)."); *McCallum v. Pixley (In re Pixley)*, 504 B.R. 852, 870 (Bankr. E.D. Mich. 2014) (applying *de la Cruz* to Section 523(a)(6) claims; *Suarez v. Barrett (In re Suarez)*, 400 B.R. 732, 738-39 (9th Cir. BAP 2009), *aff'd*, 529 Fed. Appx. 832 (9th Cir. 2013) (same); *Direct TV, Inc. v. Karpinsky (In re Karpinsky)*, 328 B.R. 516, 527-28 (Bankr. E.D. Mich. 2005); *Adamo v. Scheller (In re Scheller)*, 265 B.R. 39, 55 (Bankr. S.D.N.Y. 2001) ("In *de la Cruz*, the Supreme Court read Section 523(a)(2)(A) *in pari materia with* . . . Section

523(a)(6).").  And, closer to home, in *Nolan v. Smith (In re Smith),* 321 B.R. 542 (Bankr. D. Colo. 2005), the Colorado bankruptcy court also weighed in and determined that the *de la Cruz* "reasoning and conclusion should apply" under Section 523(a)(6).  *Id.* at 548 (determining that attorneys' fees flowing from debts found to be nondischargeable under Section 523(a)(6) are themselves nondischargeable).

The purpose of Section 523(a)(6) is to make the creditor whole if "willful and malicious injury" is proved.  Thus, the debt to be excepted from discharge extends to all liability under state law, including direct and consequential damages, exemplary damages, and costs and attorneys' fees all of which may exceed the value obtained by the debtor so long as the debt arises from, respects, or is on account of the willful and malicious injury.  Under this standard, the $250,000 debt Mr. Bloom owes to Glencove under Colorado state law for the improper "upcharge;" $120,000 for the "AGENT'S FEE;" $2,500 for the portion of the origination fee paid for the Loan that is attributable to the $250,000 upcharge; the $211 portion of the lender fee for the Loan that corresponds with the upcharge; $55,812 in extra interest paid on the Loan; and $29,947 for maintenance and repair items not performed.  The entirety of this debt is nondischargeable under Section 523(a)(6).

## VI.    **Final Decision and Judgment.**

For the reasons set forth above, the Court:

DETERMINES that the Glencove Claim is allowed as a general unsecured claim against Mr. Bloom in the amount of $458,470, plus post-judgment interest at the Colorado judgment rate pursuant to COLO. REV. STAT. § 5-12-102(4).

DETERMINES that the allowed Glencove Claim is fully nondischargeable under both Sections 523(a)(2)(A) and (a)(6).

FURTHER ORDERS that in the event that Glencove, as the prevailing party, wishes to pursue attorneys' fees and costs against Mr. Bloom, Glencove shall submit a Motion for Attorneys' Fees and Costs within 14 days from the date of this Memorandum Opinion After Trial.  Additionally, in the event that Glencove, as prevailing party wishes to pursue its costs pursuant to Fed. R. Bankr. P. 7054(b)(1), it shall submit its Bill of Costs to the Clerk of the Court within 14 days from the date of this Memorandum Opinion After Trial.

DATED this 10th day of September, 2020.

BY THE COURT:

*Thomas B. McNamara*

Thomas B. McNamara
United States Bankruptcy Judge